**In re: THE PRUDENTIAL INSURANCE COMPANY OF AMERICA SALES PRACTICES LITIGATION.**

**No. MDL 1061.**
**Civil Action No. 95–4704.**

United States District Court,
D. New Jersey.

March 17, 1997.

(Appearances of counsel are listed in Appendix A)

*OPINION*
TABLE OF CONTENTS

VOLUME 1

Page

INTRODUCTION ....................................................467

FINDINGS OF FACT ................................................468

I. The Plaintiffs, the Defendants, the Objectors, and Various State Insurance
Representatives Participated in These Proceedings ...........................468
 A. The Class Includes All Persons or Entities Who Owned Certain Life
 Insurance Products During the Class Period ............................468
 B. The Plaintiff Representatives Are Typical Victims of Prudential's Decep-
 tive Sales Practices During the Class Period ...........................469
 1. Carol Nicholson Was Victimized by Churning, Vanishing Premium
 Tactics, and Investment Plan Tactics ...............................469
 2. Martin Dorfner Was Victimized by Churning and Vanishing
 Premium Tactics ...............................................470
 3. Vincent and Elizabeth Kuchas Were Victimized by Churning and
 Investment Plan Tactics ........................................471
 4. Norman Gassman Was Victimized by Vanishing Premium and
 Investment Plan Tactics ........................................472
 C. The Court Has Granted the Requests of Several Class Members to
 Intervene .......................................................472

D. Plaintiffs Sued Prudential, a Mutual Life Insurance Company and One of the Largest Life Insurance Companies in the Country ..................... 472
E. Plaintiffs Have Also Sued Several Individual Defendants Who Were Upper Echelon Prudential Managers .................................... 473
F. Several State Government Representatives Have Contributed to These Proceedings .......................................................... 473

II. Plaintiffs Allege that Prudential Conducted a Scheme to Deceive Policyholders into Buying Prudential Life Insurance Products ................... 473
A. Prudential Used a Deceptive Sales Practice Called "Churning" to Sell Policyholders Replacement Policies ...................................... 474
B. Prudential Misstated that the Premiums on Its Life Insurance Products, Including Abbreviated Payment Plan Policies, Would Vanish ................ 476
C. Prudential Fraudulently Marketed Its Insurance Policies as Investment Vehicles .............................................................. 476
D. Prudential and the Individual Defendants Knew About the Fraudulent Marketing Scheme ..................................................... 477
E. Plaintiffs Allege Federal and State Causes of Action to Challenge Prudential's Deceptive Sales Practices ................................... 478

III. Background ................................................................ 478
A. Plaintiffs Sued Prudential Throughout the Country Concerning Prudential's Deceptive Sales Practice and the Judicial Panel on Multi–District Litigation Consolidated the Actions and Transferred them to this Court ..... 478
B. The New Jersey Insurance Commissioner Led Insurance Regulators Throughout the Country to Form a Task Force .......................... 480
C. Connecticut Conducted its Own Investigation and Produced an Independent Report ..................................................... 480
D. Plaintiffs Organized and the Court Approved a Consolidated Team to Prosecute the Prudential Fraudulent Sales Practices Actions ............... 481
E. Plaintiffs Conducted Both Formal and Informal Discovery to Obtain Information Relating to Prudential's Alleged Fraudulent Sales Practices ..... 481
F. Plaintiffs Rebuffed Prudential's Early Settlement Overtures While Discovery and Motion Practice Continued ............................... 482
G. Motion Practice Continued and Plaintiffs Pursued Informal Discovery ....... 483
H. The Court Dismissed Many of the Claims in Plaintiffs' First Amended Complaint ............................................................. 483
I. The Task Force Found that Prudential Had Committed Widespread Sales Practice Abuse, Fined Prudential $35 Million, and Released the Task Force Plan ......................................................... 484
J. The MDL Panel Continued to Transfer Actions to this Court and Some Individual Plaintiffs Filed a Consolidated Motion to Remand ............... 485
K. While Class Counsel Continued to Pursue Discovery and to Amend the Complaint, Prudential Counsel and Class Counsel Resumed Settlement Negotiations, Which Resulted in the Settlement Agreement and Later in the Stipulation of Settlement .......................................... 485
L. The Court Ordered Conditional Certification of the Class and that the Parties Mail Class Members Notice of the Proposed Settlement ............. 487

IV. Stipulation of Settlement Terms .......................................... 488
A. The Proposed Settlement Provides an Alternative Dispute Resolution Process Through Which Policyholders May Obtain Full Remediation ..... 488
 1. The ADR Procedures Cast a Wide Net to Gather Evidence Relevant to Class Members' Claims ................................ 488
 2. The ADR Process Contains Specific Claim Evaluation Procedures to Ensure that All Relevant Evidence Is Considered .................. 488
 3. The ADR Process Provides that Claims Are Scored Generously According to the Class Members' Claim and the Available Evidence ..... 489
B. Policyholders Who Do Not Desire to Participate in the ADR Process Receive Real and Valuable Benefits Through Basic Claim Relief ............. 490

C. Financial Commitments Guarantee that Class Members Will Receive Substantial Relief Under Any Turn of Events ........................... 491

D. The Unprecedented Outreach Program Will Ensure that All Class Members Are Aware of Their Rights and Will Encourage Injured Class Members to Participate in the Proposed Settlement Relief .................. 492

E. The Proposed Settlement Substantially Improves the Task Force Plan ..... 492
 1. The Proposed Settlement Provides Significant Enhancements to the Task Force Plan ...................................................... 492
 a. The Proposed Settlement Provides Valuable Financial Commitments ............................................... 492
 b. The Proposed Settlement Improves Claim Scoring and Evaluation Criteria for the Benefit of Claimants ................... 492
 c. The Proposed Settlement Includes Four Valuable ADR Remedies Not Included in the Task Force ADR Plan .............. 493
 2. The Proposed Settlement Provides Significant Enhancements to Each Form of Basic Claim Relief and Creates a New Form of Basic Relief ...................................................... 494
 3. The Proposed Settlement Provides an Elaborate Program to Inform Class Members of the Relief Available to Them ............... 494

F. The Proposed Settlement Offers Significant Value to the Class ............. 494

V. Class Counsel and Prudential Have Provided Class Members With Extremely Effective Individual and Published Notice of the Proposed Class and Proposed Settlement .......................................... 495

VI. The Proposed Settlement Has Been Enhanced Since the Execution of the Stipulation of Settlement ............................................. 496
 A. The Court Ordered Additional Remediation to Class Members in Response to Reported Document Destruction Incidents .................... 496
 B. Through Negotiations with State Regulators Prudential Has Agreed to Several "Final Enhancements" to the Proposed Settlement ................. 498

VII. Class Response to the Proposed Class Certification and the Proposed Settlement Has Been Favorable .......................................... 499

VIII. The Fairness Hearing Provided the Parties, Objectors Appearing Through Counsel, State Regulators, and All Individual Objectors an Opportunity to Express Their Positions to the Court ...................................... 499

VOLUME 2

CONCLUSIONS OF LAW ................................................. 500

I. This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims Against Prudential ........................................................ 500
 A. This Court Unquestionably Has Federal Question Jurisdiction Over this Action ........................................................ 500
 B. The Court Also Has Diversity Jurisdiction Over this Action ................. 502

II. The Court's Jurisdiction over Plaintiffs' Claims Does Not Violate the Article III Case or Controversy Requirement ...................................... 505

III. The Court Has Personal Jurisdiction over All Plaintiffs, Present and Absent..... 506

IV. The Predominance of Common Factual and Legal Issues, the Adequacy of Class Counsel and Class Representatives, and the Superiority of the Class Action Device as a Tool to Resolve the Current Controversy Require Class Certification ........................................................ 507
 A. The Proposed Settlement Class Must Be Certified as if the Case Were to Be Tried ...................................................... 508

**464**

B. The Objectors Have Standing Both to Attack the Propriety of Class
Certification and to Attack the Proposed Settlement ........................508

C. The Prudential Life Insurance Sales Practices Class Action Satisfies
Federal Rules of Civil Procedure 23(a) and 23(b)(3) ........................510

 1. The Estimated Eight Million Policyholders Satisfy the Numerosity
Requirement ................................................................510

 2. Prudential's Orchestrated Sales Presentations, the Plaintiffs'
Common Legal Theories, Prudential's Common Defenses, and
Other Common Issues Undoubtedly Satisfy the Commonality
and Predominance Requirements ...........................................510

 a. Plaintiffs Must Establish Many Common Factual Issues to
Establish Liability ....................................................512

 b. Plaintiffs Must Establish Many Common Legal Issues to
Establish Liability ....................................................512

 c. Prudential's Affirmative Defenses Add Common Issues to this
Class Action ..........................................................512

 d. Prudential's Document Destruction is an Extremely Pervasive
Issue Common to Class Members .......................................513

 e. Prudential's Fraudulent Concealment of Its Misrepresentations
and Misdeeds Is an Issue Common to Class Members ...................513

 f. The Agents' Use of Identical Oral Misrepresentations Weighs
in Favor of the Finding of Predominance of Common Issues ..........513

 (1) Prudential Agents' Oral Misrepresentations Were Uniform
Throughout the Country ..........................................514

 (2) To Create Consistent Oral Sales Presentations, Prudential
Trained Its Agents and Provided Its Agents with Uniform
Sales Materials .................................................515

 g. Plaintiffs' Claims that May Entail Establishing Reliance Do
Not Undermine the Predominance of Common Issues ..................516

 h. Individual Damages Do Not Undermine the Predominance of
Common Issues ........................................................517

 i. Objectors' Arguments that Common Issues Do Not
Predominate Are Unpersuasive .......................................517

 j. Common Issues Overwhelmingly Predominate the Individual
Issues in this Case ...................................................517

 3. The Plaintiff Representatives' Claims Are Typical of Those of the
Other Class Members .......................................................517

 4. Class Counsel and the Class Representatives Adequately Represent
the Class ..................................................................519

 a. Class Counsel Adequately Represent the Class ....................519

 (1) Class Counsel Are Extremely Qualified ......................519

 (2) Class Counsel Also Are Extremely Committed to the Class
and All Class Members and Are Unhampered By Any
Conflicts of Interest or Separate Inventories of Cases .....519

 (3) The Value of the Proposed Settlement to All Class
Members Demonstrates that Class Counsel's
Representation Is Adequate ...............................520

 (4) Class Counsel Vigorously Have Represented the Class
Throughout These Proceedings .............................520

 b. The Plaintiff Representatives Adequately Represent the Class .....520

 5. The Class Action Device Is Superior to Any Other Means to
Adjudicate this Controversy ...............................................522

 a. There Are No Other Sensible Means to Adjudicate this
Controversy ..........................................................522

 b. Individual Plaintiffs Have Little Interest in Controlling the
Prosecution of Separate Actions .....................................523

 c. The Number of Actions Pending Elsewhere Weighs in Favor of
Finding the Class Action Mechanism Superior .......................524

 d. To Concentrate this Litigation in New Jersey Is Desirable ........524

 e. Although Managing this Case Will Be Challenging, No
Anticipated Difficulties Render this Action Unmanageable ..........524

V. The Class Notice and Supplemental Materials Fulfill the Notice
 Requirements of Federal Rules of Civil Procedure 23(c)(2) and 23(e) .............526
 A. The Class Notice Adequately Describes the Allegations of the Complaint.....528
 B. The Class Notice Adequately Advises Class Members of the
 Consequences of Deciding Not to Opt Out ...............................529
 C. The Class Notice Need Not Describe Parallel State Court Proceedings
 or All Potential State Law Causes of Action ............................529
 D. The Class Notice Need Not Identify Objectors to the Proposed
 Settlement ..........................................................529
 E. The Class Notice Accurately Describes the Interaction Between the
 Task Force Plan and the Proposed Settlement ...........................529
 F. The Class Notice Adequately Indicates Class Members' Waiver of Their
 Right to a Jury Trial ...............................................530
 G. The Class Notice Adequately Indicates Prudential's Agreement Not to
 Oppose Attorneys' Fees .............................................530
 H. The Class Notice Was Not Required to Include an "Opt–Out Form" .........531
 I. The Class Notice Was Not Required to Include Individual Policy
 Illustrations ......................................................531
 J. The Class Notice Adequately Informed Policyholders About the
 Information Considered in the ADR Process and Need Not Have
 Informed Policyholders Individually of Available Evidence.................531
 K. The Class Notice is Not *Cumbersome" or Inadequate to Alert Policy-
 holders ...........................................................532
 L. The Class Notice Adequately Indicated the Deadline to File Objections
 or Opt Out ........................................................533
 M. The Class Notice Fairly Describes Basic Claim Relief and Alternative
 Dispute Resolution Provisions ......................................533
 N. Objections that Ostensibly Attack the Class Notice But Really Concern
 Proposed Settlement Terms Will Be Addressed in the Context of the
 Proposed Settlement's Fairness ....................................533
 O. Considering All of the Circumstances, Class Notice in the Present Case
 Comports with Rule 23 and with Due Process ...........................533

VOLUME 3

VI. The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the
 Multifarious Factors that the Court Must Consider .........................534
 A. The Proposed Settlement Provides Extraordinary Relief to Injured
 Policyholders ......................................................535
 B. The Complexity of this Action and the Likely Lengthy Duration of the
 Litigation Warrant Approval of the Proposed Settlement ..................536
 C. Class Reaction to the Proposed Settlement Has Been Overwhelmingly
 Favorable and Weighs in Favor of Class Approval .......................537
 D. Approval of the Proposed Settlement at this Stage of the Proceedings Is
 Appropriate Because the Plaintiffs Have Completed Extensive Discovery
 and Settlement Now Would Save the Extensive Costs of Additional
 Discovery and Trial ................................................538
 E. The Significant Risks Attendant to Plaintiffs' Ability to Establish
 Prudential's Liability and Damages Weigh In Favor of Approving
 the Proposed Settlement ............................................538
 F. The Risks of Maintaining this Class Action Through Trial Weigh in
 Favor of Approving the Proposed Settlement ...........................540
 G. Prudential's Inability to Withstand a Greater Judgment Is a Factor
 Weighing in Favor of Approving the Proposed Settlement .................540
 H. The Proposed Settlement Is Reasonable in Light of the Best Possible
 Recovery and All of the Attendant Risks of Litigation ....................540
 I. Plaintiffs Conducted Adequate Discovery Precedent to Agreeing to
 Settle ...........................................................541
 J. The Proposed Settlement is Reasonable In Light of the Plaintiffs'
 Preliminary Discovery ..............................................542

K. The Settlement Accounts for All Causes of Actions and Types of Relief Sought in the Second Amended Complaint................................542
L. The Parties Completed Negotiations of the Proposed Settlement Before Negotiating Attorneys' Fees and the Attorneys' Fee Agreement Is Legal and Proper........................................................542
M. Class Counsel's Approval of the Proposed Settlement Indicates Its Fairness...............................................................543
N. The Objectors' Panoply of Other Concerns Fall Under Their Own Weight................................................................543
 1. The Proposed Settlement Improves Upon the Task Force Plan.........543
 2. ADR Review Is Impartial..........................................545
 3. The ADR Process is Simple........................................546
 4. The ADR Process Provides Adequate Substantive Relief..............546
 5. The Proposed ADR Scoring Provisions Adequately Determine Whether Prudential Misled Individual Class Members....................547
 6. The ADR Process is an Appropriate Mechanism to Assess Whether Class Members Were Affected by Prudential's Deceptive Sales Practices.........................................................548
 7. The ADR Process Adequately Identifies Churning Cases..............549
 8. The ADR Process Adequately Identifies Cases in Which Prudential Sold Life Insurance Policies as Investment Vehicles...................550
 9. The Proposed Presumptions for APP Claims Are Unnecessary and Inappropriate.....................................................551
 10. No Additional Evidentiary Considerations Are Necessary.............551
 11. Agent Conduct Is an Appropriate Talisman of Prudential's Wrongful Conduct..............................................552
 12. A Presumption in Favor of the Policyholder Where the Policyholder's Statement Conflicts with an Agent's Statement Is Unnecessary and Undesirable......................................................552
 13. The Agent's Presence Before a Decisionmaker Is Unnecessary to Adjudicate Class Members' Claims...................................553
 14. The Complaint History Factor is Adequate..........................553
 15. The Proposed Settlement's Method of Assembling Associated Complaints is Adequate...........................................553
 16. Class Members Need Not Be Informed of Agents' Complaint Histories Prior to Choosing Relief...................................554
 17. Unauthorized Execution as a Positive Consideration is Adequately Described and Effective..........................................554
 18. The ADR Process Fairly Addresses Document Destruction.............555
 19. Policyholders Receive Adequate Representation in the ADR Process.........................................................556
 20. The Time Periods Allocated to Each Step in the ADR Process Are Fair, Reasonable, and Adequate....................................556
 21. The ADR Procedures Properly Consider as Undermining Evidence that a Class Member Received a Clear Written Disclaimer at the Time of Sale......................................................557
 22. This Court's Role in Allocating the Additional Remediation Amount Is Appropriate and Does Not Undermine the Ability of Class Members to Evaluate the Proposed Settlement's Fairness.............557
 23. Basic Claim Relief Is a Valuable Remedy............................557
 24. The Settlement Does Not Discriminate Against Policyholders Who Cannot or Desire Not to Purchase Basic Claim Relief.................558
 25. The Proposed Release Is Fair and Appropriate.......................558
 26. There Is No Basis to Appoint a Custodial Receiver or Special Fiscal Agent.............................................................559
 27. The Proposed Settlement Does Not Violate State Law.................560
 28. The McCarran-Ferguson Act Does Not Apply to the Proposed Settlement, Which Does Not Affect Policyholders' State Substantive State Law Rights...............................................561

29. The Rules Enabling Act Does Not Apply to the Proposed Settlement, Which Does Not Affect Policyholders' State Substantive State Law Rights .................................... 561

30. This Court Properly Preliminarily Certified the Class for Settlement Purposes Only ........................................ 562

31. The Fairness Hearing Format Was Fair ............................ 562
 a. The Opt–Out and Objection Period Was Sufficient ................ 562
 b. Objectors Had Sufficient Opportunity to Conduct Discovery to Prepare for the Fairness Hearing .............................. 562
 c. Objectors Had No Absolute Right to Present and Cross Examine Witnesses at the Fairness Hearing, and Under the Circumstances, These Activities Were Inappropriate .............. 563
 d. Krell and All Objectors Were Afforded an Adequate Opportunity to Present All of Their Factual and Legal Arguments ......................................... 564

CONCLUSION ...................................................... 564

WOLIN, District Judge.

## INTRODUCTION

The Prudential Insurance Company of America, the institution that for years has represented itself as the quintessence of stability, the Rock, used pervasive and systematic deceptive sales tactics to sell many individuals a great number of life insurance policies, to the benefit of Prudential and its sales agents, but to the detriment of trusting consumers. The old adage resounds true: insurance is not bought; it is sold. And through selling consumers "a piece of the rock," Prudential ultimately crushed the hopes and expectations of many policyholders with the colossal weight of hidden fees and costs. Prudential forced many individuals to pay amounts that far exceeded their means, and caused others to lose the policies that they had worked so long and so hard to build.[1]

The plaintiffs now ask the Court to help them alleviate the burdens that they allege Prudential has forced upon them. Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(3) and request this Court to approve the proposed class settle-

ment as memorialized in the Stipulation of Settlement dated October 28, 1996, and amended by the Amendment to the Stipulation of Settlement dated February 22, 1997 ("Stipulation Amendment") and by this Court's Order of February 3, 1997 (collectively the "Proposed Settlement").

The Court finds that the facts at bar compel class certification. Unlike *Georgine*, the typicality, adequacy of representation, predominance, and superiority requirements are clearly met.[2] With regard to typicality and adequacy of representation, all class members allegedly were uniformly injured by Prudential's deceptive sales practices and there are no "futures claimants." Additionally, Class Counsel have tenaciously represented all class members equally. With regard to predominance and superiority, Prudential's alleged common scheme to defraud its policyholders has created a plethora of common factual and legal issues, which dramatically outweigh any individual issues. This is a commercial dispute involving purely economic damages and no personal injuries. And, as recommended by *In re School Asbes-*

---

1. The observations contained in this paragraph are a synthesis of voluminous submissions to the Court. Because the case was settled before trial, Prudential did not avail itself of the opportunity to submit contrary evidence and does not concede the verity of these observations. Accordingly, these remarks shall have no *res judicata* effect.

2. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir.) (holding that proposed settlement class in asbestos personal injury action did not

satisfy Federal Rule of Civil Procedure 23 adequacy of representation, typicality, or predominance requirements where exposure-only futures claimants were not adequately represented and where multiple defendants and widely divergent claims would pose an obstacle to trial), *cert. granted sub nom., Amchem Prods. Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996).

*tos Litigation*,[3] Class Counsel have grouped potentially applicable state laws systematically into manageable patterns, completely obviating potential complications from choice of law differences.

Not only do the facts at bar compel class certification, but, beyond a doubt, the Proposed Settlement is fair, reasonable, and adequate in light of the many factors that this Court must consider. The Proposed Settlement's alternative dispute resolution process will provide many claimants the choice between obtaining (1) full rescission and restitution or (2) full benefit of the bargain relief. Importantly, the Proposed Settlement relief is uncapped; all class members may obtain full remediation, regardless of the benefits allocated to other class members. And substantial minimum payment guarantees secure Prudential's commitment to compensate policyholder claims. Indeed, the Proposed Settlement is extraordinary because class members have relatively modest individual claims that would be impracticable to redress individually.

The fairness of the Proposed Settlement is also confirmed by the fact that all fifty states and the District of Columbia have found that the Proposed Settlement, or the preceding

plan, the Task Force Plan, is fair, reasonable, and adequate to compensate fairly, fully, and quickly their constituents whom Prudential misled.

Consequently, based upon the evidence of record,[4] the Court's findings of fact and conclusions of law,[5] and for the reasons stated herein, the Court concludes that all of the requirements of Federal Rule of Civil Procedure 23 have been met and that the Proposed Settlement of this class action is fair, reasonable, and adequate for the class and, therefore, should be approved. Today's Opinion and Order affirms, explains, and supplements the Court's Memorandum Opinion and Order issued on March 7, 1997.

## FINDINGS OF FACT [6]

**I. The Plaintiffs, the Defendants, the Objectors, and Various State Insurance Representatives Participated in These Proceedings**

**A. The Class Includes All Persons or Entities Who Owned Certain Life Insurance Products During the Class Period**

1. The class encompasses, with some exceptions,[7] all persons or entities who owned

---

**3.** 921 F.2d 1310 (3d Cir.1990).

**4.** The Court has considered all objections, briefs, affidavits, charts, and other materials that the parties, objectors, amicus curiae, and other individuals and entities have submitted. The Court discusses in this Opinion only those facts that it finds relevant. And the Court addresses only objections that somehow elucidate the propriety of class certification or the fairness of the Proposed Settlement. The Court either implicitly or expressly addresses nearly all of the objections, some not even palpably meritorious, in the interest of developing a full record. The Court has declined to address specifically some objections that are unpersuasive on the issues of the propriety of class certification or the fairness of the Proposed Settlement. Any objections not specifically addressed are rejected.

**5.** The Court has considered an ample record. For a short list of some materials that the Court has considered, see Appendix B.

**6.** Sections I and II of these Findings summarize plaintiffs' allegations in their Second Amended Complaint. These are not findings on the merits. For the purposes of class certification, the Court must not address the merits of plaintiffs' claims.

Similarly, in addressing the fairness of the Proposed Settlement, the Court's inquiry is limited to a determination of the Proposed Settlement's fairness, reasonableness, and adequacy. From the Second Amended Complaint and the evidence that the plaintiffs have proffered, the Court determines the following findings of fact for purposes of class certification and approval of the Proposed Settlement only.

To the extent that any findings of fact include conclusions of law, or vice versa, and to the extent that the Opinion contains mixed findings of fact and conclusions of law, the Court hereby adopts all of its findings of fact and conclusions of law.

**7.** The class excludes: (1) policyholders who were represented by counsel and who signed a document in connection with a settlement of a claim, action, lawsuit or proceeding, pending or threatened, that released Prudential with respect their policies; (2) policyholders that are corporations, banks, trusts, or other non-natural entities that purchased policies as corporate or trust-owned life insurance and under which either (a) there are fifty or more separate insured individuals, or (b) the aggregate premium paid over an eight year period, ending with the close of 1996, ex-

one or more of Prudential's new or additional insurance policies between January 1, 1982 and December 31, 1995 (the "Class Period"). Stipulation of Settlement at 13, ¶ A.1.at. Approximately eight million class members own approximately 10.7 million insurance policies.[8]

## B. The Plaintiff Representatives Are Typical Victims of Prudential's Deceptive Sales Practices During the Class Period

### 1. Carol Nicholson Was Victimized by of Churning, Vanishing Premium Tactics, and Investment Plan Tactics

2. Plaintiff Carol Nicholson, executrix of the estate of decedent Keith E. Nicholson is an Illinois citizen. Consolidated Second Amended Class Action Complaint and Jury Demand ("Second Am. Compl.") at ¶ 13. Keith Nicholson was a brick mason, while Carol Nicholson is a retired K–Mart personnel manager. Second Am. Compl. at ¶ 107. Carol and Keith Nicholson purchased four life insurance policies between 1966 and 1984 with death benefits totaling approximately $30,000 (the "original policies"). Second Am. Compl. at ¶ 106. In 1986, Keith Nicholson purchased from Prudential a $100,000 whole life insurance policy (policy number 76460936), allegedly as a result of Prudential's common scheme. Second Am. Compl. at ¶ 13. Carol Nicholson alleges churning, vanishing premium, and investment plan claims. Second Am. Compl. at ¶¶ 106–19.

3. In 1984, Prudential agent Homer Gernigan contacted the Nicholsons and advised them that they could use the dividends and earnings from the original policies to "work for them" in connection with their estate and retirement planning. Second Am. Compl. at ¶ 108. Gernigan further advised the Nicholsons that they could acquire additional insurance by paying the premiums on the additional policy with the earnings from the original policies, with no additional out-of-pocket costs. Second Am. Compl. at ¶ 108. Gernigan represented that the addi-

tional insurance would be needed for the Nicholsons' financial security during retirement or estate security for the Nicholsons in the event of Keith Nicholson's death. Second Am. Compl. at ¶ 108.

4. In 1984, in reliance on Gernigan's misrepresentations, the Nicholsons agreed to acquire a $100,000 whole life insurance policy (the "additional policy"). Second Am. Compl. at ¶ 110. Gernigan told the Nicholsons that to apply the earnings from the original policies to the premiums for the additional policy, Keith Nicholson had to sign certain Prudential forms in blank. Second Am. Compl. at ¶ 112. Keith Nicholson did. just that. Second Am. Compl. at ¶ 112. Unknown to the Nicholsons, these forms authorized loans from the cash value of the Nicholsons' original policies. Second Am. Compl. at ¶ 113.

5. Subsequently, the Nicholsons received notices from Prudential indicating that policy loans had been taken and the additional policy had lapsed. Second Am. Compl. at ¶ 114. The Nicholsons contacted Prudential, which advised them to ignore the notices. Second Am. Compl. at ¶ 115.

6. Keith Nicholson was diagnosed with leukemia in 1989 and died on August 26, 1994. Second Am. Compl. at ¶ 117. At the time of Keith Nicholson's death, Carol Nicholson learned that, because of Prudential's misrepresentations and omissions, his $130,376 in insurance coverage had dwindled to $22,514.43. Second Am. Compl. at ¶ 118. Carol Nicholson learned that Keith Nicholson's additional policy had lapsed and that unauthorized loans had substantially diminished the available death benefits of the other policies. Second Am. Compl. at ¶ 118. Carol Nicholson also learned of Gernigan's material omissions and misstatements in selling the Nicholsons the additional policy: (1) that loans were made on the cash value of the original policies to pay the premiums on the additional policy; (2) that these loans would diminish the cash values and death benefits of the original policies; (3) that de-

---

ceeds one million dollars; and (3) policyholders who were issued policies in 1995 by Prudential Select life Insurance Company of America. Stipulation of Settlement at 13, ¶ A.1.at.

8. Throughout this Opinion, the Court will refer to potential class members as "class members." The phrase is not intended to reify the class; rather, the phrase is a tool of convenience.

spite Gernigan's representations, the earnings and dividends on the original policies were insufficient to pay the premiums and other charges of the additional policy; (4) that the earnings, dividends, and cash values of the original policies would dissipate; and (5) that without additional premium payments the additional policy would lapse. Second Am. Compl. at ¶ 118. Carol Nicholson, as the executrix for the Estate of Keith Nicholson, sued Prudential on February 6, 1995. Second Am. Compl. at ¶ 119.

### 2. Martin Dorfner Was Victimized of Churning and Vanishing Premium Tactics

7. Plaintiff Martin Dorfner is a Pennsylvania citizen. Second Am. Compl. at ¶ 14. He and his wife operate a small grocery store. Second Am. Compl. at ¶ 120. In April of 1991, Dorfner purchased from Prudential a $50,000 variable appreciable life insurance policy (policy number 97–522–008), allegedly as a result of Prudential's common scheme. Second Am. Compl. at ¶ 14. Dorfner alleges damages from churning and his purchase of a vanishing premium policy. Second Am. Compl. at ¶¶ 120–46.

8. As of July of 1989, Martin and Audrey Dorfner had purchased several Prudential life insurance policies to insure Martin including a $100,000 term life policy (policy number 73–438–990), a $5,000 whole life policy (policy number 22–218–366), and an essentially paid-up policy having a death benefit of $3,000. Second Am. Compl. at ¶ 124. Additionally, Audrey was insured by a Prudential $10,000 whole life policy (policy number 73–381–858) and the Dorfner's children were insured: Martin, Jr. for $5,000 (policy number 24–749–189), Brian for $5,000 (policy number 25–501–819), Donald for $5,000 (policy number 25–233–873), and Denise for $5,000 (policy number 25–233–872). Second Am. Compl. at ¶ 124.

9. In July of 1989, Prudential agent Susan Sheldon met with the Dorfners to review their coverage. Second Am. Compl. at ¶ 125. As trained by Prudential, Sheldon advised the Dorfners that Martin Dorfner would be entitled to a "free" insurance policy by using the dividends from his $3,000 policy. Second Am. Compl. at ¶ 125. In reliance on Sheldon's misrepresentations, the Dorfners agreed to complete the paperwork for the "free" policy. Second Am. Compl. at ¶ 126.

10. That month, Prudential issued another whole life policy in Martin Dorfner's name (policy number 73–831–273) (the "free policy"). Second Am. Compl. at ¶ 127. The Dorfners never received any policy documents or other information regarding the amount of death benefits provided by the "free" policy. Second Am. Compl. at ¶ 128.

11. The Dorfners later learned that in July of 1989, without authorization, Sheldon withdrew $300.50 from Martin's original $3,000 policy to pay for his "free policy." Indeed, Sheldon continued to withdraw funds each year thereafter until 1993. Second Am. Compl. at ¶ 128. The Dorfners also discovered that in April of 1991 a living needs rider had been added to the "free policy" without their knowledge.

12. In the spring of 1991, Prudential's Vice–President of the District Agencies sent Martin Dorfner a form Notice marked "important" and a copy of the computer printout of policy information. Second Am. Compl. at ¶ 129. The Notice stated that a Prudential representative would contact Dorfner to review the circled "convertible amount" of his term policy. Second Am. Compl. at ¶ 129.

13. In March of 1991, Sheldon approached Martin Dorfner regarding conversion of the term policy and presented Martin Dorfner with an offer to convert his term policy to a "new" Prudential Variable Appreciable Life ("VAL") policy. Second Am. Compl. at ¶ 130. Sheldon showed Martin Dorfner deceptive illustrations and explained that the VAL policy was superior to his term coverage, because the VAL was a whole life product. Second Am. Compl. at ¶ 131. Sheldon also explained that the VAL was a financial savings because the premiums could be expected to be completely paid within eight years by using the dividends of the Dorfners' other policies. Second Am. Compl. at ¶ 131. Sheldon told the Dorfners that the childrens' policies were essentially paid-up and that she would administer the dividend application to the new policy. Second Am. Compl. at ¶¶ 132–33. Relying on Sheldon's presenta-

tion, Martin Dorfner agreed to apply for a $50,000 VAL policy. Second Am. Compl. at ¶ 135. As trained by Prudential, Sheldon did not leave copies of the illustrations or any prospectus for the new VAL with the Dorfners. Second Am. Compl. at ¶ 134. In fact, Prudential never provided the Dorfners with a copy of the VAL policy. Second Am. Compl. at ¶ 137.

14. In July of 1992, unknown to the Dorfners, without authorization, and contrary to Sheldon's earlier representations, Sheldon took a $680.61 loan against Martin Dorfner's $5,000 whole life policy (policy number 22–218–366). Second Am. Compl. at ¶ 138. In 1993, Sheldon took another $300.50 loan, this time from policy number 73–831–273, the "free policy." Second Am. Compl. at ¶ 139.

15. On March 8, 1994, Prudential advised Martin Dorfner that a new agent would be servicing his account. Second Am. Compl. at ¶ 140. Soon thereafter, the new agent told Martin that an unauthorized loan had been made against his original policy and applied to the VAL policy. Second Am. Compl. at ¶ 140. The agent also advised Martin that Audrey's policy and the childrens' policies were in danger of lapsing because the dividends and cash value had been applied to the premiums of the VAL. Second Am. Compl. at ¶ 141. Prudential admitted in letters to Martin dated August 11, 1994 and September 13, 1994 that the loans taken to fund the VAL were not authorized. Second Am. Compl. at ¶ 142. Martin Dorfner sued Prudential on January 19, 1995. Second Am. Comp. at ¶ 146.

### 3. Vincent and Elizabeth Kuchas Were Victimized by Churning and Investment Plan Tactics

16. Plaintiffs Vincent and Elizabeth Kuchas (the "Kuchases") are Connecticut citizens. Second Am. Compl. at ¶ 15. In 1987, Elizabeth Kuchas purchased a $100,000 variable appreciable life insurance policy (policy number R0147600) and Vincent Kuchas purchased an $80,000 variable appreciable life insurance policy (policy number R0147606) from Prudential allegedly as a result of Prudential's common scheme. Second Am. Compl. at ¶ 15. The Kuchases allege churning and investment plan based fraudulent sales practices. Second Am. Compl. at ¶¶ 147–59.

17. Vincent Kuchas has retired, after working for thirty-seven years as a roofer. Second Am. Compl. at ¶ 147. Elizabeth Kuchas's occupation is unknown. On November 5, 1983, Vincent Kuchas purchased a variable life insurance policy from Prudential with a face amount of $46,908. Second Am. Compl. at ¶ 148. On November 11, 1987, Elizabeth Kuchas purchased a variable life policy from Prudential with a face amount of $40,000. Second Am. Compl. at ¶ 148. These polices are the "initial policies." Second Am. Compl. at ¶ 148.

18. In December of 1987, Prudential agent Richard Dings recommended that the Kuchases purchase new life insurance. Second Am. Compl. at ¶ 149. The Kuchases told Dings that they wanted a retirement investment similar to an IRA, not just additional life insurance. Second Am. Compl. at ¶ 149. The Kuchases also informed Dings that they could not afford an investment plan if they had to continue to pay premiums on the initial policies. Second Am. Compl. at ¶ 149. Dings proceeded to conceal from the Kuchases all of the adverse information that agents commonly withheld from customers to churn them. Second Am. Compl. at ¶ 150. On December 1, 1987, relying on Dings' representations, particularly as to financing terms, the Kuchases purchased two VAL policies (the "1987 VALs"). Second Am. Compl. at ¶ 152. Prudential provided no prospectus at the time of sale. Second Am. Compl. at ¶ 152.

19. In early 1988, the Kuchases began to receive information suggesting that further premiums would be due on the initial policies. Second Am. Compl. at ¶ 154. Dings repeatedly assured the Kuchases that they need only pay what they could afford on the initial policies to keep up the 1987 VALs and that the 1987 VALs were still good "IRA investments." Second Am. Compl. at ¶ 154. Relying on these false assurances, the Kuchases continued to make small monthly payments in amounts they could afford toward the premiums on the initial policies. Second Am. Compl. at ¶ 155. Unknown to the Kuchases, however, Prudential did not credit

these partial payments. Second Am. Compl. at ¶ 155. In February of 1994, when the Kuchases discovered that Prudential had not accepted their partial payments, Dings told the Kuchases not to worry and that he would take care of it. Second Am. Compl. at ¶ 155.

20. In September of 1994, the Kuchases learned that the initial policies had lapsed for non-payment of premiums, and that Dings had taken out loans against the initial policies to pay premiums on the 1987 VALs. Second Am. Compl. at ¶ 156. Consequently, the Kuchases had to pay additional funds to have the initial policies reinstated and to keep the 1987 VALs in force. Second Am. Compl. at ¶ 157. The Kuchases sued Prudential on February 28, 1995. Second Am. Compl. at ¶ 157.

### 4. Norman Gassman Was Victimized by Vanishing Premium and Investment Plan Tactics

21. Plaintiff Norman Gassman is an Ohio citizen. Second Am. Compl. at ¶ 16. He manages a women's shoe store. Second Am. Compl. at ¶ 160. In August of 1992, Gassman purchased from Prudential a variable appreciable life insurance policy (policy number 98354001), allegedly as a result of Prudential's fraudulent scheme. Second Am. Compl. at ¶ 16.

22. In August of 1992, Gassman had $20,000 invested in a certificate of deposit when Prudential agent Ben Schwartz, who held himself out as a "financial planner" or "financial consultant," contacted him. Second Am. Compl. at ¶ 161. Schwartz misrepresented that a VAL policy was part of an "investment plan" that was "better than a CD," that it would pay a higher rate of interest at low risk, and that the earnings on this investment would be tax-free. Second Am. Compl. at ¶ 162. Schwartz also misrepresented to Gassman that he would not be required to pay any premiums for the VAL policy because the VAL policy could reasonably be expected to yield enough dividend income to pay its own premiums in addition to providing a yield exceeding that which Gassman had earned on his Certificate of Deposit. Second Am. Compl. at ¶ 162. Although Schwartz disclosed to Gassman that some life insurance would be included with the VAL policy, he failed to disclose that the product was not an investment plan and that a substantial portion of the funds Gassman was "investing" would not, in fact, be invested. Second Am. Compl. at ¶ 165.

23. Relying on these misrepresentations, Gassman agreed to invest the money from his CD in the VAL policy. Second Am. Compl. at ¶ 164. During the following months, Gassman received notices from Prudential that contradicted Schwartz's representations. Second Am. Compl. at ¶ 166. When Gassman confronted Schwartz, he responded that Gassman should not worry because Gassman was being assessed special charges that would cease after the first two years. Second Am. Compl. at ¶ 166.

24. In March of 1995, Gassman discovered that the VAL policy was not an investment plan, that he had paid undisclosed fees and commissions to Prudential and its agent, and that Prudential had concealed that its dividend scales would not perform as represented. Second Am. Compl. at ¶ 167. Gassman sued Prudential on May 25, 1995. Second Am. Compl. at ¶ 168.

### C. The Court Has Granted the Requests of Several Class Members to Intervene

25. The Court granted the motions of objectors Treadway, Parnell, and Ginsberg to intervene in Scheduling Order No. 6, dated January 6, 1997 and the Court granted the motion of objectors Kathryn Johnson and Richard Johnson to intervene in the Court's Order of January 29, 1997.

### D. Plaintiffs Sued Prudential, a Mutual Life Insurance Company and One of the Largest Life Insurance Companies in the Country

26. Prudential is a corporation organized under the laws of New Jersey, and has its principal office at 751 Broad Street, Newark, New Jersey. Second Am. Compl. at ¶ 17. Prudential is a mutual life insurance company, meaning that it is owned by its policyholders by virtue of their ownership of Prudential products. Second Am. Compl. at ¶ 19. Unlike other corporate forms, a mutual life insurance company has no shareholders. Prudential was formed in 1873 and is one of the oldest and largest life insurance and annuity companies in the United States. Sec-

ond Am. Compl. at ¶ 19. As such, Prudential does business in all fifty states and employs over 20,000 full-time professional career agents in the United States and Canada. Second Am. Compl. at ¶ 20. Prudential also uses other distribution networks to sell its financial products. Second Am. Compl. at ¶ 20.

27. Prudential has invited public trust and confidence in its integrity and skills by using national advertising and standardized sales presentations that portray the Rock of Gibraltar as Prudential's service mark and that refer to Prudential products as a "piece of the Rock." Second Am. Compl. at ¶ 20.

### E. Plaintiffs Have Also Sued Several Individual Defendants Who Were Upper Echelon Prudential Managers

28. The individually named defendants include Robert A. Beck, Ronald D. Barbaro, and Robert C. Winters. Beck is a New Jersey citizen. He was Prudential's President from 1972 to 1979, and its Chairman and CEO from 1978 to 1987. Second Am. Compl. at ¶ 18(a). Barbaro is a Canadian citizen. He was Prudential's President from 1990 to 1992. Second Am. Compl. at ¶ 18(b). Winters is a New Jersey citizen. He was Prudential's Chairman and CEO from 1987 to 1993 and its Chairman, CEO, and President from 1993 to 1994. Second Am. Compl. at ¶ 18(c).

### F. Several State Government Representatives Have Contributed to These Proceedings

29. The Court has allowed several states to participate in these proceedings because the states have expressed strong interests in the outcome. The Court has permitted the

California Insurance Commissioner and the Florida Insurance Commissioner to appear as *amicus curiae.* Order dated February 3, 1997. The Court has permitted the Massachusetts Insurance Commissioner, the Massachusetts Attorney General, and the Texas Insurance Commissioner to intervene pursuant to Federal Rule of Civil Procedure 24(b). *Id.* The Court has recognized that the Florida Attorney General has standing to appear before the Court as an objector to the Proposed Settlement. *Id.* And, although the Court has not formally addressed the status of the New Jersey Department of Insurance in these proceedings, the Court has permitted the department *amicus curiae* status, on behalf of the department itself and on behalf of the Multi–State Life Insurance Task Force. *See infra* section III.B.

30. California, Florida, Massachusetts, and Texas initially filed objections to the Proposed Settlement. Between February 20 and 22, 1997, all four of these states settled with Prudential, or signed letters of intent to do so, and withdrew their objections to the Proposed Settlement. At that time, Prudential agreed to additional enhancements (the "Final Enhancements") to the Proposed Settlement. Because of these additional enhancements, the four previously objecting states now find that the Proposed Settlement is fair, reasonable, and adequate and fully protective of the rights of their citizens.[9] These Final Enhancements have been incorporated into the Proposed Settlement to benefit class members in all states.[10]

### II. Plaintiffs Allege that Prudential Conducted a Scheme to Deceive Policyholders into Buying Prudential Life Insurance Products

31. Prudential engaged in a systematic fraudulent marketing scheme in which its

---

**9.** Although the holdout states—California, Florida, Massachusetts, and Texas—have withdrawn their objections, the Court is aware that the change in these states' views may not be purely attributable to the Final Enhancements and a change of heart. The Court observes that in addition to the Final Enhancements, the holdout states also negotiated significant fines and penalties that add to state coffers, but that do not directly benefit class members. For example, Florida obtained from Prudential $15 million in fines and penalties and California obtained $15.4 million.

**10.** The Court finds that the Proposed Settlement is fair, reasonable, and adequate without the Final Enhancements. Nevertheless, where the Final Enhancements affect a specific provision of the Proposed Settlement, the Court will discuss the changes as appropriate.

Class members have already received adequate notice both of the pendency of this class action and of the Proposed Settlement. Class members need not be informed of the Final Enhancements to the settlement because the Proposed Settlement is only more valuable with these changes.

agents wrongfully induced policyholders to purchase certain Prudential life insurance policies. Second Am. Compl. at ¶ 5. Prudential implemented its scheme through the use of false and misleading sales presentations, policy illustrations, marketing materials, and other information that Prudential approved, prepared, and disseminated to its nationwide sales force. Second Am. Compl. at ¶ 5.

32. Prudential sells primarily three types of financial products: (1) life insurance policies (term, whole life, and combinations of these), (2) annuities, and (3) investments through its securities subsidiary. Second Am. Compl. at ¶ 21. Prudential's whole life insurance products consist of both traditional whole life policies and VAL polices. Second Am. Compl. at ¶ 21.

33. Prudential prepares, underwrites, and issues all of its products from Prudential's New Jersey headquarters. Second Am. Compl. at ¶ 22. Prudential also provides or approves all sales presentations, policy illustrations, and other information used to sell insurance to the public. Second Am. Compl. at ¶ 22. Prudential supplies its agencies with preapproved materials including product brochures, pre-call letters, computer-based sales and illustration systems, seminar materials, and newspaper advertisements. Second Am. Compl. at ¶ 22. Prudential prohibits its agents from using any advertising or marketing materials that Prudential has not first approved. Second Am. Compl. at ¶¶ 22–23.

34. Beginning in the early 1980's, Prudential used its centralized marketing system to implement a scheme to sell new insurance polices to existing and new customers through three deceptive sales tactics: "churning," "vanishing premium," and "investment plan" techniques. Second Am. Compl. at ¶ 25.

Plainly, class members who declined to opt out earlier, would not choose to do so now.

Moreover, class members who opted out may now desire to participate in the Proposed Settlement, given the added value of the Final Enhancements. For this reason, the Court will order that a special notice be sent to the opt-outs to permit them to reevaluate their choices.

## A. Prudential Used a Deceptive Sales Practice Called "Churning" to Sell Policyholders Replacement Policies

35. Prudential agents used "churning" [11] tactics to induce policyholders with significant cash values in existing policies to purchase new policies, thereby depleting the cash values of existing policies and diverting these values to Prudential. Second Am. Compl. at ¶¶ 30–40.

36. In the life insurance context, the term "churning" refers to the removal, through misrepresentations or omissions, of the cash value, including dividends, of an existing life insurance policy or annuity to acquire a replacement insurance policy.[12] Second Am. Compl. at ¶ 28. The value of the first policy may be reduced either by borrowing against the policy or by virtue of the policy's lapse. Second Am. Compl. at ¶ 28. Churning often results in financial detriment to the policyholder, a financial benefit to the agent by virtue of a large commission on the first year premium, and administrative charges being paid to the insurer. Second Am. Compl. at ¶ 29.

37. Prudential and the individual defendants trained Prudential's nationwide sales force to convince existing policyholders to use the cash values and/or dividends of existing polices to purchase replacement insurance policies with purportedly greater death benefits and cash values. Second Am. Compl. at ¶ 30. Prudential carried out its scheme through informing agents of, among other policyholder information, the amount of accumulated cash values in existing policies. Second Am. Compl. at ¶ 31. Prudential agents used this information to target elderly persons who had cash values in existing policies. Second Am. Compl. at ¶ 32. On June 5, 1995, Prudential finally announced to its agents that they were not to use specialized software to determine current policyholders'

11. "Churning" in the life insurance context is also referred to as "twisting" or "piggybacking." Second Am. Compl. at ¶ 29.

12. A replacement policy is a policy financed through using equity, cash value, dividends, interest, or premiums from an existing policy. Second Am. Compl. at ¶ 26.

cash values or dividends. Second Am. Compl. at ¶ 51.

38. Prudential distributed to its agents software programs that contained numerous form letters to solicit business from then-existing customers. Second Am. Compl. at ¶ 33. Prudential also gave new agents a "book of business," which listed existing Prudential policyholders and illustrated each policyholder's built-up cash values and accumulated dividends, instructed the new agents to sell the existing policyholders additional insurance and replacement policies, and provided its agents with audio tapes to teach the agents to churn. Second Am. Compl. at ¶ 34.

39. The agents then used their knowledge of existing customers' cash values and their knowledge of how to churn to call on the existing customers and convince them to acquire new insurance policies. Second Am. Compl. at ¶ 35. Agents misrepresented that the new insurance could be acquired through using only dividends from existing policies and that the policyholder would receive additional coverage for little or no additional premiums. Second Am. Compl. at ¶ 36.

40. Additionally, Prudential trained its agents to ask the customer to sign one or more "disbursement request forms" in blank. Second Am. Compl. at ¶ 37. Prudential printed the forms and distributed them to its agents. Second Am. Compl. at ¶ 37. The forms allow policyholders to make policy loans, to execute dividend option changes, to surrender paid-up additional insurance, to withdraw accumulated dividends, or to cash surrender the policy. Second Am. Compl. at ¶ 37.

41. Prudential trained its agents to complete the loan section of the disbursement request form to facilitate and conceal their churns. Second Am. Compl. at ¶¶ 38–40. The agent would indicate on the form that a loan would be used to pay premiums on other contracts and would, thereby, extend Prudential credit to the insured to cover the premiums to acquire a replacement policy. Second Am. Compl. at ¶ 38. The insured, thereby, could be led to believe for several years that the replacement policy provided increased death benefits without additional premiums. Second Am. Compl. at ¶ 40.

When the existing policy cash values had been depleted by the loans, however, Prudential would then require the insured to pay the additional premiums. Second Am. Compl. at ¶ 40. If the insured was unable or unwilling to pay, the policies would lapse. Second Am. Compl. at ¶ 40.

42. Prudential compounded the injuries caused by its churning by classifying replacement policies as new policies. Second Am. Compl. at ¶ 41. This classification allowed Prudential and its agents to exact significantly higher fees and commissions than would be permitted in the case of a legitimate replacement transaction. Second Am. Compl. at ¶ 41.

43. Prudential was aware that replacement is rarely in the best interests of the policyholder because: (1) existing policy premiums are usually lower because a replacement takes place when the insured is in a less favorable underwriting class; (2) acquisition costs are charged in the early years of a policy and the policyholder incurs these costs again with the replacement policy; and (3) replacement renews the risk that an incontestability or suicide clause will be incorporated into a policy. Second Am. Compl. at ¶ 44. Prudential's own corporate policy manuals purport to prohibit churning. Second Am. Compl. at ¶ 46.

44. Prudential required agents to give prospective policy purchasers a replacement disclosure form explaining that replacement is not typically in the policyholder's best interests, but agents routinely failed to do so. Second Am. Compl. at ¶ 47. Prudential repeatedly discouraged and inhibited its agents from providing adequate disclosures to the policyholders. Second Am. Compl. at ¶ 47. Moreover, Prudential's agent compensation system, which caused rapid agent turnover and a "produce or die" atmosphere, exacerbated the pressure to churn. Second Am. Compl. at ¶ 49.

45. Prudential trained its agents to extend the deception when they were contacted by policyholders who had received confusing paperwork from Prudential. Second Am. Compl. at ¶ 50. Policyholders would call Prudential when they received notices indi-

cating that loans had been taken against their policies. Prudential trained its agents to advise customers "not to worry," "that the notice was a mistake," or that the agent "would take care of it." Second Am. Compl. at ¶ 50.

### B. Prudential Misstated that the Premiums on Its Life Insurance Products, Including Abbreviated Payment Plan Policies, Would Vanish

46. Prudential agents used "Abbreviated Payment Plan" ("APP"), or "vanishing premium" policies, often in conjunction with churning, to sell permanent life insurance policies to class members; Prudential agents misrepresented that policyholders would have to pay no out-of-pocket premiums after a certain number of premium payments during the initial years of the policies. Second Am. Compl. at ¶¶ 52–61.

47. Prudential agents sold these APP policies to class members by using standardized sales presentations and written policy illustrations created from the hardware and software that Prudential distributed. Second Am. Compl. at ¶¶ 53, 55–56. Moreover, Prudential prepared and disseminated standardized sales presentations, scripts, and other materials to extol Prudential's APP policies. Second Am. Compl. at ¶¶ 52–56.

48. Prudential's standardized sales presentations and policy illustrations failed to disclose that the policy premiums would not vanish and that Prudential did not expect the policies to pay for themselves as illustrated. Second Am. Compl. at ¶ 56. Prudential's illustrations also did not inform policyholders of the assumptions on which the policy illustrations were based, assumptions which had no reasonable basis in fact. Second Am. Compl. at ¶ 56.

49. Agents frequently merged churning tactics and APP policies, forcing policyholders to pay the premium cost of the APP policy by dissipating the cash value of an existing life insurance policy. Second Am. Compl. at ¶ 57. Agents would intentionally conceal this dissipation from the policyholders. Second Am. Compl. at ¶ 57.

50. Prudential failed to apprise policyholders of the enhanced risks that they assumed in purchasing Prudential life insurance polices in the 1980's. Second Am. Compl. at ¶ 58. At that time, Prudential created new classes of dividend participating individual life policies sensitive to then-existing interest rates, policies based on the so-called Income Generation Approach ("IGA"). Second Am. Compl. at ¶ 58. Prudential knowingly failed to disclose that these policies would suffer greater adverse consequences when interest rates declined and Prudential lowered its dividend rates to correspond with declining interest rates. Second Am. Compl. at ¶ 59. Whereas in previously written policies dividends were pooled with premium proceeds from policies invested over many years, these new policies were invested in a smaller pool and risked greater exposure to declining returns on Prudential investments. Second Am. Compl. at ¶ 59. Prudential agents used standardized illustrations that failed to disclose this enhanced risk. Furthermore, Prudential agents failed to explain the risk at the time of sale or afterward. Second Am. Compl. at ¶ 59.

51. Prudential's senior management knew early in the Class Period that the assumptions underlying the APP illustrations were fundamentally flawed, but continued to approve the sale of these policies to class members without adequate disclosures. Second Am. Compl. at ¶ 61.

### C. Prudential Fraudulently Marketed Its Insurance Policies as Investment Vehicles

52. Prudential fraudulently marketed life insurance polices as "investment plans," "retirement plans," or similar investment vehicles. Second Am. Compl. at ¶¶ 62–71. Plaintiffs allege that Prudential agents failed to disclose that these purported "investment plans" were really standard life insurance policies, which carried costs and other components that materially and adversely differed from true investment or retirement plans. Second Am. Compl. at ¶¶ 62–71. These misrepresentations and omissions violated many applicable regulations prohibiting

the sale of life insurance as an investment plan. Second Am. Compl. at ¶ 70.

53. Specifically, Prudential misrepresented to policyholders, through standard presentations and materials, that life insurance policies were equivalent to investment or savings accounts, pension maximization or retirement plans, college-tuition funding plans, mutual funds, or other investment or savings plans. Second Am. Compl. at ¶ 62. Prudential's sales presentations did not even use the phrase "life insurance." Second Am. Compl. at ¶ 63. For example, Prudential used mailers and promotional brochures entitled "Guaranteed Income for Life," which did not indicate that the product being sold was life insurance. Second Am. Compl. at ¶ 63. Instead, these presentations labeled what were essentially premium payments as "deposits," "savings," "contributions," or "payments." Second Am. Compl. at ¶ 63.

54. As with the APP plans, Prudential agents often used the investment plan scheme in conjunction with churning to persuade existing policyholders to replace their policies with "new" ones, misrepresenting the benefits that policyholders could achieve by transferring the accumulated cash values to the "investment plan." Second Am. Compl. at ¶ 63. In particular, agents often misrepresented Prudential's VAL policy as a financial investment. Second Am. Compl. at ¶ 64. Prudential encouraged or permitted these fraudulent sales by providing agents presentations and materials (including mailers, promotional brochures, and videotapes). Second Am. Compl. at ¶¶ 65–66.

55. Prudential knew that agents selling the VAL policies were required to be registered with the National Association of Securities Dealers ("NASD"), and that delivery of a prospectus was required, but nevertheless encouraged VAL sales by agents who were not NASD registered and who did not provide the appropriate prospectus. Second Am. Compl. at ¶¶ 67, 70. Thus, Prudential was aware of the widespread use of the "investment plan" sales tactic and encouraged it. Second Am. Compl. at ¶ 71.

### D. Prudential and the Individual Defendants Knew About the Fraudulent Marketing Scheme

56. Not only was Prudential aware of the fraudulent practices from its participation in the scheme, Prudential and the individual defendants were alerted to these practices early in the Class Period by internal investigators. Second Am. Compl. at ¶ 79. In 1982 and 1983, internal investigations by Prudential's regional auditing directors uncovered serious patterns of abuse involving financed insurance at many Prudential offices. Second Am. Compl. at ¶ 80.

57. When the auditing directors brought the abuse to the attention of Prudential's senior management, management dismissed the auditors' concerns as unimportant. Second Am. Compl. at ¶ 82. At that time, management took remedial action only to achieve "damage control." Second Am. Compl. at ¶ 82. Meanwhile, Prudential used public relations firms to handle the incidents. Second Am. Compl. at ¶ 82. In some cases, Prudential refused to remediate claims even though an office manager confessed to churning and to forging loan applications. Second Am. Compl. at ¶ 82.

58. Prudential also removed auditors who found churning evidence during their auditing projects and told them that "Marketing" would intercede. Second Am. Compl. at ¶ 83. Prudential warned these auditors not to rock the boat. Second Am. Compl. at ¶ 83. Moreover, Prudential demoted, or even terminated, district managers who complained to Prudential regarding the use of deceptive sales practices. Second Am. Compl. at ¶ 83.

59. In 1984, Prudential's auditing department designed a computer system to detect churning. Second Am. Compl. at ¶ 85. When Prudential tested the system in its Minneapolis office, sales plummeted. Second Am. Compl. at ¶ 85. In 1986, Prudential expanded the monitoring and detection system. Second Am. Compl. at ¶ 85. Thereafter, Prudential's senior management became aware that Prudential's Marketing group did not deter abusive sales practices and that Prudential needed a single uniform detection system. Second Am. Compl. at ¶ 85. Prudential, however, did not remedy the abuse

or implement a more comprehensive system, but instead transferred the individuals reporting deficiencies from their auditing positions. Second Am. Compl. at ¶ 85. Prudential continued to refer abusive sales practice matters to Marketing, which took no steps to stop the fraud. Instead, Marketing avoided pursuing compliance issues, especially where top sales agents were involved. Second Am. Compl. at ¶ 86.

60. Throughout the Class Period, Prudential affirmatively concealed its material omissions and misrepresentations from policyholders. Second Am. Compl. at ¶ 89. Prudential agents failed to provide policyholders sample policies at the point of sale. Second Am. Compl. at ¶ 90. Indeed, Prudential instructed its agents not to leave policy illustrations with prospective policyholders. Second Am. Compl. at ¶ 90. Even when policyholders finally received the policies, the policies neither corrected any of the oral misrepresentations or omissions, nor disclosed any of the unrealistic assumptions behind the policy illustrations. Second Am. Compl. at ¶ 90. Moreover, agents lied to policyholders and forged premium loans to conceal their wrongful conduct. Second Am. Compl. at ¶¶ 91–92.

61. Prudential also concealed its wrongdoing through its widespread, deliberate strategy to destroy documentary evidence. Second Am. Compl. at ¶ 95. In the summer of 1994, Prudential directed its offices to destroy all sales literature, product brochures, and canvassing letters, except for "approved" materials. Second Am. Compl. at ¶ 96. These documents included both regional and national documents. Second Am. Compl. at ¶ 97.

### E. Plaintiffs Allege Federal and State Causes of Action to Challenge Prudential's Deceptive Sales Practices

62. Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (for the sale of VAL policies), common law fraud, breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, negligence, negligent training and supervision, and unjust enrichment. Second Am. Compl. at ¶¶ 181–237.

### III. Background

### A. Plaintiffs Sued Prudential Throughout the Country Concerning Prudential's Deceptive Sales Practices and the Judicial Panel on Multi-District Litigation Consolidated the Actions and Transferred them to this Court

63. In February of 1995, various plaintiffs filed lawsuits in federal and state courts against Prudential concerning Prudential's sales and marketing practices. Weiss Aff. at ¶ 23. The original class actions filed against Prudential included *Nicholson v. The Prudential Insurance Co. of America,* filed on February 6, 1995 in the Circuit Court of the Third Judicial Court in Madison County, Illinois, and removed on March 7, 1995 to the Southern District of Illinois; *Kuchas v. The Prudential Insurance Co. of America,* filed on February 28, 1995 in the District of Connecticut; *Zoller v. The Prudential Insurance Co. of America,* filed on March 2, 1995 in the District of New Jersey; *Groth v. The Prudential Insurance Co. of America,* filed on March 3, 1995 in the District of New Jersey; *Dorfner v. The Prudential Insurance Co. of America,* filed on March 3, 1995 in the District of New Jersey; and *Toni Wachtler, Larry Wachtler and Norman Gassman v. The Prudential Insurance Co. of America,* filed on May 25, 1995 in the District of New Jersey. *Id.* at ¶ 23 n. 4.

64. In addition to these class actions, dozens of policyholders across the country brought individual actions alleging similar misconduct by Prudential (the "individual actions") and many former Prudential agents sued Prudential, alleging that Prudential wrongfully terminated them for refusing to participate in the deceptive sales practices alleged by the policyholders (the "agent actions"). *Id.* at ¶ 24.

65. On March 31, 1995, plaintiffs in the *Zoller, Dorfner* and *Groth* actions moved to consolidate those actions for pretrial purposes in this Court. *Id.* at ¶ 23. This Court granted that motion on April 25, 1995. *Id.*

66. On April 26, 1995, Prudential motioned to the Judicial Panel on Multi–District Litigation (the "MDL Panel") to consolidate all litigation arising out of Prudential's allegedly deceptive sales practices and to transfer these cases to this Court for coordinated pretrial proceedings. *Id.* at ¶ 24. Prudential then filed motions in the *Kuchas* Action, the *Nicholson* Action and others seeking a stay, or an extension of time to respond to the complaints and to plaintiffs' motions for class certification and intervention pending the multi-district consolidation. *Id.*

67. On August 3, 1995, the MDL Panel granted Prudential's motion for consolidation. August 3, 1995 Transfer Order (the "MDL Transfer Order") (finding that "these twelve actions involve common questions of fact, and that centralization under Section 1407 in the District of New Jersey will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation"). The actions that the MDL initially transferred included the *Kuchas* and *Nicholson* actions. *Id.* Since then, the MDL Panel has transferred many other class actions, individual actions, and agent actions to this Court.[13]

68. After the MDL Transfer Order, Prudential removed plaintiffs' state court cases to federal court based on diversity of citizenship or supplemental jurisdiction, and requested that the MDL Panel transfer these cases to this Court as part of the MDL Proceedings.

69. Among the actions that the MDL panel so transferred were: *Krell v. The Prudential Insurance Co. of America,* Case No. 95–CV–282, a purported state-wide class action brought in the Court of Common Pleas, Erie County, Ohio, and removed to the Northern District of Ohio (transferred on November 27, 1995), and *Kittle v. The Prudential Insurance Co. of America,* Case No. 95–C–264, a purported state-wide class action brought in the Circuit Court of Monogalia County, West Virginia, and removed to the Northern District of West Virginia (transferred on August 22, 1995). Counsel for these actions, Michael P. Malakoff, has bombarded this Court with paper throughout these proceedings.[14]

**13.** More than 100 other actions, including the class actions, the individual actions, and the agent actions, have been filed and centralized in this Court by the MDL Panel.

**14.** In the last six months, Michael Malakoff has filed reams of motions including, among others:

- A motion to enforce Federal Rule of Civil Procedure 5 and Pre–Trial Order Number 1 and to withdraw consent to *ex parte* communications by the parties with the Court, filed September 30, 1996;
- A motion for exception from Pre–Trial Order Number 1 to obtain discovery directly from Prudential, filed October 28, 1996;
- A motion for recusal, filed December 3, 1996;
- An *emergency motion* for recusal of the District Court Judge, filed December 5, 1996;
- An *emergency motion* to amend the December 5, 1996 Order to Show Cause, filed December 10, 1996;
- An *emergency motion* to allow discovery regarding Lead Counsel's and Prudential's $90,000,000 attorney fee agreement, filed December 12, 1996;
- An *emergency motion* to allow limited discovery regarding plaintiffs' request for attorneys' fees, filed December 12, 1996;
- An *emergency motion* pursuant to Rule 60(b) requesting: (1) relief from the Court's November 22, 1996 Order; (2) an exception from Pre–Trial Order Number 1; and (3)

expedited discovery, filed December 12, 1996;
- An *emergency motion* to disqualify Reid Ashinoff, counsel for Prudential and Melvyn I. Weiss, Co–Lead Counsel for Plaintiffs, filed December 12, 1996;
- An *emergency motion* for extension of time to file objections to the Proposed Settlement, filed December 13, 1996;
- An *emergency motion* to file papers via facsimile on December 17, 1996 in support of sanctions against Prudential for destruction of documents, filed December 17, 1996;
- An *emergency motion* to extend the time in which to file objections to (or opt out of) the Proposed Settlement, filed December 17, 1996;
- An *emergency motion* to refer Prudential's destruction of documents to the U.S. Department of Justice, filed December 18, 1996;
- A motion for leave to file an overlength brief in support of objections to Proposed Settlement, filed December 19, 1996;
- An *emergency motion* to strike lead counsel's application for an award of attorney's fees and reimbursement of expenses, filed January 13, 1997;
- An *emergency motion* to compel Lead Counsel and Prudential to produce certain documents, filed January 13, 1997;
- An *emergency motion* to vacate the Court's November 6, 1996 *ex parte* order appointing a fee examiner, filed January 14, 1997;

70. Kittle and Krell both moved to remand. Kittle moved to remand to the state court in West Virginia from which the case had been removed. This Court denied that motion on January 18, 1996. On January 30, 1996, Kittle moved to certify the Court's denial of his remand motion for interlocutory review pursuant to 28 U.S.C. § 1292(b). This Court denied that motion on March 15, 1996. Krell moved to remand to the state court in Ohio from which the case had been removed. This Court denied that motion on April 16, 1996. On August 6, 1996, Krell and Kittle filed Petitions for a Writ of Mandamus and a Writ of Prohibition concerning the Kittle and Krell Remand Orders, requesting the Court of Appeals for the Third Circuit to compel this Court to remand their cases to state courts in West Virginia and Ohio, respectively. On September 25, 1996, the Court of Appeals denied these petitions without opinion.

## B. The New Jersey Insurance Commissioner Led Insurance Regulators Throughout the Country to Form a Task Force

71. On April 25, 1995, in response to the allegations that plaintiffs had raised in various complaints, the New Jersey Insurance Commissioner formed the Multi–State Life Insurance Task Force (the "Task Force") comprised of insurance regulators from thirty states. The Task Force endeavored to examine Prudential's sales practices and to determine whether Prudential engaged in abusive sales tactics or permitted these practices to occur. Task Force Report at 1–2, 25. The Task Force's objectives were:

· An *emergency* motion to strike Lead Counsel's fee petition, filed January 15, 1997;
· An *emergency motion* to examine proffered demonstrative evidence, filed February 21, 1997;
· An *emergency motion* for access to judicial records, filed February 21, 1997;
· A supplemental motion for (1) relief from the Court's 11/22/96 Order, (2) exception from Pre–Trial Order Number 1, and (3) for expedited discovery, filed February 21, 1997;
· A second supplemental motion for: (1) relief from the Court's 11/22/96 Order, (2) an exception from Pre–Trial Order Number 1, and (3) expedited discovery, filed February 24, 1997;

· To examine allegations of churning, twisting, and misrepresentation in the sale of Prudential life insurance products;
· To determine the extent of possible improprieties in Prudential's sale of financed insurance from 1985 onward;
· To determine if Prudential's management "acted responsibly" with regard to its information regarding sales practices and agent misconduct;
· To develop an appropriate remediation plan to identify and recompense policyholders harmed by past unlawful financed insurance sales;
· To develop an appropriate plan design to minimize future financed insurance sales problems; and
· To impose sanctions if appropriate.

*Id.* at 1–3, 26–27.

72. During the course of its work, the Task Force reviewed and analyzed voluminous materials produced by Prudential, including computer based transaction information and electronic databases created by Prudential at the Task Force's request. *Id.* at 29. The Task Force interviewed over three hundred Prudential employees. *Id.* at 4. The Task Force also reviewed Prudential market conduct examinations that several individual states had undertaken. *Id.*

## C. Connecticut Conducted its Own Investigation and Produced an Independent Report

73. In April of 1995, in addition to the Task Force Investigation, the Attorney General of the State of Connecticut initiated a separate investigation into Prudential's alleg-

· An *emergency motion* to require Prudential to respond to a request for admissions about its interpretation of the Settlement Agreement within seven days, filed February 24, 1997;
· An *emergency motion* pursuant to Local Rule 12(B) to file proposed findings of fact and conclusions of law via facsimile and Federal Express or in the alternative, for authorization to utilize the District Court's "Drop Box" for filing after hours on March 3, 1997, filed March 5, 1997.
Indeed, Mr. Malakoff has also filed to date a total of twenty-three personal affidavits and three affidavits of his paralegal.

edly fraudulent life insurance sales practices, spurred by the announcement of a class action filed in the United States District Court, District of Connecticut.[15] Subsequently, the Connecticut Insurance Commissioner agreed to participate in the Task Force, but the Attorney General continued his own investigation, culminating in the Report of Investigation: Life Insurance Sales Practices of the Prudential Insurance Company of America, dated November 21, 1995 (the "Connecticut Report"). Weiss App., Vol. 2, Ex. B.

### D. Plaintiffs Organized and the Court Approved a Consolidated Team to Prosecute the Prudential Fraudulent Sales Practices Actions

74. On August 28, 1995, following the MDL Transfer Order, Plaintiffs' Counsel conducted an organizational meeting to create a coordinated team to prosecute the cases. Weiss Aff. at ¶ 32. At the meeting, Plaintiffs' Counsel elected an Executive Committee headed by Co–Lead Counsel. *Id.*

75. On October 14, 1995, the Court ordered the plaintiffs in the pending policyholder actions to file one amended consolidated complaint, defining one purported class of Prudential policyholders and setting forth all claims which could be asserted on behalf of that class. *Id.* at 37. Additionally, the Court permitted plaintiffs to submit a list of core documents that they sought from Prudential.

76. On October 24, 1995, in Pretrial Order No. 1, this Court appointed Melvyn I. Weiss of Milberg Weiss Bershad Hynes & Lerach LLP, as Co–Lead Counsel for the plaintiffs and Chair of Plaintiffs' Executive Committee, and Michael B. Hyman of Much Shelist Freed Deneberg Ament Bell & Rubenstein, P.C. as Co–Lead counsel for the plaintiffs. Plaintiffs' Counsel elected an Executive Committee headed by Co–Lead Counsel, and including Perry & Windels; Bono, Goldenberg, Hopkins & Bilbrey, P.C. (now known as Hopkins Goldenberg, P.C.); and Arnzen, Parry & Wentz, P.S.C. The Executive Committee elected Goldstein Till & Lite (now Goldstein Lite & DePalma) as Liaison Counsel. *Id.*

77. Pretrial Order No. 1 designated the Executive Committee, Co–Lead Counsel, and Liaison Counsel (collectively "Class Counsel" or "Plaintiffs' Counsel") to act on behalf of the plaintiffs in the class actions and on behalf of the plaintiffs in a group of related individual actions for discovery purposes. *Id.*

78. Also, on October 24, 1995, plaintiffs filed the Consolidated Amended Class Action Complaint ("First Amended Complaint"). This complaint combined all of the claims made by class plaintiffs then before the Court. *Id.* at ¶ 39. The First Amended Complaint alleged that Prudential had engaged in a fraudulent course of conduct to deceive and induce class members into purchasing Prudential life insurance products. *Id.* at ¶ 40. The complaint asserted violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, common law fraud, breach of contract, bad faith, negligent misrepresentation, negligence, unjust enrichment, and breach of state consumer fraud statutes. *Id.* at ¶ 41. The First Amended Complaint further alleged that Prudential had made material omissions and misrepresentations in sales presentations, policy illustrations, marketing materials, and other information that Prudential approved, prepared, and disseminated to its nationwide sales force. *Id.* at ¶ 8. Finally, the First Amended Complaint alleged that Prudential had wrongfully churned policyholders, sold vanishing premium policies, and disguised life insurance as investment products. *Id.* at ¶¶ 29–43, 45–52, 53–55.

### E. Plaintiffs Conducted Both Formal and Informal Discovery to Obtain Information Relating to Prudential's Alleged Fraudulent Sales Practices

79. On October 24, 1995, Plaintiffs' Counsel submitted the core documents list requested by this Court at the October 10, 1995 meeting. Weiss Aff. at ¶ 44. Plaintiffs sought, among other materials, documents that Prudential had provided to the Task Force, organization charts, documents concerning the manner in which Prudential

---

**15.** The *Kuchas* Action was filed on February 28, 1995.

agents and their supervisors were compensated, computer software relating to policy illustrations, Prudential's sales and training materials, customer complaint files, age and discipline files, documents concerning the setting of dividends and interest rates, and documents concerning Prudential's Ethics Hotline. *Id.*

80. At a status conference held on November 9, 1995, Prudential announced it was preparing motions to dismiss or stay the actions on the bases of "primary jurisdiction" and Rule 12(b)(6). November 9, 1995 Tr. at 32–33. At the November 9, 1995 status conference, the Court concluded, over plaintiffs' objection, that before any significant formal activity, including class certification, would occur, the Court would need to resolve the "primary jurisdiction" and Rule 12(b)(6) motions. Weiss Aff. at ¶ 45. The Court required that Prudential make a limited document production, including organization charts, documents relating to the Task Force formation, and all documents that Prudential had previously produced to the Task Force and to regulatory authorities in Connecticut and Florida. *Id.* at ¶ 46. Prudential argued to the Court at this meeting that New Jersey's Rule of Professional Conduct 4.2 ("RPC 4.2") prohibited Class Counsel from communicating with present or former Prudential employees regarding plaintiffs' claims. *Id.* at ¶ 47.

81. On November 27, 1995, Prudential again argued its interpretation of New Jersey RPC 4.2, this time through a formal motion. *Id.* at ¶ 50. Finding this reasoning unpersuasive, the Court permitted Class Counsel to develop a method to interview current and former Prudential employees. *See In re The Prudential Insurance Co. of America Sales Practices Litig.*, 911 F.Supp. 148 (D.N.J.1995). On January 23, 1996, this Court allowed interviews of current and former Prudential employees to proceed in accord with the Court-approved script and guidelines. Weiss Aff. at ¶ 51.

82. Meanwhile, on December 29, 1995, Co–Lead Counsel moved to stay the *Krell* and *Kittle* actions, arguing that the conduct of counsel for *Krell* and *Kittle* was obstructing Class Counsel's efforts to prosecute the consolidated class actions. *Id.* at ¶ 55. On March 14, 1996, this Court denied the motion without prejudice. *Id.*

## F. Plaintiffs Rebuffed Prudential's Early Settlement Overtures While Discovery and Motion Practice Continued

83. At this time, Prudential first raised the issue of settlement with plaintiffs' counsel. The settlement discussions abruptly ended, however, because plaintiffs would not discuss settlement absent significant discovery. Weiss Aff. at ¶ 49. Accordingly, Fee Examiner Stephen M. Greenberg praised Plaintiffs' Counsel for elevating the class interest over Class Counsel's economic interest: "Plaintiffs' counsel acted in this regard with singular devotion to the interests of the class, putting aside their own economic interest in a potential early settlement without the expenditure of substantial assets." Report and Recommendation of Stephen M. Greenberg, Fee Examiner dated February 13, 1997 at 16 ("Fee Report").

84. From the outset, Class Counsel would not conduct settlement negotiations without certain ground rules: (i) plaintiffs would not discuss settlement terms before Class Counsel had a basis to evaluate Prudential's conduct; (ii) the financial and Alternative Dispute Resolution ("ADR") settlement terms would depend on Class Counsel's conclusions about the egregiousness and degree of Prudential management's participation in the wrongful practices; and (iii) plaintiffs would likely insist on funds in excess of compensatory payments based on Class Counsel's preliminary investigation. Weiss Aff. at ¶ 46. Because Prudential rejected Class Counsel's ground rules, negotiations quickly ended.

85. On December 26, 1995, the defendants moved to dismiss the First Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b). In support of their motion, defendants claimed: (1) the securities law claims statute of limitations had run and that the claims lacked various elements; (2) the New Jersey Consumer Fraud Act claims were preempted by New Jersey's comprehensive regulation of the insurance industry; (3) the common law fraud allega-

tions lacked particularity under Rule 9(b), failed to include allegations of requisite scienter, and improperly alleged plaintiffs' reliance based on Prudential agents' oral statements, which were contradicted by written Prudential documentation; (4) the negligent misrepresentation claim failed to include requisite allegations that specific Prudential agents knew or should have known of the falsity of the alleged misrepresentations; (5) the contract claims were barred by the plain language of the integrated written contracts; (6) no duty existed for the claim for breach of the fiduciary duty; and (7) the negligent supervision claims were not supported by the factual allegations. *See generally* Memorandum of Law in Support of Defendant's Motion to Dismiss the Consolidated Amended Class Action Complaint. Plaintiffs responded both to the primary jurisdiction and Rule 12(b)(6) motions with vast briefs and an array of supporting documents.

86. In early 1996, settlement negotiations renewed, because Prudential agreed to provide discovery. Weiss Aff. at ¶ 57. By March 12, 1996, however, the negotiations broke down, because Class Counsel would not accept the conditions that Prudential sought to impose on plaintiffs' receipt of the discovery. *Id.* Prudential demanded that plaintiffs agree to use the produced discovery for settlement purposes only and that the discovery not be used to respond to the motions to stay or dismiss, to prepare the motions for class certification, or to amend the Complaint. *Id.* When the settlement negotiations faltered, Prudential immediately ceased producing documents. March 12, 1996 Letter from Melvyn Weiss to Reid Ashinoff (discussing the breakdown of negotiations), *in* Weiss App., Vol. 1, Ex. K. On March 13, 1996, the parties informed the Court that they were at loggerheads.

## G. Motion Practice Continued and Plaintiffs Pursued Informal Discovery

87. On April 7, 1996, the Court made several key determinations. The Court denied Prudential's motion to stay or dismiss the class action based on primary jurisdiction and the Burford Abstention doctrine, the Court decided to postpone the class certification issue until the conclusion of the Task Force investigation, and the Court permitted limited discovery with prior Court approval.

88. While formal discovery was restricted, the Court permitted Class Counsel to interview, under RPC 4.2, former Prudential employees. *See In re The Prudential Ins. Co. of America Sales Practices Litig.,* 911 F.Supp. 148 (D.N.J.1995). Thereafter, Plaintiffs' Counsel contacted hundreds of current and former Prudential agents from lists obtained from Prudential and from other sources. Weiss Aff. at ¶ 61. Through the interviews, Plaintiffs' Counsel obtained critical information concerning fraudulent sales practices and document destruction; Plaintiffs' Counsel also acquired hundreds of Prudential documents, and video and audio tapes. *Id.* at ¶ 64.

89. Plaintiffs' Counsel also contacted thousands of class members through interviews and questionnaires. Counsel's findings tend to support plaintiffs' claim that Prudential had engaged in a uniform scheme to defraud policyholders. *Id.* at ¶ 72.

## H. The Court Dismissed Many of the Claims in Plaintiffs' First Amended Complaint

90. On May 10, 1996, this Court concluded that while plaintiffs had alleged Prudential's scheme to defraud with adequate particularity, many of the individual plaintiffs' claims should be dismissed without prejudice. *See generally* Order and Opinion dated May 10, 1996, 1996 WL 392145, as amended on June 10, 1996. The Court dismissed three of the five named plaintiffs' claims without prejudice. The Court also dismissed plaintiffs' claims for breach of contract, breach of fiduciary duty, and violation of the New Jersey Consumer Fraud Act. The claims against the individual defendants Arthur F. Ryan, Donald D. Barbaro, and Ronald G. Southwell were voluntarily dismissed without prejudice.

91. The Court found that plaintiffs would not likely prevail on many of their claims, even if they survived Prudential's initial challenges to their pleadings:

The Court has found much of the Complaint to be deficient, and will dismiss sev-

eral of plaintiff's claims without prejudice. On the other hand, the standard for dismissal under Rule 12(b)(6) is a high one, and the Court has allowed several claims to go forward, despite considerable doubt as to their ultimate merits. In sum, this opinion will likely not be the final word in framing the issues ultimately to be resolved in this case. Plaintiffs may successfully replead some of their claims, and Prudential may prevail on some of its arguments at the summary judgment stage.

*Id.*

### I. The Task Force Found that Prudential Had Committed Widespread Sales Practice Abuse, Fined Prudential $35 Million, and Released the Task Force Plan [16]

92. During the course of its proceedings, the Task Force reviewed numerous Prudential documents and electronic data bases and interviewed many Prudential agents and executives. Stipulation of Settlement at ¶ 6. Prudential and the Task Force continued to negotiate a remediation plan to provide relief to policyholders who had been harmed by Prudential's misrepresentations. *Id.* at ¶ 8. In July of 1996, in anticipation of the Task Force's release of the Task Force Report and Task Force Plan, the Court requested a "quiet period" during which the parties would review and study these documents but make no public comment. Weiss Aff. at ¶ 75.

93. On July 9, 1996, the Task Force issued its report. The Task Force found that many Prudential policyholders had been misled to purchase life insurance and that Prudential's internal efforts to prevent these abuses were inadequate. Task Force Report

at 13–17. The Task Force Report found, for example:

- "serious communication problems between Prudential and its sales force," *id.* at 8;

- "widespread violations by Prudential agents" of state replacement regulations, and that "some Prudential agents engaged in abusive sales practices" and "[i]n some cases, agents caused additional premiums to be paid," *id.* at 14; and

- "Prudential failed to responsibly police and discipline its agents with regard to replacement activities," *id.* at 15.

The Task Force Report also noted that "[i]n many instances, if the policyholder questioned the agent about why loans were being taken against the contract, he/she was told it was a Home Office mistake and were [sic] advised by the agent that he or she would take care of the problem." *Id.* at 189.

94. The Task Force also found, however, that not all replacement transactions or APP transactions were improper:

It is important to note that not all policyholders were dissatisfied and not all sales by Prudential agents were improper. Between 1990 and 1994, only 2.6 policyholders per 1,000 in-force policies filed sales complaints with the company or regulators. Replacements, financed insurance and APPs represented 14 percent, 16 percent and 14 percent of new sales, respectively, at their peak in 1990. There was a steady decline in all three types of sales between 1990 and 1994.

*Id.* at 11.

95. Additionally, the Task Force Report included a remediation plan, the Task Force

---

16. The Connecticut Attorney General, on November 21, 1995, issued his own investigative report. The Connecticut Report found, among other things, that Prudential's churning activities within Connecticut were widespread and uniformly misleading:

The core finding of this investigation is that there is evidence that Prudential agents induced policyholders in Connecticut to apply the cash value and dividends of existing life insurance polices to purchase additional life insurance by falsely representing that policyholders would have no out-of-pocket expenses for the new policy when they knew or should

have known that these representations were false. There is also ample evidence that Prudential agents failed to disclose or misrepresented the transaction and the effect on the values of existing policies to the detriment of policyholders in Connecticut.

\* \* \* \* \* \*

There is evidence that Prudential knew, or should have known, in the reasonable conduct of its business of the unfair or deceptive acts or practices of its agents in the state of Connecticut, and that it may be found to be responsible for such unfair or deceptive acts or practices. Connecticut Report at 67.

Plan. The Task Force Plan provided policy-holders the opportunity to participate in either an ADR process or Basic Claim Relief. *Id.* at 18. This plan essentially tracked a settlement that many of the counsel representing plaintiffs in this action had developed in litigation with New York Life Insurance Company. *Id.* at 31–33, 192–93. Forty-three states and the District of Columbia signed Consent Decrees adopting the Report, the Task Force Plan, and the associated fines.

### J. The MDL Panel Continued to Transfer Actions to this Court and Some Individual Plaintiffs Filed a Consolidated Motion to Remand

96. Prior to July 23, 1996, the MDL Panel transferred approximately thirty additional policyholder actions, mostly individual actions, to this Court. The Court invited counsel for these actions to a conference on July 23, 1996. Only one representative attended. At the July 23, 1996 conference, the Court indicated that Lead and Liaison Counsel for the class action cases should also serve that function in the individual cases.

97. In October of 1996, many of these individual plaintiffs filed a Consolidated Motion for Remand. Under this Court's November 12, 1996 Order, the Consolidated Motion for Remand was to be heard on March 21, 1997. The motion since has been adjourned and will be heard in April.

### K. While Class Counsel Continued to Pursue Discovery and to Amend the Complaint, Prudential Counsel and Class Counsel Resumed Settlement Negotiations, Which Resulted in the Settlement Agreement and Later in the Stipulation of Settlement

98. The release of the Task Force Report enlivened settlement negotiations. At this time, Prudential agreed to negotiate in accordance with plaintiffs' rules, the rules that Prudential had rejected in late 1995 and early 1996. Weiss Aff. at ¶ 84; Ashinoff Aff. at ¶ 5. Moreover, Prudential finally agreed to produce additional documents and witnesses for deposition. Weiss Aff. at ¶ 84; Ashinoff Aff. at ¶¶ 8, 11–14.

99. Lead counsel indicates that the settlement negotiations proceeded in three stages: "The more fruitful settlement negotiations ... can be divided into three phases: first, the period from July 6 through August 16, 1996 (the 'Preliminary Negotiations'); second, the period from August 17, through September 22, 1996 (the 'Settlement Agreement Negotiations'); and third, the period from September 23 through October 28, 1996 (the 'Stipulation of Settlement Negotiations')." Weiss Aff. at ¶ 103.

100. Following the release of the Task Force Report and Plan on July 9, 1996, the preliminary negotiations began. *Id.* at ¶ 104. On July 16, 1996, at the Court's direction, and after plaintiffs had studied the Task Force Report and Plan, the parties began conducting extensive discussions.

101. On July 18, 1996, plaintiffs prepared and served document requests on Prudential in an effort to ensure that plaintiffs had not missed any material information in their earlier efforts. *Id.* at ¶ 48. By August 8, 1996, plaintiffs had received more than seventy boxes of documents in response to the July 18, 1996 request. *Id.*

102. Plaintiffs' repeated insistence on a rebuttable presumption that all replacements had been made through misrepresentations, entitling each policyholder claiming wrongful replacement to an automatic ADR score, was a major impediment to negotiations. *Id.* at ¶ 107. Prudential would not concede this point, arguing that it had also refused to concede this point to the Task Force. *Id.*

103. On August 12, 1996, the Court met separately with Prudential and Class Counsel. *Id.* at ¶ 108. In the next couple of days, August 15 and 16, 1996, Class Counsel and Prudential counsel met to overcome the hurdles. *Id.* As an alternative to the blanket rebuttable presumption that had previously stymied negotiations, Class Counsel developed the concept of the financial guarantees. *Id.* at ¶ 109. These guarantees were a creative approach to achieving an eventual settlement.

104. August 16, 1996 marked the beginning of the second phase of settlement negotiations, the "Settlement Agreement Negotia-

tions." *Id.* at ¶ 117. During this phase, the parties negotiated the many detailed ADR and Basic Claim Relief improvements. *Id.*

105. On September 20 and 21, 1996, the parties informed the Court of the few remaining unsettled issues. *Id.* at ¶ 124. These open issues included: the appropriate cut-off date for the Complaint History factor, whether and when Prudential would be permitted to terminate the settlement based upon the number of class members requesting exclusion, whether the deadline for filing an election form should be increased from sixty to seventy-five days, the role of Plaintiffs' Counsel and the Court in fashioning an outreach program, and the allocation of the Additional Remediation Amount among remediated claimants. *Id.*

106. On September 22, 1996, after reviewing drafts of a joint press release, the parties executed the Settlement Agreement, which memorialized all of the terms of the parties' settlement. *Id.* at 128; Settlement Agreement in Weiss App., Vol. 2, Ex. M ("Settlement Agreement"). For the Settlement Agreement to become fully effective, however, three important conditions had to occur. First, the Settlement Agreement was not to apply to any policyholder living in one of the forty-three states and the District of Columbia that had adopted the Task Force Report and Plan through the entry of the Consent Order unless the policyholder's jurisdiction agreed to modify its Consent Order to conform to the Settlement Agreement. Settlement Agreement at ¶ F.7. Second, the Settlement Agreement required the parties to execute a final Stipulation of Settlement by October 28, 1996. *Id.* at ¶ F.3. Third, the Stipulation of Settlement would differ from the Settlement Agreement if the ongoing discovery revealed facts that were materially inconsistent with the information that Prudential had provided to plaintiffs before signing the Settlement Agreement. *Id.* at ¶ F.2.

107. Importantly, the parties did not discuss attorneys' fees on or prior to September 22, 1996. *Id.* at ¶ K.

108. During this general time frame, plaintiffs continued their discovery efforts. Weiss Aff. at ¶ 83. In mid–August 1996, Prudential agreed to produce documents re-

lating to three broad categories: actuarial documents, complaint documents (including policyholder complaints to Prudential and Prudential agent complaint files), and other documents such as training documents, marketing documents, internal publications, and internal communications. *Id.*

109. On September 19, 1996, plaintiffs compiled the evidence that they had accumulated through their investigations and through formal and informal discovery and filed the 237 paragraph Second Amended Complaint. The Second Amended Complaint contained legal claims similar to those asserted in the First Amended Complaint (common law fraud, breach of contract, breach of duty of good faith and fair dealing, negligent misrepresentation, negligent training and supervision, unjust enrichment, and imposition of a constructive trust), but significantly expanded plaintiffs' factual allegations.

110. Plaintiffs served Prudential with a formal discovery demand on September 30, 1996. Weiss App., Vol. 1, Ex. H. Prudential served its formal response to this demand on October 25, 1996. *Id.,* Vol. 1, Ex. I. In total, Prudential produced over one million pages of documents, 160 computer diskettes and cartridges, and over 500 audio and video tapes. Weiss Aff. at ¶ 85.

111. Class Counsel assembled a team of approximately thirty attorneys, with consulting actuaries and paralegals and data processing staff, to analyze and categorize these documents. *Id.* at ¶ 86; Ashinoff Aff. at ¶ 12. The team reviewed all of the produced information and conducted twenty depositions. Weiss Aff. at ¶ 91.

112. Between September 23 and October 28, 1996, the parties conducted the final phase of settlement negotiations, the "Stipulation of Settlement" negotiations. *Id.* at ¶ 130. These negotiations focused on:

· Creating a Mutual Fund Enhancement as an additional element to the Basic Claim Relief Package and other enhancements to the already expanded Basic Claim Relief package;

· Completing final discovery to ensure the validity of the assumptions underlying the settlement;

· Preparing the Stipulation of Settlement, sample claim forms, Class Notice, and other documents; and

· Harmonizing the Stipulation of Settlement with comments received from state regulators that had adopted the Task Force Plan.

*Id.* Plaintiffs anticipated that the forty-four jurisdictions with Consent Orders would agree to amend their Consent Orders to conform to the terms of the Settlement Agreement. *Id.*

113. The Task Force Plan, and the concomitant Consent Orders, provided generally that the Task Force Plan was to be implemented in October of 1996. *Id.* at ¶ 131. The regulators' principal concern was to remediate claims quickly. The Settlement Agreement had contemplated implementation only if and when the Settlement were approved and all appeals, if any, were concluded. *Id.*

114. Plaintiffs' Counsel, Prudential, and the regulators agreed that the ADR process and Basic Claim relief package would be implemented by February 1, 1997, with certain exceptions.[17] *Id.;* Ashinoff Aff. at ¶ 15.

115. Class Counsel ultimately succeeded in obtaining many terms which Prudential had previously rejected:

[P]laintiffs' counsel insisted on, and obtained, an ADR Process that included a claimant representative, chosen by Lead Counsel, to monitor the ADR Process; a commitment by Prudential to make a minimum expenditure of at least $410 million for ADR remedies; a commitment by Prudential to make a payment of additional remediation amounts, above and beyond compensatory relief, to be distributed amongst eligible Class Members; and other financial guarantees, all points to which Prudential objected when the negotiations started.

Ashinoff Aff. at ¶ 9.

116. On October 11, 1996, after all outstanding material provisions of the Stipulation of Settlement had been resolved, the Court granted the parties oral permission to negotiate attorneys' fees. The parties thereafter agreed on attorneys' fees and incorporated an appropriate provision in the Stipulation of Settlement ¶ K. Weiss Aff. at ¶ 132; Ashinoff Aff. at ¶ 16. The parties executed the Stipulation of Settlement on October 28, 1996. Weiss Aff. at ¶ 184.

**L. The Court Ordered Conditional Certification of the Class and that the Parties Mail Class Members Notice of the Proposed Settlement**

117. On October 28, 1996, the Court (1) approved the Form of Class Notice for dissemination to policyholders to advise them of the Proposed Settlement, and (2) set a date for a hearing on the fairness, reasonableness and adequacy of the Proposed Settlement; certification of the Settlement class, and plaintiffs' request for fees and reimbursement of expenses.

118. On October 28, 1996, the Court issued an Order that:

· conditionally certified the Class for settlement purposes,

· designated the law firms Milberg Weiss Bershad Hynes & Lerach LLP and Much Shelist Freed Denenberg Ament Bell & Rubenstein, P.C as Lead Counsel for the Class,

· designated additional counsel for the Class,

· designated the named plaintiffs in the Second Amended Complaint as Class Representatives,

· scheduled the Fairness Hearing for January 21, 1997,

· directed the form and timing of Class Notice, which provided an opportunity for class members to opt out or object, and

· imposed a preliminary injunction to effectuate the Proposed Settlement, enjoining policyholders or others acting on their behalf from excluding any other policyholders from the Class, from filing, commencing, continuing, litigating, intervening in or participating in any lawsuit in any jurisdiction based on facts and cir-

---

**17.** The financial minimums and guarantees, and the Mutual Fund Enhancement, for example, would only be implemented after all settlement appeals were resolved.

cumstances of the claims asserted here, unless that policyholder has opted out of the Class.

## IV. Stipulation of Settlement Terms

119. Under the Proposed Settlement, each class member may choose between an ADR process or Basic Claim Relief.

### A. The Proposed Settlement Provides an Alternative Dispute Resolution Process Through Which Policyholders May Obtain Full Remediation

120. Class members can elect to submit their claims to the ADR process, which is a fair and swift alternative to litigation. The ADR process allows a class member to attain claim resolution, more quickly and easily than would be possible through litigation. The ADR process also is less expensive than litigation, because there are no costs to the class member; Prudential has agreed to pay all costs. Class members need not retain counsel to participate in the ADR, although class members may retain counsel if they so choose.

121. The Prudential Alternative Dispute Resolution Guidelines (the "ADR Guidelines") provide detailed mechanisms to elicit complaints from policyholders, to gather relevant evidence from the claimant and Prudential's files and agents, to evaluate class member claims, to score claims properly based on the evidence gathered and the appropriate standards, to ensure adequate representation, and to offer appropriate relief based upon the claimant's score. Stipulation of Settlement, Ex. B.

### 1. The ADR Procedures Cast a Wide Net to Gather Evidence Relevant to Class Members' Claims

122. Before claims are scored, the claimants must complete a Claim Form questionnaire. The policyholder must sign the form under penalty of perjury, but the form need not be notarized. The claimant must attach all pertinent records to the Claim Form.

123. An "800" telephone number will provide claimants with assistance in completing their forms; Plaintiffs' Counsel will monitor the operators at the number to ensure that all advice given is accurate and adequate. If the claimant does not properly complete the form, Prudential will return the form and allow the claimant to correct the deficiency within thirty days.

124. Once the Claim Form has been properly submitted, Prudential must obtain its own internal records regarding the transaction and must contact the agent who sold the claimant the policy. Prudential may not discipline an agent solely based upon truthful representations that the agent made in a statement filed in response to a claim. Stipulation of Settlement, Ex. C, at 7, ¶ II.G.2.c.

### 2. The ADR Process Contains Specific Claim Evaluation Procedures to Ensure that All Relevant Evidence Is Considered

125. The claim evaluation process involves comprehensive multi-tier reviews.

126. First, a claim is reviewed by a member of the Claim Evaluation Staff. This Staff is comprised of Prudential personnel not involved with the sale of individual insurance policies. A "Claimant Representative" appointed by Class Counsel and compensated by Prudential will monitor this Staff. The Claimant Representative or his assistants will continue to aid each claimant throughout the ADR process.

127. Second, if the Claim Evaluation Staff does not award the highest score available, a "3," an Independent Claim Evaluation Team (the "Claim Team") will automatically review the claim. The Claim Team members are not affiliated with Prudential. All members are appointed by Class Counsel and the Regulatory Oversight Staff.[18] Prudential pays the costs of Claim Team review. The Claim Team uses the same scoring criteria used by the Claim Evaluation Staff. If the Claim Team disagrees with the Claim Evaluation Staff's findings, the Claim Team will recom-

---

18. The regulatory oversight staff includes those persons appointed or designated by the State Insurance Departments assembled to provide oversight of the Programs. Stipulation of Settlement, Ex. C, at 3, ¶ I.D.10.

mend in writing that the Claim Evaluation Staff increase the claimant's score.

128. Third, a member of the Claim Review Staff will review the Claim Team recommendation. The Claim Review Staff consists of Prudential employees who have not acted as licensed agents for the company and have not supported or supervised licensed agents. The final determination of the Claim Review Staff is monitored by the Claimant Representative. Prudential may not appeal this decision.

129. Fourth, if the claimant is dissatisfied with the Claim Review Staff determination, the claimant may obtain arbitration of the decision by the Appeals Committee. This Committee is comprised of individuals not affiliated with Prudential. These individuals are experienced in life insurance or in arbitration. Appeals Committee members are selected by Class Counsel and by the Regulatory Oversight Staff, from a list jointly agreed upon by Class Counsel, the Regulatory Oversight Staff, and Prudential.

130. The Appeals Committee uses the same criteria used by the Claim Evaluation Staff and Claim Team, but the Committee reviews a claimant's score *de novo*. At this stage, the claimant may obtain cost-free representation by a Representative who has been appointed by Class Counsel and approved by the Task Force. The claimant has a right to rehearing if the Claimant Representative determines that a "manifest injustice" has occurred in connection with the claim.

131. Class Counsel and the Regulatory Oversight Staff will act to ensure the fairness of the entire process. Moreover, Prudential will select, at its own expense, an independent public accounting firm, satisfactory to Lead Counsel and the Regulatory Oversight Staff, to serve as independent auditors and assess the consistent application of the ADR guidelines and procedures. Stipulation of Settlement, Ex. C, at 17–18, ¶ IV.D.

### 3. The ADR Process Provides that Claims Are Scored Generously According to the Class Members' Claim and the Available Evidence

132. Under the Proposed Settlement, claims are scored depending on the type of claim. Three claim categories correspond to the deceptive sales categories described in the Second Amended Complaint: "Financed Insurance," "Abbreviated Payment Plan," and "Life Insurance Sold as an Investment, Savings or Retirement Vehicle." *Id.*, Ex. B, at 16, 26, 34, ¶¶ II, III, IV. The Proposed Settlement also includes a fourth, miscellaneous category, "Other," for claims of misconduct, in the sale or servicing of a policy, that are not covered by the other categories. *Id.*, Ex. B, at 307, ¶ V.

133. Within each of the categories, the ADR Guidelines provide "Claims Resolution Factors" that scorers must use to assess the merits of a claim. For example, in a case involving Financed Insurance, or churning, Claim Resolution factors include: "A Misstatement in respect of loans [that] was made to the Policyholder as to whether, or to what extent, loans would be taken or charged against the Existing Policy to finance the New Policy." *Id.*, Ex. B, at 16, ¶ II.A.1.

134. To determine whether the claimant has demonstrated a Claims Resolution Factor, the scorer looks to a list of "Specific Evidentiary Considerations." In each of the four claims categories, the Guidelines provide Specific Evidentiary Considerations that are considered "supporting evidence" and "undermining evidence." The Specific Evidentiary Considerations provide the decision calculus that the scorers will use to determine a policyholder's score.

135. In cases involving Financed Insurance, for example, a policyholder's score may be increased if: (1) "the Policyholder was advised by the Agent, after the issuance of the New Policy, to disregard notices of the Company concerning loans," (2) if the agent engaged in a pattern of such transactions, or (3) if the policyholder had an annual income of less than $25,000. *Id.*, Ex. B, at 17, ¶ II.B.1.

136. In Abbreviated Payment Plan or Vanishing Premium claims, a policyholder's score could increase if a Prudential agent told the policyholder to disregard notices concerning loans or lapses, or if Prudential used the phrase "vanishing premium" or

"vanish point" in writing. *Id.*, Ex. B, at 26, ¶ III.B.1.

137. In addition to the specific evidentiary considerations applicable to specific claims, there are other considerations that apply to all claims. For example, under the Proposed Settlement, a claimant's score can be increased if there is evidence that documents pertinent to the claim have been lost or destroyed. Similarly, a claimant's score can be increased if there is a record of disciplinary action against the agent who sold the policy, or if the agent does not cooperate with Prudential in responding to the claim. *Id.*, Ex. B, at 11, ¶ I.F.1.c–d.

138. Scorers give claims a score of "1, 12," or "3," with "3" being the highest score.[19] The highest score the policyholder receives in any claim category determines the relief that the policyholder will be entitled to.

139. The relief available through the ADR Process varies depending on the type of claim and the level of proof supporting it. Stipulation of Settlement at 17, ¶ C.1. The various types of relief are designed to provide comprehensive compensation that addresses the type of claim and the harm associated with it. Under this system, scores of "3" will receive full compensatory relief.

140. The relief available depends not only on whether the claimant receives a score of "1," "2," or "3," but also on the type of claim that the claimant has asserted. The following paragraphs explain the types of relief available to different types of claims:

19. By assessing the claim resolution factors according to the available evidence, scorers will award each claimant a score. The scores are as follows:
 "3" A score of "3" is assigned in the event that either (i) Company Documentation expressly supports the Misstatement, *or* (ii) the Agent Statement confirms the Claimant's allegation of the Misstatement and this confirmation is not undermined by Available Evidence.
 "2" A score of "2" is assigned in the event that the alleged Misstatement is not expressly in writing and the Agent Statement denies the allegations, but (i) Available Evidence, on balance, supports the Claimant's allegation of the Misstatement, *or* (ii) the Agent has a Complaint History.

· **Financed Insurance**—The policyholder may obtain a refund of the loans, dividends, or values improperly used, with interest in some cases. The policyholder also may be entitled to cancel the "new" policy and get back some or all of the premiums paid, with interest in some cases. February 1, 1997 Notice at 7.

· **Abbreviated Payment**—The policyholder may be permitted to cancel the policy and obtain a refund of some or all of the premiums paid, with interest in some cases. Alternatively, the policyholder may be permitted to keep the policy without having to make any additional out-of-pocket payments for some or all of the premiums due. *Id.* at 7–8.

· **Investment Product**—The policyholder may be allowed to cancel the policy and obtain a refund of some or all of the premiums paid, with interest in some cases. Alternatively, the policyholder may be able to exchange the policy for an annuity. *Id.* at 8.

· **Other Claims**—If a policyholder was misled in some other way, the policyholder may be allowed to cancel the policy and obtain a refund of some or all of the premiums paid, with interest in some cases, or may be able to use the refund to purchase another policy. *Id.*

## B. Policyholders Who Do Not Desire to Participate in the ADR Process Receive Real and Valuable Benefits Through Basic Claim Relief

141. Class members who prefer not to participate in the ADR process, may receive

 "1" A score of "1" is assigned in the event that the alleged Misstatement is not expressly in writing and the Agent Statement denies the allegation, and Available Evidence, on balance, neither supports nor undermines the Claimant's allegation of the Misstatement.
 "0" A score of "0" is assigned in the event that Available Evidence exists which undermines the Claimant's allegation of the Misstatement and suggests that no Misstatement occurred.
 "NA" "N/A" is assigned in the event that the Claim Resolution Factor is "not applicable" to the Claim submitted.
Stipulation of Settlement, Ex. B, at 9, ¶ I.D.

the Basic Claim Relief benefits available to all class members.[20] Class members need provide no proof of injury to avail themselves of these benefits.

142. Four types of Basic Claim Relief are available to class members: Optional Premium Loans, Enhanced Value Policies, Enhanced Value Annuities, and Mutual Fund Enhancements. Arthur Andersen, LLP has valued this relief at $799.6 million. Hoyer Aff. at ¶ 6 and Ex. B.

143. Optional Premium Loans are loans that defray the costs of out-of-pocket premiums due that are beyond what was initially illustrated to the policyholder. Stipulation of Settlement, Ex. D, at 3, at ¶ I.B.11. These loans charge policyholders an interest rate equal to Prudential's unsecured short-term cost of borrowing. *Id.*

144. The Enhanced Value Policy is intended for class members who have borrowed heavily against their existing polices and desire to obtain a new policy in a comparable amount with liberalized underwriting. The Enhanced Value Policy is an insurance policy with features similar to the class member's existing or terminated policy, except that Prudential will contribute to the policy's cash value 50% of the Enhanced Value Policy's first year premium on the first annual premium due date, 25% on the third annual premium due date, 25% on the fifth annual premium due date, and 15% on the seventh annual premium due date. *Id.*, Ex. D, at 5, ¶ III.A.

145. The Enhanced Value Annuity is a currently issued, designated, nonqualified deferred annuity. *Id.*, Ex. D, at 6, ¶ IV.A. Where the first payment into the annuity is less than $25,000, Prudential will add 2% to the value of the annuity in the first year. *Id.*, Ex. D, at 7, ¶ IV.A.7. Where the initial payment is over $25,000 and not greater than $50,000, Prudential will add 3% to the value of the annuity in the first year. *Id.* In addition, Prudential will contribute 2% of the initial premium in the second policy year and 1% of the initial premium in the third policy year. *Id.*

146. The Mutual Fund Enhancement gives a policyholder a choice between certain mutual funds, where Prudential will contribute 4% of the initial purchase amount to the value of the funds, to a maximum of $2,000. *Id.*, Ex. D, at 8, ¶ V.A.

## C. Financial Commitments Guarantee that Class Members Will Receive Substantial Relief Under Any Turn of Events

147. The Proposed Settlement contains three "Financial Commitments" to ensure that policyholders will receive the relief to which they are entitled.

148. First, the Proposed Settlement contains a "Minimum Payment" provision. This provision requires Prudential to spend at least $410 million in the ADR process, regardless of the number of remediated claims.

149. Second, the Proposed Settlement contains a "Financial Guarantee" of $780 million. During settlement negotiations, Prudential provided plaintiffs with various projections of anticipated spending under the Task Force Plan. Prudential indicated that it would likely spend $220 million for each 110,000 claims remediated and that many claims would receive high scores. Plaintiffs insisted that Prudential guarantee to spend these amounts; the plaintiffs eventually negotiated an increase in the guaranteed amount from $220 million to $260 million for each 110,000 (up to 330,000) claims, for a total of $780 million.

150. Third, the Proposed Settlement provides an "Additional Remediation Amount" on a sliding scale. This Amount is a fund in addition to the compensatory relief provided by the ADR process. Under the Proposed Settlement, the Court determines how to allocate the Additional Remediation Amount among claimants who have scored a "3" or a "2," unless the Court finds that the amount should be allocated more broadly. Stipulation of Settlement, Ex. B, at 39, ¶ VI.A. The fund includes $150 million for the first 110,-

---

**20.** Any claimant may first choose Basic Claim Relief. If the claimant chooses ADR, however, and later receives a score of "0," meaning that the evidence indicates no valid claim, then the claimant cannot receive Basic Claim relief.

000 claims remediated; $250 million for 220,000 claims remediated; $300 million for 330,000 claims remediated; $250 million for 440,000 claims remediated; $150 million for 550,000 claims remediated; and $50 million for 660,000 or more claims remediated. The Additional Remediation Amount is calculated so that if Prudential remedies more than 330,000 claims, the economic effect on Prudential, *i.e.* the spending of over $1.0 billion in compensatory damages, reduces the additional remedial amounts that Prudential must pay. Although Prudential's additional remediation amount begins to decrease after 330,000 claims, Prudential's obligation to pay compensatory awards continues to increase. Thus, the net benefit to policyholders continues to increase. Indeed, the Proposed Settlement contains no cap.

### D. The Unprecedented Outreach Program Will Ensure that All Class Members Are Aware of Their Rights and Will Encourage Injured Class Members to Participate in the Proposed Settlement Relief

151. The Proposed Settlement establishes an unparalleled outreach program to ensure that class members are adequately informed about the Proposed Settlement. The outreach program entails not only that each class member be provided individual notice of Proposed Settlement benefits, but also that Proposed Settlement benefits be publicized in all fifty states, through print, television, and radio. Stipulation of Settlement, at 29, ¶¶ G.5.a. to G.5.b. The outreach program includes a six-day-a-week toll-free "800" telephone number to answer class member questions. *Id.* at 30, ¶ G.5.7(a). Plaintiffs monitor the "800" number operators.

### E. The Proposed Settlement Substantially Improves the Task Force Plan

### 1. The Proposed Settlement Provides Significant Enhancements to the Task Force Plan

### a. The Proposed Settlement Provides Valuable Financial Commitments

152. The Task Force Plan contained no minimum payments, financial guarantees, nor

Additional Remediation Amount. The Proposed Settlement now provides these commitments to ensure that policyholders will receive meaningful relief in the ADR process, and receive an extra-compensatory award.

### b. The Proposed Settlement Improves Claim Scoring and Evaluation Criteria for the Benefit of Claimants

153. The Proposed Settlement significantly improves the claim scoring and evaluation criteria contained in the Task Force ADR Plan:

· The Proposed Settlement provides that boilerplate statements contained in policy illustrations and contracts to the effect that the dividends, interest or investment returns are "not guaranteed" or "non-guaranteed," will not independently undermine a claim. Stipulation of Settlement, Ex. B, at 9, ¶ I.D.

· The Proposed Settlement reduces from six complaints to three the number of policyholder complaints against an agent which would entitle a claimant to score of at least "2." *Id.*, Ex. B, at 5, ¶ I.C.

· The Proposed Settlement extends the period during which the complaints will be counted by nearly two and a half months, from July 9, 1996 to September 20, 1996. *Id.* The February 22, 1997 amendment extended the September 20, 1996 deadline further to February 1, 1997.

These changes greatly enhance the ability of a policyholder to establish the presumption that he or she was misled, thereby entitling the policyholder at minimum to a score of "2."

154. The Proposed Settlement also includes significant improvements in the factors and evidentiary considerations used to evaluate claims. These changes include:

· A claimant's score may be raised if documents originally kept by Prudential that could affect the scoring have improperly been destroyed and no copies can be located.[21] *Id.*, Ex. B, at 11, ¶ I.F.1.g.

---

21. Additionally, as discussed above, on February 3, 1997, the Court implemented the agreement between Class Counsel, the Task Force, and Prudential to incorporate new and more substantial

· Under the Task Force ADR Plan, the score on "churning" claims can be raised if 15% of the selling agent's total sales were "financed insurance" sales. The Proposed Settlement lowers this threshold to 12% of total sales. *Id.*, Ex. B, at 15, ¶ II.B.1. (This change significantly increases the number of agents who engaged in a "pattern of financing activity" from 1987 through 1994.)

· Scores on churning claims may be raised if blank, unsigned disbursement forms were used without the policyholder's consent. *Id.*, Ex. B, at 17, ¶ II.B.1.f.

· Scores on "Abbreviated Payment" or "Vanishing Premium" claims may be raised if an agent used the phrases "vanishing premium" or "vanishing point" in writing in connection with the sale of the policy at issue. *Id.*, Ex. B, at 27, ¶ III.B.1.g.

· Under the Proposed Settlement, scores on "Abbreviated Payment" claims may no longer be lowered simply because the policy lapsed prior to the date in the illustration when the premiums were to "vanish", if it appears that the policyholder became aware, prior to the misrepresented "vanish" date, that the policy would not perform as illustrated. *Id.*, Ex. B, at 28, ¶ III.B.2.f.

· The Proposed Settlement requires Prudential to contact the agent who sold the policy at issue to obtain additional information about the sale of the policy. *Id.*, Ex. C, at 6, ¶ II.G.2.b. Because agents may fear that a truthful statement in response to a claim will put their job in jeopardy, the Proposed Settlement includes an explicit recognition that Prudential will not take disciplinary action against an agent based solely on truthful representations in the "Agent Statement." *Id.*, Ex. C, at 7, ¶ II.G.2.c.

· The Task Force ADR Plan provided that Prudential had a co-equal role with the regulators in the selection of a "Representative," who would advocate on behalf of the claimant at the arbitration level. It also limited the funding for this posi-

ADR provisions to account for document destruc-

tion to $10 million, regardless of the number of claims submitted. In the Proposed Settlement, the Representative is selected by plaintiffs' counsel, subject only to the approval of the regulators. Prudential has no role in that process. The Proposed Settlement also eliminates the cap on the funding for the Representative; under the Proposed Settlement ADR Plan, the Representative will be paid on a per claim basis. *Id.*, Ex. C, at 19–20, ¶ V.B.2.

· The Proposed Settlement creates an entirely new position, the "Claimant Representative," who is selected by Class Counsel and who will monitor the entire process on behalf of the Class Member, including the claim evaluation staff's initial claim review. *Id.*, Ex. C, at 13–14, ¶ IV.A.

### c. The Proposed Settlement Includes Four Valuable ADR Remedies Not Included in the Task Force ADR Plan

155. First, the Proposed Settlement provides more interest to claimants scoring a "2." Under the Task Force ADR Plan, claimants receiving a score of "2" did not receive any interest as part of their award. Under the Proposed Settlement, as originally negotiated, claimants scoring a "2" would receive 50% of the interest that a claimant scoring a "3" would receive. *Id.*, Ex. B, at 19, ¶ II.C.1.b(ii). The Amended Stipulation dated February 22, 1997 increased the 50% interest rate to 100% for claimants who receive a score of "2" and allows rescission of the policy and a refund of the premiums, with interest. Stipulation Amendment at ¶ 2.

156. Second, where a policy lapsed before the claimant died, the Proposed Settlement allows a claim receiving a "2" to receive relief. Under these circumstances, the Task Force ADR Plan provided that a death benefit would be paid only for claims that receive a score of "3." Under the Proposed Settlement, a claim receiving a score of "2" will receive 50% of the death benefit that would have been paid if the claim had been scored a "3." Stipulation of Settlement, Ex. B, at 13, ¶ I.I.1.

tion.

157. Third, the Proposed Settlement provides full compensatory relief where a Prudential agent promised in an Abbreviated Payment or "vanishing premium" case that the claimant would have a "paid up" policy. *Id.*, Ex. B, at 29, ¶ III.C.1.c. Thus, under the Proposed Settlement, as promised, after the payment of a specified number of premiums, the policy will be fully "paid up", so that no further premiums will be due (the typical vanishing premium claim), and all dividends or interest credited to the policy will be applied to increase the cash value of the policy. *Id.* The Task Force ADR plan did not recognize this type of claim.

158. Fourth, the Proposed Settlement ADR process expressly permits claims on behalf of the decedent where the policyholder/decedent died while the policy was in force, even if a death benefit has already been paid. *Id.*, Ex. B, at 15, ¶ I.I.3. The Task Force Plan excluded policyholders who died while their policies were in force.

**2. The Proposed Settlement Provides Significant Enhancements to Each Form of Basic Claim Relief and Creates a New Form of Basic Relief**

159. First, the Proposed Settlement eliminates fifty basis points on Optional Premium Loans ("OPLs"). *Id.*, Ex. D, at 2, ¶ I.B.7. In the Task Force Plan, the interest rate was a short-term rate representative of Prudential's unsecured short-term cost of borrowing, plus fifty basis points.

160. Second, under the Proposed Settlement, Prudential will contribute toward Enhanced Value Policies ("EVPs") 50% of the first year's annual premium on the first annual premium due date, 25% on the third annual premium due date, 25% on the fifth annual premium due date and 15% on the seventh annual premium due date. *Id.*, Ex. D, at 5, ¶ III.A. In the Task Force Plan, Prudential contributed only 50% of the first-year annual premium toward the cash value of the EVP on the first annual premium due date.

161. Third, under the Proposed Settlement, Prudential increases its contributions to the Enhanced Value Annuities ("EVAs"). In the Task Force Plan, Prudential contributed 2% of the initial purchase price to the value of the EVA where the purchase price was less than $25,000, and 3% of the purchase price where the purchase price was between $25,000 and $50,000. Under the Proposed Settlement, in addition to these contributions, Prudential will credit 2% of the initial purchase price to the value of the EVA in the second policy year, and 1% of the initial purchase price to the value of the EVA in the third policy year. *Id.*, Ex. D, at 6–7, ¶ IV.A.2.

162. Under the Proposed Settlement, policyholders may participate in a new form of relief—Mutual Fund Enhancements. Prudential will contribute 4% of the initial purchase price to the fund, up to a maximum of $2,000. *Id.*, Ex. D, at 9, ¶ V.A.

**3. The Proposed Settlement Provides an Elaborate Program to Inform Class Members of the Relief Available to Them**

163. The Proposed Settlement provides for individual notices to class members, multiple publication notices in all fifty states, the use of a toll-free "800" telephone number, staffed by trained operators monitored by Class Counsel, and multiple radio and television notices, all subject to the agreement of Class Counsel, with any disputes to be resolved by the Court. The Task Force Report did not describe how its outreach program would be implemented.

**F. The Proposed Settlement Offers Significant Value to The Class**

164. Plaintiffs' actuarial expert, Robert L. Hoyer of the Life & Health Actuarial Services group of Arthur Andersen LLP, placed a value of $1.187 billion inclusive of the Financial Guarantees and Additional Remediation Amount, on the ADR relief if 330,000 claims are remedied. Hoyer Aff. at ¶ 5. Hoyer states that the estimate of only 330,000 remediated claims (approximately three percent of the class) is a conservative estimate based on evaluations of likely effects of the numerous class action settlement improvements specifically designed to increase participation. *Id.* at ¶¶ 13–14. Tillinghast–Towers Perrin concluded that the ADR program compensates the policyholder in an amount

equivalent to their financial loss. Guinn Aff. at ¶ 5.

165. Plaintiffs' expert valued Basic Claim Relief at $799,600,000. Hoyer Aff. at ¶ 16. This valuation assumes 1,080,000 participants. Prudential's actuarial expert, Daniel J. McCarthy of Milliman & Robertson, Inc., estimated the value of Basic Claim Relief to be $425 million. McCarthy Aff. at ¶ 5. McCarthy's analysis also included a range of values from $272 million to $686 million. *Id.* (Plaintiffs' expert valued the enhancements to the Task Force Plan at $1.123 billion.) Hoyer Aff. at ¶ 19.

166. All of the above expert valuations exclude the value to the class of having the requested $90 million attorneys' fee paid directly by Prudential and exclude the substantial costs of providing notice and administering the entire claims process, all of which costs are to be paid directly by Prudential.

167. In his Fee Report, Stephen Greenberg valued the Proposed Settlement at between $1,209,600,000 and $2,077,000,000, exclusive of the costs of notice, the administration of the ADR process, and Class Counsel's fee. Fee Report at 56–57 & n. 10. The minimum figure is the sum of Mr. Hoyer's valuation of Basic Claim Relief ($799.6 million) and the minimum guaranteed amount to be paid in connection with the ADR process ($410 million). *Id.* at 56. The higher figure (which was not a maximum) was the sum of Mr. Hoyer's valuation of the total Settlement ($1.987 billion) and the maximum amount of counsel fees sought by class counsel ($90 million) Significantly, no opponent of the Proposed Settlement has proffered evidence disputing these analyses.[22]

## V. Class Counsel and Prudential Have Provided Class Members With Extremely Effective Individual and Published Notice of the Proposed Class and Proposed Settlement

168. This Court's October 28, 1996 Order required that individual notice be sent, by first-class mail, postage prepaid at Prudential's expense, no later than sixty days before the Fairness Hearing, to the last known addresses of all policyholders. October 28, 1996 Order. Pursuant to the Order, individual notice was sent to more than eight million present and former policyholders by first class mail on or before November 4, 1996.[23] Meade Aff. at ¶ 11.

169. The October 28, 1996 Order also required that a summary notice be published, at Prudential's expense, in the national editions of *The New York Times* (business section), *The Wall Street Journal, USA Today,* and *The Star Ledger.* In addition to these publications, Prudential published the notice in the largest circulating newspapers in each of the fifty states and the District of Columbia. Burke Aff. at ¶¶ 3, 6. Of the sixty total newspapers utilized by Prudential, the notice appeared in thirteen newspapers on Wednesday, November 20, 1996, forty-one newspapers on Thursday, November 21, 1996, and six newspapers on Friday, November 22, 1996. *Id.*

170. The individual notice described in plain English the lawsuit, the settlement, and the options available to class members. The notice included (i) the caption; (ii) a description of the litigation; (iii) a description of the settlement class; (iv) the names of counsel for the class; (v) a description of the Proposed Settlement, including the relief available and the release to be given Prudential; (vi) the hearing date; (vii) a description of the ability to enter an appearance either individually or through counsel; (viii) the procedure and deadline for filing objections; (ix) the procedure and deadline for filing requests for exclusion; (x) the consequences of exclusion; (xi) the consequences of remaining in the settlement class; (xii) the full text of the release that would bind class members; (xiii) a description of Prudential's responsibility for plaintiffs' attorneys' fees and expenses and of its agreement to pay

22. Florida, which formerly had done so, has withdrawn its purported expert's submissions.

23. After the Court was informed that several thousand of the individual notices were returned undelivered, the Court ordered redelivery of these individual notices and extended the deadline for exclusion of the affected policyholders to January 6, 1997.

attorneys' fees awarded by the Court up to a maximum of $90 million; (xiv) a description of the preliminary injunction issued by the Court; and (xv) the procedure for obtaining additional information, including the toll-free "800" telephone number established to respond to class member inquiries.[24]

171. In addition to the formal notice, the notice package sent to each class member included a six-page cover letter from Prudential's Chairman, Arthur Ryan, a twenty-one-page question-and-answer brochure, and a customized statement of eligibility. Stipulation of Settlement, Exs. F–1 to F–3. Each statement of eligibility included the class member's name and address and listed as best as practicable the class member's eligible policies and the relief available with respect to each policy.

172. The publication notice, also written in plain English, included (i) the caption; (ii) a description of the settlement class; (iii) a brief description of the settlement; (iv) the names of counsel for the class; (v) the hearing date; (vi) a description of the ability to appear at the hearing; (vii) a statement of the deadline for filing objections to the settlement; (viii) a statement of the deadline for filing requests for exclusion; (ix) the consequences of exclusion; (x) the consequences of remaining in the settlement class; (xi) a description of the preliminary injunction issued by the Court; and (xii) the procedure for obtaining further information, including a copy of the settlement notice.

173. The Court takes judicial notice of the fact that the Proposed Settlement also received press coverage, including articles put out by wire services carried in many other state, local, and trade newspapers nationwide.

174. The dates on which the individual notices were mailed and the summary notice published meant that class members had ample opportunity—approximately six to eight weeks—to consider their options before the December 19, 1996 deadline for exclusion requests and objections.

## VI. The Proposed Settlement Has Been Enhanced Since the Execution of the Stipulation of Settlement

### A. The Court Ordered Additional Remediation to Class Members in Response to Reported Document Destruction Incidents

175. On December 16, 1996, plaintiffs obtained an Order to Show Cause returnable on December 18, 1996 why this Court should not impose sanctions upon Prudential in connection with allegations of document destruction. On December 18, 1996, at the Order to Show Cause hearing, the Court directed Class Counsel to conduct an investigation into the alleged Cambridge office document destruction and "whether Prudential's notification on destruction of documents was or was not satisfactory." December 18, 1996 Tr. at 44. The Court directed Class Counsel to present a Report of Investigation to the Court by December 27, 1996.

176. Between December 19 and December 24, 1996, Plaintiffs' Counsel reviewed hundreds of Prudential documents, and between December 20 and 24, 1996, conducted 56 depositions of Prudential personnel. Those depositions included Prudential's Chairman and Chief Executive Officer, Arthur F. Ryan; Prudential's Chief Financial Officer, Mark Grief; its General Counsel, James R. Gillen; other senior management and employees located at the Cambridge office; and each person identified by Pruden-

**24.** Prudential retained Boston Financial Data Services ("BFDS") to operate the Claimant Support Team and "800" number. Hegarty Aff. at ¶ 1. BFDS has particular experience in this role, having helped to implement the settlement reached by New York Life in *Willson v. New York Life Insurance Company*, Index No. 94/127804 (N.Y.Sup.Ct.). At the parties' instruction, BFDS established a toll-free telephone hot-line in order to respond to inquiries from the Class about the Proposed Settlement and the litigation. *Hegarty*

Aff. at ¶ 4. BFDS hired many operators and supervisors to work on this telephone bank. These personnel were trained by BFDS executives, plaintiffs' counsel, and Prudential. *Id.* at ¶¶ 5, 8. Back-up call center vendors were also hired and trained to provide additional support to BFDS as needed. *Id.* at ¶ 6. The Class Notice and all other settlement communications included the telephone number for this assistance hot-line. Stipulation of Settlement, Exs. F–1 to F–3.

tial as having knowledge of the incident. Moreover, approximately fifty randomly selected agents were requested to complete a questionnaire to ascertain the agents' knowledge and understanding of Prudential's document preservation guidelines. Plaintiffs' Counsel also learned that there might have been similar incidents of document destruction in Prudential's Syracuse, New York office and, therefore, deposed the general manager of that office. On December 27, 1996, plaintiffs provided the Report of Investigation to the Court.

177. On January 6, 1997, the Court, having reviewed the Report and Prudential's response, found that improper document destruction had occurred and issued its findings of fact and sanctions in a written Opinion and Order, 169 F.R.D. 598.[25] The Court found specifically that:

- Prudential's use of PROFS notes to preserve documents and to prevent their destruction was ineffective and failed to implement this Court's document preservation order;

- Various PROFS notes regarding document retention were circulated, but did not represent the systematic process necessary to preserve documents;

- Document destruction had occurred on at least four occasions: in Jacksonville, Florida; Cambridge, Massachusetts; Des Moines, Iowa; and Syracuse, New York;

- Document destruction in Cambridge was of particular concern because of its scope and because no index was prepared of the documents destroyed; the Court and the litigants had no way of knowing what documents were destroyed or from which files;

- Prudential's procedures to identify and report document destruction to senior management were unduly cumbersome and slow;

- Prudential's management had failed to establish a comprehensive document preservation policy;

- Prudential management's failure promptly to ascertain and notify the Court of the Cambridge incident was particularly inexcusable in light of the December 19, 1996 exclusion date that required Cambridge policyholders to decide whether to remain in the class action;

- While there was no proof that Prudential engaged in conduct intended to thwart discovery through purposeful document destruction, its haphazard and uncoordinated approach to document retention denied plaintiffs potential evidence to establish disputed facts;[26] and

- The destroyed materials were relevant and, if available, would lead to proof of a claim.

January 6, 1997 Opinion at 612–15.

178. The Court observed also that:

- Prudential's conduct explicitly violated the Court's mandate to preserve documents;

- Document destruction had been a recurring theme throughout the litigation;

- Accusations of document destruction threatened the integrity of the Court and the proceedings before it; and

- Document destruction caused plaintiffs substantial prejudice and the Court could not ascertain whether the provisions of the ADR process which contemplate nominal, routine destruction of documents can fully address the harm incurred.

*Id.* at 615–16.

179. The Court ordered:

(1) Prudential to mail each employee a copy of the Court's September 15, 1995 Order requiring document retention with a full explanation of the pending

**25.** On January 8, the Court was informed that a Prudential lawyer may have destroyed documents in Florida. On January 14, the Court appointed Special Master Justin P. Walder to investigate that alleged document destruction incident. Special Master Walder provided his report to the Court on January 24, 1997. On January 29, 1997, the Court reviewed Walder's Report and found that no improper document destruction had occurred.

**26.** Under the ADR process, claims are scored with evidence from Prudential's files and the agent's files on that policy. On at least four occasions, these files have been purged of evidence that may have raised claimants' scores.

litigation and the civil and criminal sanctions that apply to the failure to follow a court order;

(2) Prudential to submit to the Court a written manual that embodies Prudential's document preservation policy;

(3) Prudential to dedicate a telephone hotline to facilitate reports of document destruction;

(4) Prudential to require each manager to certify that his or her office complies with the document retention manual;

(5) Prudential to be sanctioned $1 million; and

(6) Prudential to reimburse Plaintiffs' Counsel for fees and costs.

*Id.* at 616–17.

180. The Court also provided that these sanctions were "without prejudice to the subsequent imposition of additional sanctions as may be fair and appropriate to remedy unknown harm to individual party opponents caused by document destruction." *Id.* at 617.

181. Pursuant to this statement, Class Counsel and Prudential negotiated additional procedures and criteria for scoring claims where evidence indicates that relevant documents have been destroyed. *See generally* February 3, 1997 Order. Under the supervision of the Court, plaintiffs and the Regulatory Oversight Staff will undertake a nationwide investigation of document destruction in Prudential's offices. *Id.* at 1–2. Now, claimants will receive enhanced scores depending on whether the document destruction was improper, whether there is a known impact on a specific file, and whether the destroyed document was material:

· Where documents material to the claim under review were destroyed, the claimant will automatically receive a score of "3" if the destruction was improper *or* the documents impacted the claimant's file. Even if the destruction was not improper or there is no known impact on the specific file, the claimant will receive a score of not less than "2," and a score of "3" will be awarded if the claim otherwise would have been scored a "2."

· Where it cannot be determined whether the documents were material to the claim,

the claimant will receive a score of "3" if the destruction was improper *and* the documents impacted the claimant's file. If documents of unknown materiality were destroyed and the destruction was either improper *or* impacted the claimant's file, the claimant will receive a score of not less than "2," and a score of "3" will be awarded if the claim otherwise would have been scored a "2."

· Where it cannot be determined whether the documents were material and the destruction was neither improper nor had any known impact on the file, the claimant's score will be increased by one point, to a maximum score of "3."

*Id.,* Ex. A.

## B. Through Negotiations with State Regulators Prudential Has Agreed to Several "Final Enhancements" to the Proposed Settlement

182. In the days before the Fairness Hearing, Prudential agreed with the remaining state objectors to add several meaningful enhancements to the Proposed Settlement. These included:

· The Complaint History cut-off was extended to February 1, 1997; Stipulation Amendment at ¶ 1.

· The interest rate on scores of "2" was increased from 50% to 100%; *id.* at ¶ 2.

· A non-specific evidentiary consideration was added to the ADR Guidelines to allow the claim evaluator to consider that the policyholder was age sixty years or older at the time of sale; *id.* at ¶ 3.

· A claim-resolution factor was added to allow a claimant with a life insurance application containing an unauthorized signature to receive an automatic score of "3"; *id.* at ¶ 4.

· Prudential must "[p]rovide claimants who so request with current information with respect to the existence of any outstanding loans, their most recent dividend payments, their dividend status, and, where applicable, their currently illustrated year of abbreviation;" *id.* at ¶ 5.

## VII. Class Response to the Proposed Class Certification and the Proposed Settlement Has Been Favorable

183. The Proposed Settlement has received overwhelming class support. The Court has received an opt-out list representing 23,421 policies, or about 19,000 policyholders. This represents about .24% of the class.

184. In addition to the exclusion requests, a total of approximately 295 written communications were served upon counsel and/or filed with the Court in compliance with, or in an apparent attempt to comply with, the procedures for objecting described in the Class Notice authorized by this Court in its October 28, 1996 Order. Pls. Certif. Reply, Ex. A.

185. The Class Action Administrator has received over 500,000 telephone inquiries on the "800" number provided for policyowners to obtain further information about the proposed settlement. Hegarty Supp. Decl. at ¶ 2.

186. Regulators of all fifty states and the District of Columbia have endorsed the Proposed Settlement. Task Force participants have ordered Prudential to seek prompt approval of the Proposed Settlement, because the Proposed Settlement is in "the best interests of the policyholders." Biederman Aff. at ¶ 7 (quoting Amended Consent Orders).

## VIII. The Fairness Hearing Provided the Parties, Objectors Appearing Through Counsel, State Regulators, and All Individual Objectors an Opportunity to Express Their Positions to the Court

187. Pursuant to this Court's October 28, 1996 Order, Prudential mailed individual notices of the Proposed Settlement to approximately eight million policyholders who collectively own or owned approximately ten million policies. Additionally, Prudential published a summary notice in *The New York Times, The Wall Street Journal, USA Today,* and in major newspapers in all fifty states. The Class Notice directed class members who had objections to the Proposed Settlement to file their objections with the Court no later than December 19, 1996. October 28, 1996 Order at ¶ 13.

188. Subsequently, the Court ordered that the Fairness Hearing be moved to February 24, 1997.[27] January 6, 1997 Order. Because of this adjournment, the Court extended the deadline by which objectors could file supplemental objections to January 14, 1997, provided that their materials referred to the issues already filed in the initial objections. *Id.* at ¶ 4. The Court further ordered that Prudential and Class Counsel could speak for two hours each, states thirty minutes each, and objectors fifteen minutes each. *Id.* at ¶ 12.

189. On February 21, 1997, the Court was advised that the state objectors were withdrawing their objections. Accordingly, the Court notified those individual objectors who had filed written objections that they would have additional time to speak.

190. On February 24, 1997, the Court held the Fairness Hearing to determine whether the class should be certified and whether the Proposed Settlement was fair, reasonable, and adequate.

191. Prior to the hearing, Class Counsel[28]

---

27. The Court determined that rescheduling was appropriate, because the document destruction investigation, including the taking of fifty-six depositions related to document destruction in Prudential's Cambridge office, adversely affected Class Counsel's ability to prepare for the Fairness Hearing.

28. In particular, the Court considered the testimony submitted by plaintiffs' experts through affidavits, affirmations and declarations in support of the Proposed Settlement, including those from H. Russel Bernard, Professor of Anthropology at the University of Florida regarding the content of the Class Notice; Joel Cohen, Professor of Marketing, Professor of Anthropology and Director of the Center for Consumer Research at the University of Florida, regarding the use of surveys as evidence; Dean John E. Sexton of New York University Law School regarding the structure of the Proposed Settlement, the jurisdiction of the Court and due process considerations of the Class Notice; Professor Arthur R. Miller, Bruce Bromley Professor of Law at Harvard Law School regarding the appropriateness of class certification pursuant to Rule 23(b)(3); Professor Samuel Issacharoff, Charles Delford McCormick Professor of Law at the University

**500**

and Prudential[29] had fully briefed and supported their positions with extensive affidavits and exhibits. At the hearing, both parties made substantial and informative presentations.

192. Objectors also briefed and provided support for their positions prior to the hearing. At the hearing, several objectors made presentations: Johnson, Beauvias, Treadway, Parnell, Ginsberg, Krell, Chin, Helton, the Gradys, and several hundred policyholders represented by UAW–Ford–General Motors–Chrysler Legal Services Plan.

193. Several state insurance regulators also provided the Court with their views of the Proposed Settlement. New Jersey filed papers in support of the Proposed Settlement on its own behalf and submitted letters of support from state insurance regulators across the nation. Massachusetts, Texas, California, and Florida had filed objections to various aspects of the Proposed Settlement, but all states withdrew their objections at or before the hearing. As a result, the Proposed Settlement was joined and supported by every insurance regulator in the nation.

194. The Court permitted any participant to submit proposed findings of fact and conclusions of law by Monday, March 3, 1997. Thereafter, Class Counsel, Prudential, intervenor Richard Johnson, the Krell objectors, objector Beauvias, and objectors Treadway, Parnell, and Ginsberg each submitted proposed findings of fact and conclusions of law.

## CONCLUSIONS OF LAW

### I. This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims Against Prudential

1. After full consideration of the arguments presented and the applicable law, the Court finds that its exercise of subject matter jurisdiction over this case is appropriate.[30] The Court asserts both federal question and federal diversity jurisdiction over the entire action.

### A. This Court Unquestionably Has Federal Question Jurisdiction Over this Action

2. Plaintiffs allege, and this Court agrees, that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and has supplemental jurisdiction under 28 U.S.C. § 1367. Second Am. Compl. at ¶ 2. Plaintiffs allege claims under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and under Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission (17 C.F.R. § 240.10b–5) and common law claims. Second Am. Compl. at ¶ 1.

3. Specifically, named plaintiff Martin Dorfner asserts claims against Prudential and the individual defendants under Sections 10(b) and 20(a) of the Securities Exchange of 1934 and for violation of Rule 10b–5. Second Am. Compl. at ¶¶ 1, 130–45, 181–96. Martin Dorfner alleges that, as a part of Prudential's scheme to defraud life insurance policyholders, Prudential sold him a VAL policy in violation of federal securities laws using fraudulent sales practices in violation of various state laws.

4. This Court has jurisdiction over Dorfner's federal securities claims, and the federal securities claims of other similarly situated plaintiffs, under 28 U.S.C. §§ 1331 and 1337.

of Texas, regarding whether the action's claims were appropriate for treatment as a nationwide class action; Professor Georgene M. Vairo regarding jurisdiction; and Robert L. Hoyer of Arthur Andersen LLP, regarding the valuation of the Settlement.

**29.** The Court considered testimony submitted by Prudential from its experts, including Esther Milnes, Vice President and Actuary of Prudential Insurance Company of America, regarding the mechanics and performance of certain Prudential life insurance products; Patricia L. Guinn and George J. Hebel, Jr., principals of Tillinghast–Towers Perrin, regarding the estimated

pre-tax cost to Prudential of the ADR process of this Settlement; and Daniel J. McCarthy and Dale S. Hagstrom of Milliman and Robertson, Inc. regarding the valuation and cost to Prudential of the Basic Claim Relief portion of the Settlement.

**30.** The Court will address whether it has jurisdiction only over the class action plaintiffs, named and unnamed. The Court reserves the decision whether to remand the opt-out actions, which Prudential removed to federal court and the MDL panel transferred here. The Court will address that issue in April of 1997.

Indeed, there is no dispute that the Court has exclusive "federal question" subject matter jurisdiction over plaintiffs' federal securities fraud claims under 15 U.S.C. § 78aa and 28 U.S.C. § 1331. Plaintiffs' federal securities laws claims are more than just "colorable;" they survived Prudential's motion to dismiss. May 10, 1996 Order; *cf. Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1280–81 (3d Cir.1993) (dismissal for lack of subject matter jurisdiction is appropriate only if the right claimed is so "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy") (quoting *Kulick v. Pocono Downs Racing Ass'n, Inc.,* 816 F.2d 895, 899 (3d Cir.1987)).

■ 5. This Court has jurisdiction also over the remaining claims of these class members and the other class members in this action, because all of the claims are part of the same "case or controversy under Article III of the United States Constitution," and, therefore, the additional claims are within this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.[31] Under section 1367, the Court has supplemental jurisdiction over all claims that are so closely related that they form part of the same case or controversy under Article III. *Id.* This is true even where the claims involve additional parties. *Id.*

■ 6. Claims are "so closely related" that they form part of the "same case or controversy" if the claims share "significant factual elements." *See HB Gen. Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185,

1198 (3d Cir.1996); *Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991) ("Claims are part of the same constitutional case if they derive from a common nucleus of operative fact. . . .'") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)).

■ 7. Here, the state law claims are part of the same case or controversy as the federal claims because the claims are inextricably factually intertwined.[32] Dorfner and others allege that Prudential sold its VAL policies in violation of federal laws through the financing mechanisms and other deceptive sales practices that comprise plaintiffs' state law claims. All the claims are premised upon a common course of conduct by Prudential; all relate to the same alleged companywide development and implementation of the patently fraudulent sales techniques.[33] *See Palmer v. Hosp. Auth. of Randolph County,* 22 F.3d 1559, 1563–64 (11th Cir.1994) ("same case or controversy" satisfied where claims related to the same course of events, and would involve the same witnesses, presentation of the same evidence, and determination of the same, or very similar, facts); *cf. In re IGI Sec. Litig.,* 122 F.R.D. 451, 461 (D.N.J.1988) (pendent state law negligent misrepresentation claim certified when claims presented essentially same issues asserted by federal securities law claims).

■ 8. Where the original federal jurisdiction claim would proceed to trial absent settlement, as is true in this case, to promote judicial economy and the convenience of and fairness to the parties, the district court

---

**31.** Section 1367(a) provides in pertinent part:

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the *same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.*

28 U.S.C. § 1367(a) (emphasis added).

**32.** No objector, including Krell, disputes that plaintiffs' state law claims are sufficiently related to plaintiffs' federal securities law claims that

they form part of the "same case or controversy."

**33.** Because section 1367 extends jurisdiction over the entire case or controversy, it applies to both pendent parties and pendent claims. *See Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995); *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir.1995); *see generally* 13B Charles A. Wright, Arthur R. Miller, & Edward H. Cooper § 3567.3, at 48 (Supp.1996) (and numerous authorities cited therein). Indeed, the statute expressly so provides. *See* 28 U.S.C. § 1367(a) (supplemental jurisdiction "shall include claims that involve the joinder or intervention of additional parties.").

should exercise jurisdiction over state claims based on the same nucleus of operative facts unless there exists some substantial countervailing consideration. *See Lancaster,* 45 F.3d at 788; *Sparks v. Hershey,* 661 F.2d 30, 33–34 (3d Cir.1981) ("This is especially true where it is desirable to avoid the possibility of duplicating the recovery of damages."). Because there are no substantial countervailing considerations, the Court will exercise its discretion to take jurisdiction over the entire case.[34] *See Growth Horizons,* 983 F.2d at 1285 n. 14 (noting that section 1367 "states that federal courts *shall* exercise supplemental jurisdiction over pendent claims arising out of the same case or controversy and *may* decline to exercise jurisdiction if all federal claims are dismissed") (emphasis in original); *Stehney v. Perry,* 101 F.3d 925, 939 (3d Cir. 1996) (decision to exercise supplemental jurisdiction is committed to district court's jurisdiction).

9. Accordingly, the Court unquestionably has supplemental jurisdiction over the entire dispute and the Proposed Settlement and will exercise its jurisdiction. *See, e.g., Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1305 (3d Cir. 1993) (subject matter jurisdiction in nationwide class settlement of federal and state law claims premised on 15 U.S.C. § 78aa, 28 U.S.C. § 1331, and 28 U.S.C. § 1367).

### B. The Court Also Has Diversity Jurisdiction Over this Action

10. Plaintiffs allege that this Court has subject matter jurisdiction over this action also pursuant to 28 U.S.C. § 1332, and the Court agrees. Second Am. Compl. at ¶ 3. The named plaintiffs and defendants are citizens of diverse states. *Id.* Plaintiffs allege that each named plaintiff meets the $50,000 amount in controversy requirement because each plaintiff lost more than $50,000 exclusive of interest and costs in "insurance coverage, premiums paid, dividends and/or interest income and accumulated cash values." *Id.* Plaintiffs allege that each meets the $50,000 threshold also because of the punitive damages and attorneys fees requested, in which each plaintiff allegedly has an undivided interest. *Id.*

11. Section 1332 of title 28 provides that this Court has jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds the sum of $50,000 exclusive of interest and costs. 28 U.S.C. § 1332; *see Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1044 (3d Cir.), *cert. denied,* 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 373 (1993). In a class action suit, diversity between citizens requires that there must be complete diversity between the named representatives of the class and the defendants. *See In re School Asbestos Litig.,* 921 F.2d at 1317 (observing that only named plaintiff must be diverse to establish diversity). The objectors do not dispute that the diversity of citizenship requirement is satisfied.

12. The parties contest, however, whether this action satisfies the amount in

---

34. Section 1367(c) provides

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in *exceptional circumstances,* there are other compelling reasons for declining jurisdiction.

The Court concludes also that these four exceptions to supplemental jurisdiction do not preclude this Court's exercise of supplemental jurisdiction. First, plaintiffs' state law claims raise numerous issues common to the federal securities claims, ensuring the predominance of common factual and legal issues over the individual issues raised by any particular claim. *Cf. Lancaster,* 45 F.3d at 789 ("The substantially predominate' standard . . . is not satisfied simply by a numerical count of the state and federal claims the plaintiff has chosen to assert on the basis of the same set of facts."). Second, the state law claims are not novel or complex and the state laws have been categorized for manageability at trial. *See generally* Issacharoff Aff. Third, the Court has not and likely will not dismiss the federal securities fraud claim over which it has original jurisdiction; indeed, the Court previously refused to do so. Fourth, there are no "exceptional circumstances" providing "compelling reasons" to decline jurisdiction. Indeed, all of the reasons that support the superiority of nationwide class certification in this action support also the discretionary exercise of supplemental jurisdiction here.

controversy requirement. Objectors contend that plaintiffs fail to satisfy the amount in controversy requirement for a class action because each member's claim must and cannot satisfy the jurisdictional minimum. The party asserting federal subject matter jurisdiction must demonstrate that the amount in controversy requirement is satisfied. *See Packard,* 994 F.2d at 1045. The face of the complaint determines jurisdiction if the claim appears to be made in good faith: "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that . . . the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *See id.* at 1045–46 (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938)). If the Court finds to a "legal certainty" that the threshold amount is not met, then this Court must reject federal diversity jurisdiction. *See St. Paul Mercury Indem. Co.,* 303 U.S. at 290, 58 S.Ct. at 591; *see also Columbia Gas Transmission Corp. v. Tarbuck,* 62 F.3d 538, 541 (3d Cir.1995) ("dismissal is appropriate only if the federal court is certain that the jurisdictional amount cannot be met"); *Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d Cir.) (same). Members of a class may not aggregate their claims to reach the $50,000 amount in controversy requirement. *See Zahn,* 414 U.S. at 301, 94 S.Ct. at 512; *Packard,* 994 F.2d at 1045 (citing *Snyder,* 394 U.S. at 334, 89 S.Ct. at 1055–56).

■ 13. Where plaintiffs seek equitable relief pertaining to the enforcement of insurance policies, the face value of the policy is the measure of the amount in controversy. While Krell contends that the measure should be the cash surrender value or some other figure,[35] courts have uniformly held that, where the validity of the policy is at issue, the proper measure is the face value. *See, e.g., Bell v. Preferred Life Assurance Soc'y,* 320 U.S. 238, 240, 64 S.Ct. 5, 6, 88 L.Ed. 15 (1943) ($1,000 face value of insurance certificate, not the $202 in premiums, satisfied amount in controversy requirement in action concerning certificate purchased as a result of fraudulent misrepresentations); *Stephenson v. Equitable Life Assurance Soc'y,* 92 F.2d 406, 410 (4th Cir.1937) (life insurance face value, plus value of double indemnity feature, was amount in controversy in suit seeking declaratory relief restoring policy to force); *Guardian Life Ins. Co. of America v. Muniz,* 101 F.3d 93, 94 (11th Cir.1996) (face value of policy, not loan value, cash surrender value, or paid-up value of polices, was amount in controversy in insurer's action seeking cancellation of life insurance policies); *New York Life Ins. Co. v. Swift,* 38 F.2d 175, 176–77 (5th Cir.1930) (same).

■ 14. The Supreme Court had held that each member of a class action must meet the amount in controversy requirement to establish diversity jurisdiction. *Zahn v. International Paper Co.,* 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973); *Snyder v. Harris,* 394 U.S. 332, 338, 89 S.Ct. 1053, 1057–58, 22 L.Ed.2d 319 (1969). But, plaintiffs no longer have to comply with the *Zahn* rule because *Zahn* was effectively overruled by 28 U.S.C. § 1367.[36] Only the

---

**35.** Krell complains that Lead Counsel denied Krell's November 8, 1996 request to depose named plaintiff Dorfner to determine whether he, in fact, had a claim exceeding $50,000. Krell Brief at 26. Although Krell correctly observes that it is the plaintiffs' burden to establish which named plaintiffs have claims exceeding $50,000, Krell erroneously assumes that he is entitled to discovery into this matter. *See* 1 *Newberg* § 3.33, at 3–158 ("[C]ourts are sharply curtailing inquiries into and attacks on the personal circumstances of plaintiffs who seek to represent a class."). There is a potential for such discovery to be "harassing and oppressive on representatives who seek to bring meritorious class litigation." *See id.* at 3–158 to 3–159. And Krell has indicated no basis to doubt Dorfner's claims.

**36.** Section 1367(b) provides:

In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, over claims by persons proposed to be joined or as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

28 U.S.C. § 1367(b).

named plaintiff must satisfy the jurisdictional amount in controversy requirement. Although the Third Circuit has not yet addressed the issue, *see, e.g., Packard*, 994 F.2d at 1045–46 n. 9, a plain reading of section 1367(a) clearly permits the exercise of supplemental jurisdiction over class plaintiffs' claims that do not meet the amount in controversy requirement. *See In re Abbott Labs.*, 51 F.3d 524, 529 (5th Cir.1995) (holding that a plain reading of section 1367 overrules *Zahn* ); *Deep v. Manufacturers Life Ins. Co.*, 944 F.Supp. 358, 363 (D.N.J.1996) (same); Vairo Affirm. (observing that plain meaning of section 1367 supports finding that section 1367 overruled *Zahn* ); *see also Stromberg Metal Works v. Press Mechanical, Inc.*, 77 F.3d 928, 930 (7th Cir.1996) (holding that by its plain meaning section 1367 overrules *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939), in which the Supreme Court held in a nonclass action case that each plaintiff's claim must satisfy the amount in controversy requirement); *Gandolfo v. U–Haul International, Inc.*, Civ. No. 95–4393, at 5 (D.N.J. Dec. 19, 1996) (holding that district court can exercise supplemental jurisdiction over a co-plaintiff' claim that fails to meet the amount in controversy requirement) *Lindsay v. Kvortek*, 865 F.Supp. 264, 276 (W.D.Pa.1994) (same).

■ 15. Section 1367(a) authorizes the exercise of supplemental jurisdiction over class members' claims that fail to meet the amount in controversy requirement, because section 1367(a) unequivocally confers jurisdiction on the district court over "*all* other claims that are so related to the claims in the action within such original jurisdiction that they form part of the came case or controversy." *See, e.g., In re Abbott Labs*, 51 F.3d at 528–29; *Stromberg*, 77 F.3d at 931. Class members' claims that may fail to meet the amount in controversy requirement certainly form part of the same "case or controversy" as the class members' claims that meet the threshold amount.

16. Moreover, section 1367(b) disallows 1367(a) supplemental jurisdiction over claims founded solely on diversity and joined by certain Rules, specifically Federal Rules of Civil Procedure 14, 19, 20, and 24; Federal Rule of Civil Procedure 23, however, is not among the enumerated exceptions. Under the maxim *expressio unius est exclusio alterius*, the presence of these exclusions and the absence of Rule 23 on the list confirms the propriety of the exercise of supplemental jurisdiction in a Rule 23 class action case over plaintiffs' claims that may fail to meet the jurisdictional threshold amount.

17. The Court is not persuaded by the reasoning of the courts that have refused to exercise supplemental jurisdiction over class members' claims where a named plaintiff has satisfied the amount in controversy requirement, *see, e.g., DeCastro v. AWACS, Inc.*, 935 F.Supp. 541, 547 (D.N.J.1996) (refusing to exercise jurisdiction where named plaintiffs failed to satisfy threshold amount in controversy); *Garcia v. General Motors Corp.*, 910 F.Supp. 160, 164 (D.N.J.1995) ("To date, *Zahn* and *Packard* remain good law in the Third Circuit. Accordingly, GMC must establish that each of the Putative Plaintiffs meets the amount-in-controversy requirement."); *In re Potash Antitrust Litig.*, 866 F.Supp. 406 (D.Minn.1994) (summarizing pro–*Zahn* and anti–*Zahn* cases). Maintaining that they are bound by *Zahn*, these courts rely on the legislative history of section 1367 to suggest that section 1367 did not overrule *Zahn*: "[T]he section is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley*." H.R.Rep. No. 101–734, 101st Cong., 2d Sess. 29, 76–77 (1990), *reprinted in* 1990 U.S.S.C.A.N. 6802, 6875.

■ 18. But, because the plain language of the statute is clear and the legislative history that these cases quote conflicts with the facial meaning of the statute, the Court cannot consider that history. *See City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 337–38, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994); *West Virginia Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 98–99, 111 S.Ct. 1138, 1146–47, 113 L.Ed.2d 68 (1991); *In re Continental Airlines, Inc.*, 932 F.2d 282, 287 (3d Cir.1991). Moreover, less frequently cited legislative history of section 1367 demonstrates that the Federal Courts Study Committee ("FCSC"), which recommended the enactment· of section 1367 to

Congress, informed Congress that *Zahn* made little sense from a policy standpoint. Vairo Affirm. at 3 (citing 1 FCSC Working Papers And Subcommittee Reports 560, 561 n. 33 (1990)). Indeed, the FCSC proposal, which is "fairly similar to the statutory language ultimately adopted," advised Congress to overrule *Zahn.* Vairo Affirm. at 3.

19. In this case, the named plaintiffs have alleged claims exceeding $50,000 each. The Second Amended Complaint states that "each Plaintiff lost more than $50,000 (exclusive of interest and costs) in insurance coverage, premiums paid, dividends and/or interest income and accumulated cash values...." Second Am. Compl. at ¶ 3.[37] Furthermore, the face value of the policies alone for each of the named plaintiffs exceeds $50,000. Mrs. Nicholson alleges that she purchased a $100,000 policy from Prudential as a result of Prudential's common deceptive scheme. Second Am. Compl. at ¶ 13. The Kuchases complain that they purchased $100,000 and $80,000 policies as a result of the scheme. Second Am. Compl. at ¶¶ 15–16. Mr. Gassman argues that he was persuaded to contribute the funds of his $20,-000 Certificate of Deposit into a variable appreciable life policy with a face value of $150,000. Second Am. Compl. at ¶¶ 161–64.

20. Alternatively, even if the face value of the policy were not determinative of the amount in controversy, the Court clearly has jurisdiction over Ms. Nicholson's claims and supplemental jurisdiction over the remaining claims under section 1367. Ms. Nicholson lost over $100,000 in actual death benefits. Ms. Nicholson expressly alleges that, due to Prudential's wrongful conduct, upon the death of her husband in August 1994, the $130,376 in insurance coverage that she expected from the Prudential life insurance policies sold to her had dwindled to $22,-514.43. Second Am. Compl. at ¶ 118.

21. Krell's challenges to plaintiffs' ability to satisfy the amount in controversy

requirement are legally incorrect and Krell fails to establish that, to a "legal certainty," the named plaintiffs' claims fail to exceed $50,000.[38] Krell argues that the amount in controversy requirement is not satisfied because policyholders are likely to recover only several thousand dollars in compensatory damages and because the total damages requested in the Second Amended Complaint substantially exceed Prudential's net worth and could not be awarded. Krell Brief at 26. A judgment or settlement for less than the jurisdictional amount does not indicate a failure to meet the amount in controversy requirement for purposes of establishing diversity jurisdiction. *See, e.g., Suber,* 104 F.3d at 583 ("Once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction, the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of $50,000.") (citation omitted). Therefore, the Court rejects Krell's arguments, because whether the amount in controversy is satisfied turns on plaintiffs' allegations in the complaint and not on the defendant's financial condition or on the ultimate resolution of plaintiffs' claims. *See Packard,* 994 F.2d at 1045–46 (citation omitted).

22. Consequently, because plaintiffs' allegations satisfy the amount in controversy and because it does not appear to a legal certainty that the claim is really for less than the jurisdictional amount, the Court finds also that it has subject matter jurisdiction over plaintiffs' claims by virtue of its diversity jurisdiction.

## II. The Court's Jurisdiction over Plaintiffs' Claims Does Not Violate the Article III Case or Controversy Requirement

23. This case presents a "case or controversy" under Article III of the Unit-

---

**37.** While each plaintiff also claims an undivided interest in punitive damages exceeding $50,000, *see* Second Am. Compl. at ¶ 3, the Court need not address the argument, because named plaintiffs satisfy the amount in controversy requirement without punitive damages.

**38.** Krell is represented by Michael Malakoff. The Court notes that during this Court's hearing on whether to remand Michael Malakoff's other action, the *Kittle* action, to state court in West Virginia, Mr. Malakoff refused to waive his client's claim to damages exceeding $50,000. *See* December 13, 1995 Tr. 68.

ed States Constitution. The underlying tenents of the "case or controversy" requirement are ripeness and standing. "Standing focuses on whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir.1994) (quoting Erwin Chemerinsky, *Federal Jurisdiction* 99 (1989)). The presence of an Article III "case or controversy" is determined vis-a-vis the named parties. *See Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (class members need not individually demonstrate standing); *see generally* Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 2.05, at 2–29 (3d ed. 1992) [*"Newberg"*] ("Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense").

24. While Krell concedes that each named plaintiff has alleged a cognizable claim against Prudential that gives rise to a "case or controversy," Krell raises novel variations on the case or controversy theme. Krell Brief at 39–41. First, Krell mistakenly argues that because the class is defined to include all Prudential policyholders from 1982 to 1995, some of these policyholders may not have been injured by Prudential and, therefore, this entire case does not constitute a "case or controversy." Krell again presents no authority, and the Court is aware of none, for the notion that the Court has no jurisdiction over this action merely because *some* class members may not currently assert a claim. The current class definition is similar to many commonly accepted definitions. The current class is akin, for example, to those used in securities fraud class action cases, which commonly define a class to include all purchasers of the defendant company's common stock during a specified period of time. *See, e.g., Green v. Wolf Corp.*, 406 F.2d 291, 299 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The current class also

bears resemblance to a class defined to include all purchasers of a specific product, the court having deferred the issue of whether individuals have suffered injury and what those injuries are to a subsequent procedure. *See, e.g., In re Asbestos School Litig.*, 104 F.R.D. 422, 424, 433–34 (E.D.Pa.1984), *aff'd in pertinent part*, 789 F.2d 996, 998–99, 1008–11 (3d Cir.1986) (certifying Rule 23(b)(3) opt-out class of "essentially all public school districts and private schools in the nation"). Indeed, class action experts encourage plaintiffs to define a class in similar objective terms, without regard to the merits of the claim or the specific relief sought. *See* 2 *Newberg*, § 6.14, at 6–61; *Manual for Complex Litigation* § 30.14 (3d ed. 1995).

25. Second, in his Supplemental Objection, Krell raises a new "case or controversy" argument. He contends that any "case or controversy" ceases upon Court approval of the Proposed Settlement, depriving the Court of continuing jurisdiction to determine the method to allocate settlement funds such as the Additional Remediation Amount. Krell Supp. Obj. at 3. It is well settled, however, that this Court may retain jurisdiction to supervise the fulfillment of the Proposed Settlement, even after a final judgment has been entered and the appeal period has expired. *See, e.g., Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380–82, 114 S.Ct. 1673, 1676–77, 128 L.Ed.2d 391 (1994) (a district court's explicit retention of jurisdiction over a settlement agreement, or its incorporation of that agreement into its final order, satisfies any jurisdictional concerns); *Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 336 (E.D.Pa.1994) (district court expressly retained jurisdiction over settlement), *vacated on other grounds by*, 83 F.3d 610 (3d Cir.), *cert. granted sub nom., Amchem Prods. v. Windsor*, —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996); 2 *Newberg* § 11.33, at 11–67 (and numerous authorities cited therein).

## III. The Court Has Personal Jurisdiction over All Plaintiffs, Present and Absent

26. This Court has personal jurisdiction over all class members. A court

acquires personal jurisdiction over absent class members after class notice has been sent and potential class members have been given the opportunity to exclude themselves from the class. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 2974–75, 86 L.Ed.2d 628 (1985); *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 199 (3d Cir.1993). In this case, over eight million policyholders received individual and publication notice of the proposed class action in the first week of November of 1996 and had until December 19, 1996 to opt out. The policyholders who have not excluded themselves from the class are deemed to have implicitly consented to this Court's jurisdiction. *See Shutts*, 472 U.S. at 812, 105 S.Ct. at 2974–75; *Carlough*, 10 F.3d at 199.

27. Krell cites *Phillips Petroleum* for the proposition that a class action defendant cannot assert a *res judicata* defense against absent class members if the district court enters a class action judgment without proper personal jurisdiction over an absent party. Krell Supp. Obj. at 2. Krell's observation is axiomatic, but irrelevant. As is style, Krell does not reason an argument, but expects the Court to extrapolate Krell's intended meaning.[39] The Court gathers that Krell impliedly argues that this Court has no personal jurisdiction over absent plaintiffs. But, as discussed previously, the Court clearly has personal jurisdiction over absent individual plaintiffs. Because Krell has offered absolutely no support for the argument, and the Court is not aware of any, the Court rejects the argument.

**IV. The Predominance of Common Factual and Legal Issues, the Adequacy of Class Counsel and Class Representatives, and the Superiority of the Class Action Device as a Tool to Resolve the Current Controversy Require Class Certification**

28. Class certification "enables courts to treat common claims together, obviating the need for repeated adjudications of the same issues." *General Motors Corp. Pick–Up*

*Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir.), [*"GM Trucks"*], *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). The class action device achieves also other very important objectives: "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous claimants with similar claims." *Id.* at 783–84 (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 402–03, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980)). The last goal has particular significance because without spreading litigation costs many injured individuals will be unable to obtain relief: "When it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device." *Id.* at 784 (citation omitted).

29. Courts increasingly have used the class action device in cases, such as this one, in which a class of policyholders has sued an insurance company for misrepresentations in the sale of insurance policies and benefit plans. *See, e.g., Reserve Life Ins. Co. v. Kirkland*, 917 S.W.2d 836 (Tex.App.1996); *Janicik v. Prudential Ins. Co. of America*, 305 Pa.Super. 120, 451 A.2d 451 (1982). And several courts have certified classes of policyholders suing insurance companies other than Prudential in cases involving deceptive sales practices identical to those that the plaintiffs now allege Prudential has committed. *See, e.g., Willson v. New York Life Ins. Co.*, No. 94/127804, 1995 N.Y. Misc. LEXIS 652 (N.Y.Sup.Ct. July 31, 1995) (certifying settlement class in vanishing premium case), *aff'd* 228 A.D.2d 368, 644 N.Y.S.2d 617 (1996); *Goshen v. Mutual Life Ins. Co. of New York*, No. 95–600466 (N.Y. Sup.Ct. June 7, 1996) (certifying class in case involving both vanishing premium and churning allegations).

**39.** While Krell fires his arguments at the Court as buckshot in the air, hoping to hit at least something, the Court, nonetheless, has devoted considerable attention to his submissions. Krell's legal concerns deserve the attention of the Court despite his counsel's slipshod approach.

## A. The Proposed Settlement Class Must Be Certified as if The Case Were to Be Tried

30. Federal Rule of Civil Procedure 23 allows the Court to certify a class for settlement purposes only. *GM Trucks,* 55 F.3d at 778. A settlement class is "a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification." *Id.* at 786. The settlement class is an "extremely valuable" device to dispose of major and complex class actions. *See id.* Despite the absence of statutory guidance for settlement classes, courts have routinely established temporary classes for settlement purposes only. *See id.* (gathering authority).

31. In certifying a class for settlement purposes, the Court must abide by the ordinary Rule 23 requirements: "Rule 23 permits courts to achieve the significant benefits created by settlement classes so long as these courts abide by all of the fundaments of the Rule." *See id.* at 778 (holding that Rule 23(a) requirements must be satisfied as if class were to litigate its claims); *see also Georgine,* 83 F.3d at 617 (holding that Rule 23(b) requirements must be satisfied as if class were to litigate its claims). Thus, a settlement class must satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation and the Rule 23(b) requirements. *See GM Trucks,* 55 F.3d at 778. In this case, because the settlement proponents seek to certify the class under Rule 23(b)(3), the class must satisfy this provision's superiority and predominance standards. *See id.*

32. The Court must consider the propriety of certification as if the case were to go to trial: "[D]espite the possibility that settlement-only class actions might serve the 'useful purpose of ridding the courts' of the 'albatross[ ]' represented by mass tort actions, the rule in this circuit is that settlement class certification is not permissible unless the case would have been 'triable in class form.'" *Georgine,* 83 F.3d at 625 (citing *GM Trucks,* 55 F.3d at 799–800). More-over, the Third Circuit has held that this Court cannot consider the Proposed Settlement's possible amelioration of the Court's manageability concerns. *See id.* at 625–26.

33. The Court must enumerate findings of fact to establish each of the Rule 23 requisites. *See id.* Although the Court may look beyond the pleadings to determine whether a motion for class certification should be granted, the Court should not resolve the merits of the plaintiffs' claims. *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970) ("whether there is a proper class does not depend on the existence of a cause of action"); *Gunter v. Ridgewood Energy Corp.,* 164 F.R.D. 391 (D.N.J.1996). In a borderline case, the Court should allow class certification: "the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.) (citations omitted), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985); *see Walsh v. Pittsburgh Press Co.,* 160 F.R.D. 527, 529 (W.D.Pa.1994) ["*Walsh v. Pittsburgh*"] (citing *Hoffman Elec., Inc. v. Emerson Elec. Co.,* 754 F.Supp. 1070, 1075 (W.D.Pa.1991)).

## B. The Objectors Have Standing Both to Attack the Propriety of Class Certification and to Attack the Proposed Settlement

34. The Court rejects Plaintiffs' argument that the objectors have no standing to attack class certification. Plaintiffs have argued in their Reply Memorandum in Support of Class Certification that this Court should be skeptical of the objectors' attacks on class certification. Plaintiffs' Cert. Reply at pp. 1–3. Plaintiffs argue that the objectors, having had an opportunity to opt out and having chosen not to do so, cannot now oppose the existence of the class. *Id.* According to plaintiffs, upon receiving Class Notice, policyholders had two options: (1) they could opt out of the Class to pursue their individual claims, or (2) they could remain in the Class and accept or object only

to the fairness and adequacy of the Proposed Settlement. *Id.* But, the Third Circuit has routinely allowed objectors to object to the propriety of class certification where a combined notice informed the policyholders of both the class action and the Proposed Settlement. *See, e.g., Georgine,* 83 F.3d at 622 (addressing objectors' concerns regarding class certification); *GM Trucks,* 55 F.3d at 804–05 (same).

35. In this case, the Court approved a combined notice, *i.e.,* to provide notice of the class action as required by Rule 23(c)(2) and to provide notice of the terms of settlement as required by Rule 23(e).[40] The purpose of class action notice is to allow a class member to choose whether to participate in the class action. Upon receiving Rule 23(b)(3) class action notice, a class member can opt out of the class if the class member prefers not to participate. *See* Rule 23(c)(2) ("the notice shall advise each member that … the Court will exclude the member from the class if the member so requests").

36. Plaintiffs observe that after receiving class notice in the ordinary case, a would-be class member cannot refuse to opt out and later object to class certification. Plaintiffs argue that through declining to opt out, the class member has in essence consented to the propriety of class certification. Courts have held, for example, that a decision not to opt out of a class should foreclose attacks on whether the class has adequate representation. *See, e.g., Shore v. Parklane Hosiery Co., Inc.,* 606 F.2d 354, 357–58 (2d Cir.1979) (observing that right to opt-out of the proposed settlement protects class members' interests from alleged inadequate representation); *see also Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1378 (9th Cir.1993) (holding that the failure to opt-out precluded chal-

lenge to adequate representation based upon purported conflicts of interest between subclasses), *cert. denied,* 512 U.S. 1220, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994).

37. The purpose of the notice of settlement is to allow a class member who has consented to class certification to object, if necessary, to any proposed settlement. *See* 2 *Newberg* § 11.55, at 11–132 ("Any party to the settlement proceeding has standing to object to the proposed settlement.").

38. While plaintiffs argue that the objectors have no standing to challenge, in addition to the settlement terms, the propriety of class certification, the Court disagrees. Following plaintiffs' logic, no class member would ever be able to challenge the propriety of class certification and the Court would be denied the advantage of access to adverse perspectives. But, under *Georgine,* the Court must evaluate the propriety of class certification before contemplating the fairness of the settlement. Because the objectors' concerns may help crystallize issues affecting the propriety of class certification, the Court should consider these concerns in its class certification inquiry.

39. It seems counterintuitive that a class member who questions the propriety of class certification would desire to participate in the class action. It may even seem, as plaintiffs suggest, that the class member who does so is at best disingenuous.[41] Because the Court refuses to opine on the objectors' motives, and because it is theoretically possible that an objector may desire both to participate in the class and to challenge certification, the Court will permit the objectors to challenge the class certification elements.[42]

---

40. The Rule provides:

Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.
Fed.R.Civ.P. 23(e).

41. For example, it seems curious that Michael Malakoff, who represents plaintiffs Kittle and

Krell, would opt Kittle out of class, but leave Krell in the class.

42. Plaintiffs observe that the motives of objectors Krell and Beauvias in this action are suspect. Krell and Beauvias have participated in the class for the sole purpose of opposing the existence of the class and hypocritically contend that it would be impermissible to certify a nationwide class in this case, although counsel for both have sought to certify nationwide classes in other insurance sales practices litigation.

### C. The Prudential Life Insurance Sales Practices Class Action Satisfies Federal Rules of Civil Procedure 23(a) [43] and 23(b)(3) [44]

#### 1. The Estimated Eight Million Policyholders Satisfy the Numerosity Requirement

40. The proposed class must be comprised of members that are so numerous that "joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1); *see In re ORFA Sec. Litig.*, 654 F.Supp. 1449, 1464 (D.N.J. 1987). To meet the numerosity requirement, class representatives must demonstrate only that "common sense" suggests that it would be difficult or inconvenient to join all class members. *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 250 (D.N.J.1992). The Court may consider the geographical dispersion of class members. *Eisenberg*, 766 F.2d at 785–86 (holding numerosity requirement to be satisfied where putative securities fraud class consisted of "more than 90 geographically dispersed plaintiffs"). "To be sure, when the class is very large—for example, numbering in the hundreds—joinder will be impracticable; but in most cases, the number that will, in itself, satisfy the Rule 23(a)(1) prerequisite should be much lower." 1 *Newberg* § 3.05, at 3–25.

41. In this case, the numerosity requirement unquestionably is satisfied. Potential class members are dispersed throughout the United States and number in excess of eight million. Common sense suggests that it would be at best extremely inconvenient to join all class members. While Beauvias argues that this class is too large, super-numerosity is not inconsistent with requirements of Rule 23(a)(1). *See, e.g., General Tel. Co. of the N.W., Inc. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980) (finding that the numerosity requirement is fact specific and proposes no absolute limitations). Rather, Beauvias' concern may implicate "superiority" issues and the Court will discuss Beauvias' concern in that context.

#### 2. Prudential's Orchestrated Sales Presentations, the Plaintiffs' Common Legal Theories, Prudential's Common Defenses, and Other Common Issues Undoubtedly Satisfy the Commonality and Predominance Requirements

42. In Rule 23(b)(3) class actions, courts often apply the Rule 23(a)(2) commonality requirement and the 23(b)(3) predominance tests together. 1 *Newberg* § 3.13, at 3–71. And the Third Circuit follows this approach. *See Georgine*, 83 F.3d at 626. For the class action device to be appropriate, there must be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This requirement is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (citation omitted). The commonality requirement is "easily met," because it is satisfied by the presence of a single common issue. 1 *Newberg* § 3.10, at 3–50 to 3–52. And for a class certified under Rule 23(b)(3), the Court must find that

---

**43.** Rule 23(a) provides in pertinent part:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

**44.** Rule 23(b)(3) provides:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b).

these common questions "predominate." To evaluate predominance, the Court must determine whether the efficiencies gained by class resolution of the common issues are outweighed by individual issues presented for adjudication. *See generally Newberg* § 4.25, at 4–81 to 4–86. The Third Circuit has observed that even a few common issues may satisfy the predominance requirement where the resolution of these issues greatly will advance the litigation:

> There may be cases in which class resolution of one issue or a small group of them will so advance the litigation that they may fairly be said to predominate. Resolution of common issues need not guarantee a conclusive finding on liability ... nor is it a disqualification that damages must be assessed on an individual basis.

*In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.) (citations omitted), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117, *and by*, 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986).

43. Where many purchasers allegedly have been defrauded over time by similar misrepresentations, or by a common scheme to which alleged non-disclosures related, courts have found that the purchasers have a common interest in determining whether the defendant's course of conduct is actionable. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975) (gathering authority), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Lerch*, 144 F.R.D. at 252 (finding predominance requirements satisfied where defendant's challenged activity was a common course of conduct); *In re Western Union.Sec. Litig.*, 120 F.R.D. 629, 637 (D.N.J. 1988) (same); *see also Seidman v. American Mobile Sys., Inc.*, 157 F.R.D. 354, 366 (E.D.Pa.1994) (finding plaintiffs' allegations of defendant's single, ongoing course of fraudulent behavior satisfied commonality and predominance requirements) *Zinberg v.*

*Washington Bancorp, Inc.*, 138 F.R.D. 397, 410 (D.N.J.1990) ("Where all class members are united in their desire to establish the defendants' complicity and liability, individual issues, if they exist, are secondary.") The Third Circuit has implicitly endorsed this approach in reversing the district court for denying certification in *Eisenberg*. *See* 766 F.2d at 786 (declaring that the presence of individual questions does not preclude a finding that predominance requirements are satisfied).

44. Thus, courts frequently find allegations that the defendant engaged in a common course of conduct to satisfy the commonality and predominance requirements. *See, e.g., Seidman*, 157 F.R.D. at 360; *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 142 (D.N.J.1984) (finding requirements met where there were common questions whether corporation's financial statements and prospectus contained material misrepresentations or omissions) *Shankroff v. Advest, Inc.*, 112 F.R.D. 190, 193 (S.D.N.Y.1986) ("Since plaintiff's allegations focus on overall managerial decisions which affected all [of defendant's] clients, questions of oral representations or individual reliance do not overwhelm the issues common to the class."); 1 *Newberg* § 3.10, at 3–51 ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.").

45. Here, the commonality and predominance requirements are satisfied because not one, but many issues are common to all of the plaintiffs' claims. Miller Decl. at ¶¶ 12–13. All of plaintiffs' claims stem from Prudential's alleged common course of conduct. Particularly, all plaintiffs allege that Prudential encouraged or otherwise permitted fraudulent sales practices.[45] Although

---

**45.** Prudential's alleged intentional use of the fraudulent sales tactics provides the "single central issue" lacking in *Georgine*. 83 F.3d at 628. Unlike *Georgine*, where class members' claims varied widely and where a trial would necessarily focus on individual issues, here, trial would focus on Prudential management's conduct. Trial would also focus on whether Prudential management refused to stop deceptive practices after

being warned by senior management of the existence of these practices. Additionally, unlike *Georgine*, the Class is limited to purchasers of one type of product (life insurance policies) from one specific vendor (Prudential) through uniform sales techniques. And the class members are readily identifiable and have already suffered injury by the purchase of a product that was misrepresented.

individual class members purchased their policies independently, Prudential allegedly induced them to do so through sales presentations containing standardized, coordinated, and uniformly deceptive sales representations and omissions.

### a. Plaintiffs Must Establish Many Common Factual Issues to Establish Liability

46. It is readily apparent that class members will have to establish many of the same factual allegations to establish liability. Plaintiffs must establish, for example:

· Prudential's common course of conduct,

· Prudential's development of the sales presentations and materials, and artificial inflation and maintenance of dividend scales,

· Prudential's sale of replacement policies by material omission,

· Prudential's sale of vanishing premium policies by material omission,

· Prudential's sale of policies by misrepresenting the policies as investment or retirement plans,

· Prudential's failure to train or supervise agents,

· Prudential's unwillingness to prevent deceptive sales practices, and

· Prudential's scienter.

47. The MDL Panel recognized the predominance of common factual issues in its Transfer Order:

The Panel finds that these twelve actions involve common questions of fact, and that centralization ... will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Regardless of the nature of the plaintiff parties, all actions involve allegations that deceptive life insurance sales practices occurred or were encouraged as a[sic] result of some larger scheme or schemes organized by Prudential. Centralization ... is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings ..., and con-

serve the resources of the parties, their counsel and the judiciary.

August 3, 1995 Transfer Order at 1–2.

### b. Plaintiffs Must Establish Many Common Legal Issues to Establish Liability

48. Class members will have to establish many of the same legal issues. These include, for example:

· whether policyholder reliance may be presumed by virtue of omissions or affirmative misrepresentations in Prudential's sales presentations,

· whether Prudential's offer to finance a policyholder's purchase of a policy constitutes an enforceable financing contract distinct from the policy itself,

· whether Prudential breached the financing contract,

· whether Prudential breached an obligation of good faith and fair dealing implied in the policy contract or the financing contract,

· whether constructive trust principles apply to premium payments obtained by Prudential through deceptive sales presentation,

· whether compensatory damages of all claims asserted on behalf of class members can be objectively quantified on a classwide basis, and

· whether punitive damages should be imposed on Prudential.

### c. Prudential's Affirmative Defenses Add Common Issues to this Class Action

49. In this case Prudential's affirmative defenses would satisfy, even without the commonality of plaintiffs' claims, the Rule 23 commonality requirement. And these defenses add to the predominance of common issues under Federal Rule of Civil Procedure 23(b)(3). Courts often have held that affirmative defenses raise common issues that are appropriately tried using the class action device. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.,* 100 F.R.D. 718, 723 (E.D.N.Y. 1983) ("Certification would be justified if only to prevent relitigating [affirmative] defenses over and over."), *aff'd,* 818 F.2d 145 (2d

Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988).

50. In this case, Prudential asserts several defenses common to the claims of most plaintiffs. For example, Prudential asserts strong statutes of limitation and laches defenses. Additionally, Prudential asserts that plaintiffs fail to establish reliance.

51. Furthermore, the determination of some of Prudential's affirmative defenses has become a very important common issue for the plaintiffs. In its motion to stay or dismiss the litigation under the doctrines of primary jurisdiction and abstention, Prudential asserted several defenses that are equally applicable to all class members. Prudential asserted that the Court should: (1) dismiss Plaintiffs' state law claims based on the doctrine of primary jurisdiction, (2) dismiss Plaintiffs' state law claims based on the Burford abstention doctrine, and (3) dismiss Plaintiffs' state law claims as mooted, precluded, or otherwise limited by the Task Force Plan. Because this Court denied Prudential's motion, all class members now share an interest in: (1) defending the Court's ruling against a motion for reconsideration or an appeal by Prudential, and (2) obtaining class certification so that this issue will become res judicata in favor of the class.

### d. Prudential's Document Destruction Is an Extremely Pervasive Issue Common to Class Members

52. Prudential's persistent destruction of relevant documents also is a common issue weighing in favor of predominance. As documented in earlier orders of this Court, *see, e.g.,* January 6, 1997 and February 3, 1997 Orders, the appropriate remedy for document destruction is an extremely important common issue, which should be resolved in a single action to ensure an appropriate and uniform remedy.

### e. Prudential's Fraudulent Concealment of Its Misrepresentations and Misdeeds Is an Issue Common to Class Members

53. Similarly, class plaintiffs' allegation that Prudential fraudulently concealed its misrepresentations and omissions creates a common issue fulfilling the commonality re-

quirement. Courts often have found that a common issue of fraudulent concealment satisfies the commonality requirement. *See, e.g., Abramovitz v. Ahern,* 96 F.R.D. 208, 218 (D.Conn.1982). In *Abramovitz,* for example, the Court found the commonality requirement was satisfied, because, in part, the issue whether fraudulent concealment would toll the statute of limitations was common to all class members. *See id.* And in the current case, plaintiffs must establish (1) whether Prudential employed systematic affirmative steps following the sale of policies to conceal its wrongful conduct from plaintiff class members; and (2) whether Prudential permitted or failed to prevent the destruction of documents that would have been relevant to Plaintiffs' claims. These issues represent other common issues weighing in favor of the predominance finding.

### f. The Agents' Use of Identical Oral Misrepresentations Weighs in Favor of the Finding of Predominance of Common Issues

54. In this case, Prudential agents' use of uniform oral misrepresentations based on Prudential training and uniform sales materials warrants a finding of predominance. Allegations of a common scheme of deception may indicate predominance, even where the scheme is implemented through oral misrepresentations by sales agents. *See, e.g., In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.,* 140 F.R.D. 425, 430–31 (D.Ariz. 1992); *Davis v. Avco Corp.,* 371 F.Supp. 782, 792 (N.D.Ohio 1974) (certifying class claiming a pyramid investment scheme where plaintiffs alleged that defendants' agents made similar misrepresentations despite "individual variations" in the alleged misrepresentations); *In re Baldwin–United Corp. Litig.,* 122 F.R.D. 424, 427 (S.D.N.Y.1986) (certifying class where defendant's alleged wrongful conduct occurred at the management level and observing that "[e]ven proof of a material variance among the representations will not defeat the class if certain omissions, inferred from their absence in the [sales] literature, were common to all").

55. One indicator of a scheme of common deception is that the oral representations were substantially similar. *See*

*Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307–08 (5th Cir.1977), ("[T]he key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations."), *cert. denied*, 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978); *see also Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669 (N.D.Ill.1989) (issue of what representations and disclosures were made could be a common one); *Shankroff*, 112 F.R.D. at 193 ("Since plaintiff's allegations focus on overall managerial decisions which affected all [defendant's] clients, questions of oral representations or individual reliance do not overwhelm the issues common to the class."); *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 37–38 (E.D.Pa.1985) (observing that oral representations that appear similar or derived from the same "sales pitch" would support a predominance finding); *In re Am. Continental Corp.*, 140 F.R.D. at 430 ("Although the representations made to the bond purchasers in this case were not identical, they were sufficiently uniform to warrant class treatment."); *contrast Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 216 (N.D.Cal.1994) (distinguishing factually *In re Am. Continental Corp.*, *Heastie*, and *McMahon Books* and finding lack of predominance because no evidence of "even a somewhat standardized sales pitch").

56. Another indication of a common scheme to deceive is the existence of uniform written materials on which the oral representations were based. *See, e.g., Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724–25 (11th Cir.1987) (observing that where oral communications are based on and consistent with, deceptive written materials, the fact that individual brokers provided information through oral communications does not preclude class certification), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 1221, 99 L.Ed.2d 421 (1988); *Sharp v. Coopers & Lybrand*, 70 F.R.D. 544, 548 (E.D.Pa.1976), *aff'd*, 649 F.2d 175 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *see also In re Home–Stake Prod. Co. Sec. Litig.*, 76 F.R.D. 351, 368–69 (N.D.Okla.1977); *Mulcahey v. Petrofunds, Inc.*, 79 F.R.D. 272, 279 (S.D.Tex.1978); *Shankroff*, 112 F.R.D. at 193; *contrast Martin*, 156 F.R.D. at 216 (finding no evidence of a "fixed set of written materials").

**(1) Prudential Agents' Oral Misrepresentations Were Uniform Throughout the Country**

57. In this case, the oral component of the fraudulent sales presentations did not vary appreciably among class members. Bernard Decl. at ¶ 23. Plaintiffs' allegations and the evidence presented to the Court demonstrate that throughout the country, Prudential agents uniformly misled class members with virtually identical oral misrepresentations.

58. For example, policyholder complaints demonstrate that throughout the country Prudential uniformly misrepresented to class members that APP policy premiums would vanish and that existing policy values could be used to fund replacement policies without any additional out-of-pocket premium obligations. Task Force Report at 51–52. Also, Prudential audits revealed early in the Class Period that agents committed uniform, deceptive sales practices throughout the country. Second Am. Compl. at ¶¶ 79–88; Weiss Aff. at ¶¶ 71–74. In 1982 and 1983, for example, internal auditor John Cressman found rampant churning activities in various Prudential locations. Second Am. Compl. at ¶ 84; Weiss Aff. at ¶ 74. In response to these findings, Cressman created a system to detect churning. Second Am. Compl. at ¶ 85; Weiss Aff. at ¶ 74. When Prudential tested this system in other cities, the churning declined and sales plummeted—a strong indication of the prevalence of churning activity at these dispersed locations. Weiss Aff. at ¶ 74.

59. In addition to customer complaints and Prudential audits, many state regulatory investigations into Prudential's conduct indicate that Prudential's deceptive sales practices were uniform. The Task Force concluded that the fraudulent sales practices "were not isolated to any one region of the country." Task Force Report at 14. The Task Force found also that policyholder complaints regarding financed insurance and vanishing premium policies increased since

1990 in "every region" of the country. *Id.* at 223.

## (2) To Create Consistent Oral Sales Presentations, Prudential Trained Its Agents and Provided Its Agents with Uniform Sales Materials

60. The agents' oral presentations were uniform because: (1) Prudential trained its agents uniformly; and (2) Prudential required its agents to use uniform sales materials.

61. First, Prudential extensively trained its agents to make uniform sales presentations. *See, e.g.,* Connecticut Report at 65 ("[T]here is evidence that sales managers taught new agents how to identify and use cash values and dividends to pay for new policies, misled policyholders during sales presentations, and even encouraged veteran agents to churn."); Pls. Evid. Sub., B–8 at 421 (Affidavit of Ronald H. Ward, June 27, 1995) ("I have in my possession training tapes, slides and sales materials in which The Prudential's executives and registered representatives made what I now believe to be misleading statements of material fact about features, returns and product identification."); *id.,* C–1 at 455 (Deposition Transcript of James C. Helfrich, August 16, 1996) (agent said "we were trained to do it this way"); *id.,* C–7 at 487 (Transcript of D. Rinsky, September 19, 1996) (discussing training processes); *id.,* H–1 at 808 (Memorandum by James C. Helfrich, November 18, 1992) ("Due to the way that agents were previously educated by management in the sale of insurance . . ., it appears that many, if not most, new agents were taught to sell insurance through financing mechanisms."). Prudential even provided its agents with scripts. *See, e.g.,* Pls. Evid. Sub., C–7 at 487–88 (Transcript of D. Rinsky, September 19, 1996) ("So the scripts, questions and answers, detailed training materials and then repetition, certainly, is another important part of the training process."); C–8 at 500 (Transcript of E. Dare, September 18, 1996) ("[W]e have scripts for training new representatives on how to present different things."). A memorandum authored by James Helfrich, Prudential's Director of Consumer Affairs and Marketing Practices, warned senior Prudential management that Prudential agents were being taught to sell insurance through churning mechanisms and that agents were rewarded for their churning with high commissions:

> Due to the way that agents were previously educated by management in the sale of insurance (especially in areas such as Ohio), it appears that many, if not most, new agents were taught to sell insurance through financing mechanisms.
>
> \* \* \* \* \* \*
>
> [F]luctuating dividend scales and complex use of loan values and the eventual impact of these financing transactions on insurance plans was mostly negative and not clearly understood by the consuming public. Consequently, as dividends decreased and as ill-conceived and miscalculated loan transactions started to cause many "financed" programs to fail or to not meet expectations, an attendant increase in complaints on all levels (regulatory, executive, home office, field, etc.) resulted.
>
> \* \* \* \* \* \*
>
> In the past, the common response when agents were questioned as to why they used financed or abbreviated pay mechanisms for selling insurance has been: "That's the way we were trained." I think we have to admit that *this response is so common and consistent that, in fact, that was the primary, or only, way many of these agents were trained to sell insurance.* In all candor, it was an easy, appealing way to generate commissions. . . .

Pls. Evid. Sub., H–1 (emphasis added).

62. Second, Prudential's requirement that agents use pre-approved written marketing materials, which contained identical misrepresentations and omissions, further guaranteed the consistency of accompanying oral misrepresentations. Prudential specifically prohibited agents from using advertising or marketing materials that Prudential had not approved. Second Am. Compl. at ¶ 23; Pls. Evid. Sub., E–1 (document entitled "Approved PRUCO Materials"). Prudential required all sales presentations, policy illustrations, computer hardware and software used to generate sales materials, and other infor-

mation used to sell insurance products to be pre-approved by Prudential. Second Am. Compl. at ¶ 22. Additionally, Prudential supplied its agents with pre-approved materials, including product brochures, pre-call letters, computer-based selling and illustrations systems, seminar materials, and newspaper advertisements. Second Am. Compl. at ¶ 22. And Prudential required standardized materials to market securities such as the VAL policies. Second Am. Compl. at ¶ 24; Pls. Evid. Sub., E–1 at 677 (Index of Pruco Direct Mail Letters and Ads, Including VAL Letters).

### g. Plaintiffs' Claims that May Entail Establishing Reliance Do Not Undermine the Predominance of Common Issues

63. Some objectors have mistakenly argued that the need for individual plaintiffs to prove reliance for their fraud based claims undermines the predominance of common issues. The Court rejects the argument. Indeed, courts generally reject the argument that the issue of reliance undermines the predominance of common issues because reliance is an issue secondary to establishing the fact of the defendant's liability: "Challenges based on ... reliance have usually been rejected and will not bar predominance satisfaction because [reliance pertains] to the right of a Class Member to recover in contrast to underlying common issues of the defendant's liability." 1 *Newberg* § 4.26, at 4–104. Where all class members must establish the defendant's complicity and liability, thus, the individual issues are secondary and the class should be certified. *See In re IGI Sec. Litig.,* 122 F.R.D. at 460. Even if many of the plaintiffs' claims involved a reliance element, thus, common issues would predominate.

64. But in this case most of the plaintiffs' claims do not even involve a reliance element. Plaintiffs' claims for breach of contract, breach of implied obligation of good faith and fair dealing, negligence, negligent training and supervision, and unjust enrichment do not involve reliance. An individual issue with respect to one element of a small portion of plaintiffs' claims does not outweigh the multitude of issues common to the remaining elements and claims.

65. And plaintiffs' fraud-based claims stem largely from misleading omissions, Second Am. Compl. at ¶¶ 43, 58–59, for which reliance may generally be presumed. For example, under the Securities Exchange Act section 10(b), individual reliance is presumed if the defendant's omission is material. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 152–54, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741 (1972) [hereinafter *Ute Citizens* ] (holding that reliance on a material omission may be presumed in a Rule 10b–5 case); *see also, e.g., Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 924 (3d Cir.1992) (holding that plaintiffs were entitled to the *Ute Citizens* presumption of reliance); *Sharp,* 70 F.R.D. at 547 ("One of the two exceptions to the reliance requirement arises when the defendant fails to disclose material facts which it has a duty to disclose (nondisclosure)."); *In re LILCO Sec. Litig.,* 111 F.R.D. 663, 668–69 (E.D.N.Y.1986) ("With respect to federal securities claims under § 10(b) and Rule 10b–5, issues of individual reliance are largely irrelevant [to class certification] because reliance is presumed if the statement or omission is material."); *In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.,* 122 F.R.D. 251, 254–55 (C.D.Cal.1988) (holding that *Ute Citizens* applied to permit certification of hybrid misrepresentation/omission claims because the court could not predict which theory would prevail before resolution of merits). In addition, reliance may be presumed for fraud-based common law claims when the alleged omissions and misrepresentations are uniform and material and the class members acted in a manner consistent with reliance. *See, e.g., Vasquez v. Superior Ct. of San Joaquin County,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 804–05, 484 P.2d 964, 972–73 (1971) (holding that where material misrepresentations are made to class members an inference of reliance arises to the entire class). Accordingly, because reliance is an element only in some of plaintiffs' claims, and because reliance may be presumed, reliance does not undermine the predominance of common issues.

### h. Individual Damages Do Not Undermine the Predominance of Common Issues

██ 66. Individual damages issues do not defeat an otherwise valid class certification attempt. *See Baby Neal*, 43 F.3d at 57 (finding that individual damage determinations did not undermine commonality finding); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when common issues which determine liability predominate."), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Gunter*, 164 F.R.D. at 399; *Walsh v. Pittsburgh*, 160 F.R.D. at 531 (finding predominance met where issue of individual damages was "largely a matter of mathematical calculation").

67. In this case, the Court would employ one of several methodologies to allow the parties to present classwide damages evidence at trial.[46] Pls. Certif. Memo, Case Management App. at 16–24. One approach would be to present expert testimony estimating the aggregate amount of damages sustained by the class. *See In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 351–54 (E.D.Pa.1976) ("*Sugar Indus.*"). Another approach would be to allow the jury to determine, with the assistance of expert testimony, a formula that would later be applied to individual class members to compute damages during the claims allocation process. *Id.* Thus, there are many available means to address individual damages that would allow the Court to adjudicate fairly and efficiently the many issues common to the plaintiffs while allowing a fair resolution also of the individual damages issues.

### i. Objectors' Arguments that Common Issues Do Not Predominate Are Unpersuasive

68. Beauvias incorrectly argues that the predominance of common issues is refuted by Prudential's contention that a global inference of improper sales practices is improper and insistence that any claim must be assessed individually. Prudential claims, for example, that "incidents of improper activity likely constituted only a fraction of the financed and APP sales discussed in the Report." Prudential's Response to Report of the Multi–State Life Insurance Task Force and Multi–State Market Conduct Examination *in* Pru. App., Vol. II, Ex. 6. Prudential's interpretations of the issues in this class action do not, however, control; Prudential may be incorrect and plaintiffs may be entitled to various presumptions of reliance. Additionally, however, the logically prior issue whether a presumption should apply is itself a common issue.

69. Krell argues that common questions cannot predominate for those injured by "other improper sales practices" because the Court cannot discern what common and individual questions would be for these class members. Krell's argument is creative, but unpersuasive. Plaintiffs have alleged that Prudential defrauded customers through systematically deceptive sales practices. The "other improper sales practices" clearly involve the same issues—Prudential's intent and knowledge, for example.

### j. Common Issues Overwhelmingly Predominate the Individual Issues in this Case

70. The Court finds that Rule 23's commonality and predominance requirements are satisfied because the plaintiffs' allegations and evidentiary submissions establish the multiplicity of common issues discussed above and that these common issues dramatically outweigh the potential individual issues, also discussed above.

### 3. The Plaintiff Representatives' Claims Are Typical of Those of the Other Class Members

██ 71. Rule 23 requires also that the named plaintiffs' claims be typical of those of

---

**46.** The Third Circuit has held that when there is sufficient evidence of the fact of damage presented at trial, proof of the amount of damages to a mathematical certainty is unnecessary and an intelligent estimate of damages is acceptable. *See Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 895 (3d Cir.1975) ("Although the law does not command mathematical preciseness from the evidence in finding damages, sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture."), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976).

the class at large. In the words of the Supreme Court: "[t]he typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." *General Tel. Co.*, 446 U.S. at 330, 100 S.Ct. at 1706. The typicality inquiry assesses whether the action can be efficiently maintained as a class action and whether the named plaintiffs have incentives aligned with those of absent class members to ensure that the absentees' interests are protected. *See Baby Neal*, 43 F.3d at 57–58; *Eisenberg*, 766 F.2d at 786; *Weiss v. York Hosp.*, 745 F.2d 786, 809–10 n. 36 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). The plaintiff with claims typical of the class benefits the class by pursuing self-interest: "[A] plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with those of the representative." 1 *Newberg* § 3.13, at 3–75. The named plaintiffs' claims should not be "markedly different" from those of the class. *See Baby Neal*, 43 F.3d at 57.

72. Typicality lies where there is a strong similarity of legal theories, *see id.* at 58, or where the claims of the class representatives and the class members arise from the same alleged course of conduct by the defendant, *see Eisenberg*, 766 F.2d at 786; *Walsh v. Pittsburgh*, 160 F.R.D. at 530; *Gunter*, 164 F.R.D. at 395–96; *In re Western Union Sec. Litig.*, 120 F.R.D. at 634. Wrongful conduct that aggrieves both the named plaintiffs and the putative class members is sufficient to satisfy the typicality requirement despite varying fact patterns underlying the individual claims. *See Baby Neal*, 43 F.3d at 58 ("Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."); *see also In re IGI Sec. Litig.*, 122 F.R.D. at 456 ("[I]t is defendants' course of conduct, in this case the release to the press of the allegedly fraudulent and misleading statements, upon which the court must focus in determining typicality."). Under these circumstances, factual differences do not preclude a typicality finding. *See, e.g., Eisenberg*, 766 F.2d at 786.

73. In this case, typicality is clearly fulfilled. All of the named plaintiffs allege that Prudential maintained a scheme to defraud policyholders. Specifically, plaintiff Nicholson asserts churning, vanishing premium, and investment plan claims; plaintiff Dorfner asserts churning and vanishing premium claims; plaintiffs Kuchases assert churning and investment plan claims; and plaintiff Gassman asserts vanishing premium and investment plan claims. The absent class members purportedly were subjected to the same scheme and deceptive sales practices as these representatives. And because there is a prominent guiding thread through all of the plaintiffs' claims—prudential's scheme to defraud—this action can be efficiently maintained as a class action and the class representatives will adequately protect the interest of absentees.

74. Krell wrongfully alleges that the class fails for lack of typicality because no class representative claims to have been injured by "other improper sales practices." The Supreme Court has set forth factors that class plaintiffs must demonstrate to show that their claims are typical of a broader set of claims alleged. *See General Tel. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The named plaintiff must be part of the class, possess the same interest as the other class members, and suffer the same injury as other class members. *See id.* at 156, 102 S.Ct. at 2369–70. Where the named plaintiff alleges multiple claims on behalf of the class, that plaintiff must possess the same injury and suffer the same generic type of harm as other class members. *See id.* at 159, 102 S.Ct. at 2371. The injury need not necessarily arise from identical factual circumstances that gave rise to the injuries of class members. *See Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 131 (3d Cir.1987) (holding typicality satisfied where named plaintiffs did not share all of the claims of the class but the claims alleged appeared to stem from a single course of conduct by which the defendant failed to represent its members fairly and effectively), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988). In the

instant case, class members injured by "other fraudulent sales practices" have suffered the same injury—they are victims of Prudential's deception—and have suffered the same generic type of harm—they have economic damages—as the named plaintiffs. The fact that the Proposed Settlement covers claims concerning "other fraudulent sales practices" occurring during the Class Period where no class representative claims to be injured by "other fraudulent sales practices" does not undermine typicality.

### 4. Class Counsel and the Class Representatives Adequately Represent the Class

■ 75. Rule 23(a) requires, lastly, adequacy of representation: "the representative parties [must] fairly and adequately protect the interests of the class." There are two factors: (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class. *See Hoxworth*, 980 F.2d at 923 (citations omitted); *see also In re Western Union Sec. Litig.*, 120 F.R.D. at 635. The party challenging representation bears the burden to prove that representation is not adequate. *See Walsh v. Pittsburgh*, 160 F.R.D. at 530; *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. at 140.

#### a. Class Counsel Adequately Represent the Class

■ 76. The vigorous prosecution requirement ordinarily equates to the competence and experience of Class Counsel. *Grasty*, 828 F.2d at 129 (" 'vigorous prosecution' must be measured in terms of the efficiency and legal acuity of the class representative rather than the number or length of papers filed."). In the context of proceedings to certify a class for settlement purposes only, the Third Circuit has observed that the terms of a proposed settlement may demonstrate whether representation by counsel is adequate. *See Georgine*, 83 F.3d at 630 (finding that class conflict prevented finding of adequate representation and observing that settlement demonstrated class conflict because settlement made recovery determinations on which class member interests were at odds).

#### (1) Class Counsel Are Extremely Qualified

■ 77. In this case, there is no doubt that Class Counsel have prosecuted the interests of the class members with the utmost vigor and expertise. Plaintiffs' team of legal counsel is comprised of preeminent class action attorneys from throughout the country, many of whom have been qualified as lead counsel in other nationwide class actions. Weiss Aff. at ¶ 252; *New York Life*, 1995 N.Y. Misc. LEXIS 652, at *28; *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y.1995). Indeed, Plaintiffs' Counsel have a long and successful track record in litigating and trying major class action cases. Weiss Aff. at ¶ 254.

#### (2) Class Counsel Also Are Extremely Committed to the Class and All Class Members and Are Unhampered By Any Conflicts of Interest or Separate Inventories of Cases

78. Counsel who have separate inventories of cases, may compromise class representation. *See Georgine*, 83 F.3d at 622. In this case Class Counsel have no inventories of cases outside the current action and have the fullest commitment to ensuring that class members receive the maximum benefits available.

79. Also, counsel who negotiate their fee arrangements while continuing to negotiate for class relief may not adequately represent the class because of their pecuniary interest in obtaining a large fee. *See GM Trucks*, 55 F.3d at 801 ("[E]ven honorable counsel—like Class Counsel here—may be compromised by the possibility of a large fee."). In this case, this Court did not authorize Class Counsel's fee negotiations until after all provisions in the Settlement Agreement were complete and Class Counsel and Prudential did not commence any fee negotiations until after this Court authorized them. Class Counsel's fee agreement with Prudential, thus, did not compromise Counsel's ability to negotiate relief on behalf of the class.

80. Krell argues that Class Counsel abandoned crucial discovery when the fee was being negotiated, raising serious "red flags" about the Proposed Settlement and the adequacy of lead counsel. Krell Brief at 65. Krell attempts to divert the Court with a red herring. Discovery in this case was extremely substantial, and Class Counsel negotiated as if Prudential's conduct were the worst imagined.

### (3) The Value of the Proposed Settlement to All Class Members Demonstrates that Class Counsel's Representation Is Adequate

81. In this litigation, Class Counsel have demonstrated their skills in developing the monumental settlement currently proposed. Foremost, Class Counsel helped first to achieve the Task Force Remediation Plan, and later achieved the enhancements that form the present Settlement Agreement between Prudential and the Class. Weiss Aff. at ¶¶ 23–27, 117–29. Then, upon discovering evidence of widespread document destruction, Class Counsel investigated the document destruction and negotiated additional class benefits in light of the document destruction episodes. January 6, 1997 and February 3, 1997 Orders. Class Counsel avidly have promoted the plaintiffs' interests and have thereby afforded the class highly satisfactory significant material benefits.

### (4) Class Counsel Vigorously Have Represented the Class Throughout These Proceedings

82. Moreover, even without the substantive achievements of the Proposed Settlement, Class Counsel have shined throughout these proceedings. Class Counsel adroitly represented class members when counsel briefed and argued plaintiffs' interests in a host of pretrial motions: motions to dismiss, motions to stay the proceedings, a motion to abstain, and motions to stay discovery. Weiss Aff. at ¶¶ 52–59. Even after the Court stayed formal discovery at Prudential's request, Plaintiffs' Counsel undertook an intensive private investigation and informal discovery, developing, with this Court's approval, a method to interview former Prudential agents. *Id.* at ¶¶ 60–64. And, once this Court lifted the stay, Plaintiffs' Counsel conducted massive document discovery and depositions. *Id.* at ¶¶ 85–100. Counsel for plaintiffs have, thus far, reviewed over one million pages of documents, 160 computer disks, and 500 videotapes and audio tapes, and have conducted numerous depositions and interviews of Prudential witnesses. *Id.* at ¶¶ 85–97.

83. Krell criticizes the fact that Class Counsel valued speed in resolving this case. But a swift resolution of this case is important to afford policyholders, many of whom are ill or elderly, meaningful relief. And speed did not jeopardize class relief. Plaintiffs' counsel engaged in extremely adversarial pretrial motion practice and voluminous discovery. Class representation has not been compromised by Class Counsel's sound and swift effort to resolve plaintiffs' claims.

### b. The Plaintiff Representatives Adequately Represent the Class

84. Class certification requires also that the class representatives represent adequately the interests of the class. Although it is not necessary for the putative class representatives' claims to be identical to those of absent class members, due process precludes certification if the named plaintiffs possess potentially conflicting interests that may impair the vigorous prosecution of the class claims. *In re Baldwin–United Corp. Litig.*, 122 F.R.D. at 428. Where class members have conflicting interests, each group must receive its own representation; it is not sufficient that the named representatives' claims are representative of other class members. *See Georgine,* 83 F.3d at 631 ("presently injured class representatives cannot adequately represent the future plaintiffs' interests and vice versa"); *GM Trucks* 55 F.2d at 801 ("[W]e must be concerned that the individual owners had no incentive to maximize the recovery of the government entities; they could skew the terms of the settlement to their own benefit."); *contrast Halderman v. Pennhurst State Sch. & Hosp.,* 612 F.2d 84, 109–110 (3d Cir.1979) (possible disagreement among class members as to appropriate relief is no bar to certification at the liability stage), *rev'd on other grounds,* 451 U.S. 1, 101 S.Ct. 1531, 67

L.Ed.2d 694 (1981); *Link v. Mercedes–Benz,* 788 F.2d 918, 929 (3d Cir.1986) (holding in suit against manufacturers and dealers for price fixing or repairs that fact that class members obtained repairs from different dealerships did not create antagonism to preclude finding of adequate representation).

■ 85. In this case, the named plaintiffs unquestionably well represent the class. The named policyholders who were defrauded share the same incentive as absent policyholders who were defrauded to establish the alleged fraud and to maximize the overall recovery. Weiss Aff. at ¶ 252; *see also Weiss v. York Hosp.,* 745 F.2d at 811; *New York Life,* 1995 N.Y. Misc. LEXIS 652, at \*29 (holding representation adequate where policyholders represented mix of characteristics representative of the mix found in the class itself). And, there are no disparate interests to impair plaintiffs' incentive to prosecute fully all aspects of their claims against Prudential. All plaintiffs have an interest in establishing Prudential's knowledge and orchestration of the scheme to defraud life insurance consumers. All plaintiffs share an interest in obtaining relief commensurate with individual injury and in securing a punitive damages claim against Prudential. Against this backdrop, individual factual variations between plaintiffs' claims do not divide the class.

86. Also, the Proposed Settlement confirms that class representatives provide adequate representation to absent class members and that there are no conflicts between class members. Under the Proposed Settlement, each claimant may obtain relief based on whether the available evidence demonstrates that he or she was injured. Additionally, relief is uncapped, allowing all class members to be compensated for their losses without the risk that some victims will deplete the defendant's funds at the expense of other victims.

87. Some objectors have argued that policyholders who acquired their policies on different dates are antagonistic toward each other. Differences in the dates that a policy

was acquired are irrelevant, however. *See In re Baldwin–United Corp. Litig.,* 122 F.R.D. at 428. In *In re Baldwin,* for example, the court rejected the argument that plaintiffs who purchased early in the Class Period had no incentive to prove the facts relevant to a purported fraud committed on a subsequent purchaser. *See id.* ("All class members stand or fall on the issue whether material information was misrepresented or withheld from [product] purchasers, and the Court believes that the named plaintiffs will pursue this issue vigorously.") The facts surrounding Prudential's sales practices employed early in the Class Period are similar to those surrounding later sales practices. Additionally, the primacy of the issue of Prudential's scheme to defraud dwarfs any potential differences between class members created by timing. Consequently, there is no class antagonism based on policy purchase date differences.

88. Some objectors have argued that there is intra-class antagonism because of a conflict between presently injured plaintiffs and "futures claimants," as was a problem affecting class certification in *Georgine.* Krell, citing *Georgine,* argues also that "other sales practices" claimants may have valuable future claims, concerning their existing contracts, that will be forever released in this Proposed Settlement and that class representatives cannot re resent these class members. Krell's argument is without merit. All class members including those with "other sales practices" claims are presently injured. If any misrepresentation or fraud occurred in the sale of a life insurance policy to a class member during the Class Period, the resultant injury now exists. Even if a policyholder was not aware prior to receiving the Class Notice that he or she had been injured, the policyholder now knows about his or her injuries by virtue of the Class Notice. Additionally, Prudential is creating an "800" number to provide the policy information necessary to enable a policyholder to determine the extent of any injury due to fraudulent sales practices that occurred during the Class Period.[47] Thus, all class members are

---

47. The Stipulation Amendment provides that the Stipulation of Settlement, Exhibit C, ¶ II.D.4 is

amended to require that relevant information be provided to class members to allow them to

injured now, if at all, and there are no "futures claimants."

89. According to Krell, there is a conflict also between replacement policyholders and non-replacement policyholders. Krell states that Lead Counsel traded the "very substantial claims of the replacement policyholders to obtain additional relief for the other class members." Krell Brief at 6. Krell explains that Class Counsel traded valuable replacement claims for the financial guarantees. Krell bases his argument on the incorrect assumption that illegal replacements are easily demonstrated by the policyholder's underwriting file at Prudential, while vanishing premium and investment claims are based on potentially conflicting oral testimony of policyholders and agents. *id.*

90. The Court disagrees with Krell's assertion that there is a conflict between replacement and non-replacement policyholders. First, the claims of replacement policyholders are not stronger than non-replacement claims. There will often be significant documentation to support both vanishing premium sales and investment plan sales. For example, vanishing premium sales often were accompanied by fraudulent illustrations and investment plan sales were accompanied by sales material that failed to disclose that the product offered was life insurance. Second, the Proposed Settlement treats all claims equally. Any policyholder, regardless of the fraudulent sales practice alleged, is entitled to full compensatory relief if the policyholder demonstrates a right to relief. Class Counsel did not allocate relief to some plaintiffs while denying relief to others. Thus, Krell's allegation that the Proposed Settlement compromises replacement policyholder rights for the benefit of other claimants proves untrue.

## 5. The Class Action Device Is Superior to Any Other Means to Adjudicate this Controversy

■ 91. The final class certification factor that must be discussed, Rule 23(b)(3)

requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." The Rule provides four non-exclusive factors to aid the Court in a superiority determination: (1) the interest of individual members of the class in individually controlling the prosecution of the action; (2) the extent of litigation commenced elsewhere by class members; (3) the desirability of concentrating claims in a given forum; and (4) the management difficulties likely to be encountered in pursuing the class action. In this case, considering these and other factors, the class action is not only the superior method for adjudicating this controversy, it affords the vast majority of class members the only practical avenue of redress.

### a. There Are No Other Sensible Means to Adjudicate this Controversy

92. Before reaching Rule 23(b)(3)'s enumerated factors, the Court observes that Rule 23(b)(3)'s superiority requirement compares class actions to other available methods to adjudicate the controversy. When the claims of class members are small, denial of class certification would effectively deprive these class members of judicial redress, a strong indication that the class action is the superior means of adjudication:

> For that segment of the class with small individual claims, the costs of litigation and lack of notice would mean that small or unsophisticated claimants would go unprotected. It must be remembered that Rule 23(b)(3)'s superiority requirement expressly compares class actions "to other *available* methods for the fair and efficient adjudication of the *controversy*." ... When the claims of the class members are small, denial of a class action would effectively exclude them from judicial redress.

1 *Newberg* § 4.27, at 4–107 to 4–109 (emphasis in original). The class action device may allow plaintiffs "to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co.,* 472 U.S. at 809, 105

---

assess their injuries. Prudential must: "[p]rovide Claimants who so request with current information with respect to the existence of any outstanding loans, their most recent dividend

payments, their dividend status, and, where applicable, their currently illustrated year of abbreviation." Stipulation Amendment ¶ 5.

S.Ct. at 2973; *see MacNeal v. Columbine Exploration Corp.*, 123 F.R.D. 181, 187–88 (E.D.Pa.1988) (holding that class action was superior to individual suits where class members had relatively small interests and might not have the wherewithal to bring suit to protect their individual rights).

93. Additionally, as a class increases in size, there become fewer methods to adjudicate the controversy. As the case becomes larger and more geographically dispersed, the traditional alternatives of joinder, consolidation, and intervention will be impracticable. *See* 1 *Newberg* § 4.33, at 4–136 to 4–137.

94. In this case, most class members' individual compensatory damages claims are relatively modest, leaving individual class members with little ability to litigate their claims against Prudential independently. Weiss Aff. at ¶ 261. The majority of class members in this case own relatively modest life insurance policies with death benefits averaging $35,000. *Id.* Also, the class includes over eight million members from throughout the country, making joinder, consolidation, and intervention impracticable. Consequently, there appear to be no other available means to adjudicate this controversy and the class action device appears the only rational avenue of redress for many class members.

**b. Individual Plaintiffs Have Little Interest in Controlling the Prosecution of Separate Actions**

95. Rule 23(b)(3) indicates that the first factor is "the interest of members of the class in individually controlling the prosecution or defense of separate actions." The test is whether the interest of most class members in conducting separate lawsuits is so strong as to require denial of class certification. *See, e.g., McClendon v. Continental Group, Inc.*, 113 F.R.D. 39, 45 (D.N.J.1986) (holding class action to be superior adjudication method where individual class members had no interest in controlling prosecution of individual actions).

96. Here, class members have little incentive or ability to prosecute their claims against Prudential individually. *See* 7A Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, *Federal Practice and Procedure* § 1779, at 557 (1986) (observing that "a group composed of consumers or small investors typically will be unable to pursue their claims on an individual basis because the cost of doing so exceeds any recovery they might secure"); *Sala v. National R.R. Passenger Corp.*, 120 F.R.D. 494, 500 (E.D.Pa.1988); *Cumberland Farms, Inc. v. Browning–Ferris Indus., Inc.*, 120 F.R.D. 642, 648 (E.D.Pa.1988) (holding that class action was superior to alternatives where many individuals were injured, but no one person may have been damaged to the degree requisite to institute independent litigation). The class is estimated to encompass millions of Prudential policyholders located throughout the United States. Because Prudential markets to middle-income consumers, most class members cannot afford to pursue individual litigation. Weiss Aff. at ¶ 261. The average death benefit payable on a class member owned insurance policy totals $35,-000. *Id.* Thus, compensatory damages suffered by a typical class member are insubstantial, and it is unlikely that many class members would be able to locate attorneys to litigate their individual claims for a contingent-fee. *Id.*

97. Also, the proportionately small number of policyholder suits now pending against Prudential confirms that class members lack a compelling interest individually to control the prosecution of separate actions. *See, e.g., Bentkowski v. Marfuerza Compania Maritima, S.A.*, 70 F.R.D. 401, 405 n. 10 (E.D.Pa. 1976) (observing that "dearth" of other suits suggested lack of interest in individual control). As of recently, there were approximately 200 separate policyholder suits pending against Prudential nationally. Miller Decl. at ¶ 14. In relation to the total population of class members, these action represent less than six one-thousandths of one percent of all class members.

98. And, although the number of individual actions pending against Prudential, approximately 200, indicates little incentive to individually litigate when measured against the over eight million class members, the individual actions are numerous enough in absolute terms to serve as a significant strain

on the judicial system. *Id.* These factors weigh heavily in favor of granting class certification.

### c. The Number of Actions Pending Elsewhere Weighs in Favor of Finding the Class Action Mechanism Superior

99. Rule 23(b)(3) indicates as the second factor "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." The existence of other actions may indicate either that there are other methods to adjudicate the controversy or that class certification is superior:

> [T]he existence of other suits by class members may suggest an interest in individual litigation. On the other hand, the existence of other suits may indicate that a class action is needed. Class actions are intended in part to eliminate the waste of judicial resources caused by duplicative individual actions. A class action will ordinarily be superior to repetitive individual suits.

1 *Newberg* § 4.30, at 4–121; *see, e.g., Shamberg v. Ahlstrom,* 111 F.R.D. 689, 699 (D.N.J. 1986) (holding that class action was superior to other methods of adjudication, including multiplicity of duplicative individual lawsuits).

100. Here, the existence of other actions weighs in favor of certifying the class. First, the number of individual actions is inconsequential in light of the number of potential class members. *See McClendon,* 113 F.R.D. at 45. This suggests little individual interest in prosecuting actions against Prudential. Second, the sheer number of actions, although proportionally few, indicates that a class action is necessary to eliminate the waste of judicial resources caused by duplicative individual actions. Third, the individual actions will not adjudicate the controversy that underlies this class action litigation; rather, each would only resolve the individual claims of a minute portion of the class.

### d. To Concentrate this Litigation in New Jersey Is Desirable

101. Rule 23(b)(3) indicates that the third factor to be considered in assessing whether the class action device is superior to other means of adjudication is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." The factor emphasizes the desirability of the forum selected, not the desirability of claims concentration generally. *See* 1 *Newberg* § 4.31, at 4–123; *Bentkowski,* 70 F.R.D. at 405 (holding that when majority of class lived in New Jersey, Maryland, Pennsylvania, and Virginia, the Eastern District of Pennsylvania was a desirable forum).

102. In this case, plaintiffs' claims are appropriately concentrated in New Jersey. Prudential's principal place of business is in New Jersey and most potential upper echelon managerial witnesses are located in New Jersey. As the MDL Panel observed, plaintiffs' allegation of Prudential's common scheme, in particular, indicates that the District of New Jersey is the most appropriate forum for this litigation:

> Particularly in light of plaintiffs' allegations of company-wide schemes (supposedly emanating from these headquarters), significant discovery of Prudential documents and employees is likely to occur there. We also note that the New Jersey forum is not just the choice of New Jersey litigants. Plaintiffs in several other of the constituent actions state that they support or do not oppose centralization in the District of New Jersey.

August 3, 1995 Transfer Order at 2. Indeed, there is no more appropriate forum for this controversy.

### e. Although Managing this Case Will Be Challenging, No Anticipated Difficulties Render this Action Unmanageable

103. Rule 23(b)(3) indicates last that the Court should consider "the difficulties likely to be encountered in the management of a class action" to determine whether the class action mechanism is superior to other means of adjudicating the case. Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

104. The Court must query not whether there will be any manageability problems,

but whether reasonably foreseeable difficulties render some other method of adjudication superior to class certification. *See* 1 *Newberg* § 4.3, at 4–125 ("It is only when such difficulties make a class action less fair and efficient than some other method, such as individual interventions or consolidation of individual lawsuits, that a class action is improper."). When courts and counsel work together to manage increasingly complex and large-scale litigation, "[e]xperience . . . shows that visions of unmanageability soon disappear." *Sugar Indus.*, 73 F.R.D. at 357. Moreover, most courts hold that manageability difficulties cannot support denial of class certification when no other practical litigation alternative exists. *See, e.g., Brown v. Cameron–Brown Co.*, 92 F.R.D. 32, 49 (E.D.Va. 1981) (certifying class where common questions predominated and there was no other effective way to try the case); *see also* 1 *Newberg* § 4.32, at 4–130 to 4–131 ("As has been noted with the predominance test, Rule 23(b)(3) permits a class denial for lack of superiority only when other available methods for the fair and efficient adjudication of the controversy actually exist.").

105. Indeed, the successful resolution through trial of extremely large and complex classes bodes well for the manageability of even the biggest and most complex actions:

> Cases that have certified large classes illustrate the size and complexity of classes that have been upheld. Decisions denying classes under similar circumstances should be of limited value as precedent, because they are based on speculation at the outset of the suit that the action will prove unmanageable, while the cases cited show otherwise.

1 *Newberg* § 4.33, at 4–139.

106. Here, the Court has carefully considered the choice of law issues that confront the Court and concludes that these choice of law issues do not render this class action unmanageable. Plaintiffs have demonstrated, consistent with the approach endorsed in *Asbestos School* and cited with approval in *Georgine*, that any state-by-state variations in the governing legal standards are manageable. Issacharoff Decl.; Issacharoff Decl., Apps. B & C. Plaintiffs have submitted a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims for fraud, breach of contract, implied obligations of good faith and fair dealing, negligence, and negligent misrepresentation. Issacharoff Decl., App. B. These charts compare state-by-state the elements of the claims alleged in the Second Amended Complaint with citations to the pertinent authorities in each of the fifty states—the same approach used in the *Asbestos School* litigation. The elements of these common law claims are substantially similar and any differences fall into a limited number of predictable patterns. Issacharoff Decl. at ¶ 22 ("[A]ny variations among legal standards [of the state laws] are neither particularly great nor insuperable to the certification of a litigation class. To the extent that such variations exist, they could be readily handled by instructions and structured questions to the jury and, if necessary, appropriate subclasses."). Thus, plaintiffs' claims can be grouped into a manageable number of categories accommodating any variations in the elements of the potentially applicable states' laws.[48] And, the Court finds that a manageable number of jury instructions could be fashioned to comport with the elements of the common law claims in the many jurisdictions.[49]

107. Additionally, the Court finds that any difficulties that may arise during the discovery, pre-trial, or trial stage of this litigation may be effectively managed through traditional procedural techniques such as special interrogatories, special verdict forms, sub-classes, or sequenced trial phases. *See GM Trucks*, 55 F.3d at 815; *In re Kirschner*

---

48. A court certifying a class for claims very similar to those at bar—a nationwide class of vanishing premium policyholders alleging claims for fraud, negligence, gross negligence, and statutory fraud—used a similar approach. *See Justice v. Great West Life Assurance Co.*, No. 94–3155 (Tex. Dist.Ct. Aug. 1, 1995).

49. Plaintiffs have submitted sample jury instructions and special verdict forms to illustrate that variations among potentially applicable state laws can be managed to permit a fair and efficient adjudication by the fact finder at trial. Issacharoff Decl., App. C.

*Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 83 (D.Md.1991). The record establishes that plaintiffs can offer classwide proof of liability and damages:

> [Plaintiffs'] allegations, by themselves, place this litigation well within the ambit of a certifiable Rule 23(b)(3) class, because they clearly allege both the existence and predominance of common issues and demonstrate the superiority of aggregate adjudication.... [P]laintiffs have made a record that they can offer classwide evidence with respect to both liability and damages. That showing further confirms predominance of common issues and the manageability of the case through the remainder of the pretrial and trial phases.

Miller Decl. at ¶ 13.

108. In sum, with effective case management this class action will obtain the benefits of efficiency and fairness, the Court finds that the superiority requirement is met.[50]

## V. The Class Notice and Supplemental Materials Fulfill the Notice Requirements of Federal Rules of Civil Procedure 23(c)(2) and 23(e)

109. The Class Notice was adequate, comprehensive, and timely. Notice here was a combined notice to inform class members both of the existence of a class action, as required by Rule 23(c)(2),[51] and the substance of the Proposed Settlement, as required by Rule 23(e). *See, e.g., Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 826 (3d Cir.1973); *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 324 (E.D.Pa.1993). The combined Class Notice must meet the requirements of both Rule 23(c)(2) and Rule 23(e). *See Carlough*, 158 F.R.D. at 324–25 ("The requirements of Rule 23(c)(2) are stricter than the requirements of Rule 23(e) and arguably stricter than the due process clause.").

110. The Court finds that the contents of the individual and publication notices provided class members the information necessary to make an informed and intelligent decision whether to participate in the class and whether to object to the Proposed Settlement. Indeed, the comprehensive notice program in this case far exceeded the requirements of Rule 23 and due process.

111. Federal Rule of Civil Procedure 23(c)(2) affords the right to opt out of a Rule 23(b)(3) class and requires that the parties send a notice to inform class members of this option. *See* Fed.R.Civ.P. 23(c)(2). Rule 23(c)(2) also requires that the notice indicate that the judgment will bind all class members who do not opt out and that any member who does not opt out may appear

---

50. This case is of a different species than *Georgine*, where the Third Circuit observed that a class of a certain "magnitude" might not be appropriate for certification. *See Georgine*, 83 F.3d at 634.

In *Georgine*, the class sought to settle claims of between 250,000 and 2,000,000 individuals who were exposed to asbestos products produced by twenty companies. *See id.* at 617. The Third Circuit held that the class could not be certified because the class failed the typicality and adequacy of representation requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b). *See id.* In *Georgine*, the Court observed that "[e]xamined as a litigation class, this case is so much larger and more complex than all other class actions on record that it cannot conceivably satisfy Rule 23." *Id.* at 618. Each plaintiff's claim raised "radically different" factual and legal issues from the other plaintiffs. *See id.* And, when exponentially magnified by choice of law considerations, these differences eclipsed any common issues in the case. *See id.*

This case is of a different species, however, because although there are numerically more class members here, eight million as opposed to two million, this case is infinitely less complex. *See generally* Appendix C, Georgine Comparison Chart. For example, there is only one primary defendant, there are economic damages only, and choice of law differences have been categorized into manageable categories.

51. Rule 23(c)(2) provides:

> In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

Fed.R.Civ.P. 23(c)(2).

through counsel. *See id.* Rule 23(c)(2) notice must be "the best practicable notice under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2); *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 90 (3d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985).

 112. Notice of a proposed settlement under Rule 23(e) must inform class members (1) of the nature of the pending litigation, (2) of the settlement's general terms, (3) that complete information is available from the court files, and (4) that any class member may appear and be heard at the Fairness Hearing. *See* 2 *Newberg* § 8.32, at 8–103. The Court must consider both the notice's mode of dissemination and its content to assess whether the notice was sufficient. The nature and extent of Rule 23(e) class notice of a proposed settlement lies squarely within the discretion of the trial judge. *See Zimmer Paper Prods., Inc.,* 758 F.2d at 90 (observing that Rule 23(e) commits the form of the notice to the court's discretion); *Walsh v. Great Atl. & Pac. Tea Co.,* 96 F.R.D. 632, 642–43 (D.N.J.) (same) [*"Walsh v. Great Atl. & Pac."*], *aff'd,* 726 F.2d 956, 962 (3d Cir.1983) (same); *see also Grunin,* 513 F.2d at 120–21 ("[T]he mechanics of the notice process are left to the discretion of the court subject only to the broad reasonableness' standards imposed by due process.").

 113. Rule 23(e) notice is designed to be only "a summary of the litigation and the settlement [and] it is crucial to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *See* 2 *Newberg* § 8.32, at 8–109; *see also Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.) ("Class members are not expected to rely upon the notices as a complete source of

settlement information"), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The notice need not be unduly specific. *See* 2 *Newberg* § 11.53, at 11–130 (citing *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145, 170 (2d Cir.1987) (holding that settlement notice that failed to detail a distribution plan was not inadequate), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988)). The notice need not include the entire settlement agreement. *See Grunin,* 513 F.2d at 122; *Carlough,* 158 F.R.D. at 332. Nor need the notice indicate arguments in favor of and against the proposed settlement. *See Greenspun v. Bogan,* 492 F.2d 375, 382 (1st Cir.1974). The notice of the Proposed Settlement, to satisfy both Rule 23(e) requirements and constitutional due process protections, need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections. *See, e.g., Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity present their objections."); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1177 (9th Cir.1977) ("Notice in a class suit must present a fair recital of the subject matter and proposed terms and [give] an opportunity to be heard to all class members.").

 114. No objector has challenged the mode of dissemination. Nor could any objector due so. Dissemination of the Class Notice in this case has been extraordinary. Where possible, each individual class member received individual notice. And the Class Notice was published in major newspapers throughout the country.[52] Indeed, the

---

**52.** Neither Rule 23 nor the requirements of due process require actual notice to each and every possible class member. *See Mullane,* 339 U.S. at 317, 70 S.Ct. at 658–59; *In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 534, 551 (N.D.Ga.1992). Many class members could not

be located through reasonable effort. Supplementing individual notice with publication notice represents an appropriate balance between protecting class members and making class actions workable. *See, e.g., Weinberger v. Kendrick,* 698

dissemination of the Class Notice was ideal. *See, e.g., Grunin,* 513 F.2d at 121 (stating that individualized notice by mail is the best notice practicable in the class action context); *In re Chambers Dev. Sec. Litig.,* 912 F.Supp. 822, 836 (W.D.Pa.1995) (holding that actual notice by mail in conjunction with published notice was best possible notice satisfying Rule 23(c)).

115. And the content of the Class Notice in this case clearly satisfies all of the necessary requirements. The Class Notice indicates the nature of the pending litigation. Stipulation of Settlement, Ex. F–2, at 4–7. The Class Notice indicates that any class member may opt out. *Id.* at 2, 4. The Class Notice indicates that any class member who declines to opt out will be bound by the final judgment. *Id.* at 4. The Class Notice indicates the general terms of the settlement. *Id.* at 7–15. The Class Notice indicates that complete information is available in the Court files. *Id.* at 18–19. And the Class Notice indicates that any class member may appear and be heard at the hearing at the specified date, time, and place.[53] *Id.* at 18.

116. Several objectors have challenged the content of the Class Notice and the Supplemental Materials. These objections are unmeritorious. Certainly none of them indicates that this Court somehow abused its discretion in approving the form of notice. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 169 (holding that minor discrepancies were immaterial where essential goal of the notice requirement, notice of suit and opportunity to consult counsel, was accomplished); *In re Four Seasons Sec. Laws Litig.,* 525 F.2d 500, 503 (10th Cir. 1975) (holding that notice apprised class members sufficiently of information that notice was intended under the Rule to convey).

117. Though the Court will address all of the objections that can be gleaned from the often profuse ramblings of several of the objectors, the Court pauses to observe the tension involved in drafting an appropriate class action notice. On the one hand, the notice must be readable. Objectors have, for example, criticized the length of the Class Notice, arguing that policyholders cannot manage the extensive information provided. And, on the other hand, the parties must be careful to include the requisite core information. Objectors have complained also that the Class Notice fails to indicate nuances of the Proposed Settlement. The Court is mindful of the dichotomy and will assess the objectors' various grievances to ensure that neither the accuracy nor the readability of the Class Notice has been compromised. The Court has discretion to approve a wide range of possible notices, however, each of which would strike an appropriate balance between inclusiveness and brevity.

## A. The Class Notice Adequately Describes the Allegations of the Complaint

118. Johnson complains that the Class Notice fails to adequately to describe the allegations of the Second Amended Complaint, the defenses Prudential may have, or to assess the strength of plaintiffs' claims. Johnson at 25. But, the Class Notice includes a general description, in plain English, of plaintiffs' allegations in the Second Amended Complaint, as well as Prudential's position in response to plaintiffs' claims. Stipulation of Settlement, Ex. F–2 at 5–6. And any class member who so desired could review all of the pleadings in the case, as the Class Notice clearly advised. *Id.,* Ex. F–2, at 18. The Class Notice thus complies with Rule 23. *See Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 799 (10th Cir. 1970) (Rule 23 does not require the Class Notice to include "all the various causes of action, theories of recovery and defenses alleged in the complaints and answers").

---

F.2d at 61, 69–71 (mailed notice supplemented with published notice in only one newspaper).

53. On January 6, 1997, this Court ordered that the Settlement Hearing be moved from January 21, 1997 to February 24, 1997. The Class Notice provided that the date of the hearing could be changed without further notice and that class members should verify the date of the hearing. Nevertheless, this Court ordered additional notice to all class members who indicated a desire to participate in the Fairness Hearing to indicate that the date of the hearing had been moved.

**B. The Class Notice Adequately Advises Class Members of the Consequences of Deciding Not to Opt Out**

119. Johnson argues that the Class Notice fails to advise class members of the rights and claims they will forego if they do not opt out. Johnson at 25. This assertion is belied by the Class Notice, which clearly advises class members, in plain English and bold typeface, that **"Prudential will be released from all claims that have been or could have been asserted by Class Members"** if the Proposed Settlement is approved. Stipulation of Settlement, Ex. F–2, at 16. The Class Notice further advises class members that the paragraph concerning the release is very important **"[b]ecause it will affect your rights if you remain in the Class."** *Id.* Thus, the Class Notice clearly and accurately states the consequences of not opting out of the class.

**C. The Class Notice Need Not Describe Parallel State Court Proceedings or All Potential State Law Causes of Action**

120. Johnson complains also that the Class Notice should have identified each state class action currently pending. Johnson at 25. Similarly, Krell contends that the Class Notice should have apprised class members of alleged state law violations that are not even asserted in the Second Amended Complaint. Krell Brief at 55. Both objections misinterpret the law: The Third Circuit and others have repeatedly ruled that notice of a proposed settlement need not include information about parallel state court proceedings. *See, e.g., Bell Atlantic Corp.,* 2 F.3d at 1317–18 (notice need not describe objector's parallel state court litigation or its relative merit); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 224 (5th Cir. 1981) (same), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). And if proceedings asserting state law claims need not be included, the Class Notice need not

describe possible state law claims that have not been asserted against Prudential.[54]

**D. The Class Notice Need Not Identify Objectors to the Proposed Settlement**

■ Some objectors complain that the Class Notice should have advised class members that some states, such as Florida, had objected to the Proposed Settlement. Krell Brief at 48. Others argue that the Class Notice should have indicated that some state class actions have attempted to remove themselves from the Settlement. Johnson at 25. But the law is again clear that no notice of these occurrences is appropriate: the Class Notice need not inform class members that various parties or entities have objected to the proposed settlement. *See, e.g., Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1079 (2d Cir.1995).

**E. The Class Notice Accurately Describes the Interaction Between the Task Force Plan and the Proposed Settlement**

121. Johnson claims that the Class Notice fails to state that if policyholders opt out, they will not be entitled to relief under the Task Force Plan. Johnson at 27. This claim is based on the false premise that opt-outs will not be entitled to relief under the Task Force Plan. To the contrary, the Class Notice accurately advises that the Task Force Plan will be offered on February 1, 1997, to residents of those states that accepted the Task Force Plan whether or not the Proposed Settlement had been approved at that time. Stipulation of Settlement, Ex. F–2, at 21–22. The notices and election forms to select between ADR and Basic Claim Relief under the Task Force Plan were mailed by February 1, 1997 to policyholder residents of the 46 jurisdictions that have accepted the Task Force Plan, *regardless* of whether those policyholders have opted out of the Class

---

**54.** This logic applies also to the contention that the Class Notice's reference to the Task Force investigation is misleading because the Class Notice fails to acknowledge investigations conducted by other states. Fla. AG at 14. Indeed, the Notice refers to the Task Force's investigation

only because class members have already received notice of the Task Force Plan, and a failure to address the interaction between the Task Force Plan and the Proposed Settlement might have confused class members.

settlement. Indeed, a special notice went to policyholders who live in these states and who excluded themselves from the Class. That notice specifically explains that those policyholders are entitled to relief under the Task Force Plan.

### F. The Class Notice Adequately Indicates Class Members' Waiver of Their Right to a Jury Trial

122. Krell complains that the Class Notice fails to indicate that through participating in the Proposed Settlement, a class member waives the right to a jury trial for individual claims against Prudential. Krell Brief at 41. Krell, in keeping with his *modus operandi*, cites no authority in support of his objection, and his objection is spurious. First, the Class Notice explicitly informs class members that the Proposed Settlement releases Prudential for all causes of action or claims for damage. Stipulation of Settlement, Ex. F–2, at 16–17. Additionally, the settlement release is attached in whole to the Class Notice as Appendix A. Second, the Class Notice explicitly informs class members also that, absent exclusion, a class member cannot pursue his or her own lawsuit against Prudential for claims covered by the class action. *Id.,* Ex. F–2, at 2. Third, the Class Notice explicitly informs class members also of the alternative forms of relief available under the Proposed Settlement, none of which suggest the availability or preservation of a right to a jury trial.

### G. The Class Notice Adequately Indicates Prudential's Agreement Not to Oppose Attorneys' Fees

123. Krell argues that the Class Notice does not adequately inform policyholders that Prudential "agreed not to oppose" Plaintiffs' request for an award of attorneys' fees. Krell admits that the Stipulation of Settlement explicitly states that: "Defendants agree not to oppose an application for award of attorneys' fees not to exceed a total of $90 million...." Krell Brief at 43 (quoting Stip-

ulation of Settlement, ¶ K). Krell's argument fails, because there is no authority requiring that Prudential's agreement not to oppose attorneys' fees be repeated in the Class Notice. The Class Notice need not include the entire contents of the Proposed Settlement and all class members have access to the Stipulation of Settlement, itself.

124. Krell indicates that the Class Notice fails also because it falsely advised class members that Prudential, not policyholders, would pay plaintiffs' attorneys' fees. Krell Brief at 41. The Court disagrees. The Class Notice indicates that "class members will not be required to pay any portion of plaintiff's attorneys' fee." Stipulation of Settlement, Ex. F–2, at 23. This statement is not misleading to policyholders. Policyholders will not contribute out-of-pocket for attorneys' fees. And attorneys' fees will not be paid out of the benefits allocated to policyholders under the ADR or Basic Claim Relief.

125. The fact that Prudential is a mutual insurance company, and that future dividends may be impacted by Prudential's payment to attorneys, does not undermine the validity of the statement that "class members will not be required to pay any portion of plaintiff's attorneys' fee."[55] Most importantly, conceding for the sake of argument only that Prudential's payment of plaintiffs' attorneys' fees would impact existing policyholders, there is no requirement that the information be in the class notice. Any hypothetical collateral effect on existing policyholders would not represent the type of core information that is required in a Rule 23(e) notice. Moreover, it is far from clear that there would be any impact on dividend payments from Prudential's payment of plaintiffs' attorneys' fees. Non-company sources such as directors' and officers' liability insurance policies covering the Prudential officers named in the Second Amended Complaint may cover the attorneys' fees. And even if Prudential does pay the attorneys'

55. Krell argues that the notice to be accurate should have said: "Plaintiffs, through their equity interest in Prudential, will be required to pay *all* of Lead Counsel's attorneys' fees...." This statement, following Krell's own logic, is clearly erroneous. Class members who bought policies during the Class Period, following Krell's logic, would not pay all of the I attorneys, fees, because the costs for attorneys' fees could impact all Prudential policyholders, class members or not.

fees, it is not clear that this payment will impact policyholder benefits. *See generally,* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 80:53 (3d ed. 1996) (indicating that a member of a mutual life insurance company is entitled to dividends only after discretionary ascertainment and apportionment of divisible surplus by board of directors). Furthermore, the cost of continued litigation would potentially exceed the attorneys' fees at issue here and would have a greater impact on policyholder interests in Prudential than would the attorneys' fees agreement at issue.

### H. The Class Notice Was Not Required to Include an "Opt–Out Form"

■ 126. Objector Beauvias argues that the parties should have included an "opt-out form" in the Class Notice "for the convenience of the policyholders."[56] Beauvias at 12. Courts have often refused to allow an opt-out form to be included with a class notice, however, because the approach creates more confusion than it remedies. *See, e.g., In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. at 553–54 (finding that inclusion of opt-out form would confuse class members after considering expert testimony that in cases in which notice included both claim and opt-out forms, class members inadvertently completed both forms); *Roberts v. Heim,* 130 F.R.D. 416, 423 (N.D.Cal.1988) (observing that on balance "a separate form will engender confusion and encourage investors to unwittingly opt out of the class"); *see also* 2 *Newberg* § 8.21, at 8–70. And, in this case, the Class Notice clearly describes the steps to opt out, which are extremely simple. Stipulation of Settlement, Ex. F–2, at 17. Additionally, because Beauvias is the only objector to complain of the lack of an opt-out form, and because 19,000 class members managed to opt out, the Court finds that the Class Notice was adequate in this respect.

### I. The Class Notice Was Not Required to Include Individual Policy Illustrations

■ 127. Beauvias argues also that the Class Notice of the Proposed Settlement should have included both: (1) recreated copies of the illustrations that were shown to each policyholder and (2) a current, in-force policy illustration for comparison. Beauvias at 13. The Court disagrees. Beauvias does not cite, and this Court is unaware of, any authority requiring the level of individualized information that Beauvias demands. It appears quite frankly that Beauvias' suggestion is not only unprecedented, but also preposterous. Recreating millions of policy illustrations, even if it could be accomplished, and even if it were palpably desirable, would be unduly burdensome, costly, and wasteful.

### J. The Class Notice Adequately Informed Policyholders About the Information Considered in the ADR Process and Need Not Have Informed Policyholders Individually of Available Evidence

■ 128. Texas argued that the Class Notice was faulty, because it provided "no method for Policyholders to determine what evidence exists in his or her particular case."[57] Tex. at 3. Texas argued that policyholders should be provided information concerning "sales practices complaints against the agent who sold the policy and, with respect to Financed Insurance claims, the extent to which the agent engaged in financial transactions." *Id.* at 5. Texas cited no precedent for the creation of such an individualized notice. And particularizing the notice to the individual level, in this case of more than ten million policies, would unduly complicate that Class Notice dissemination, if even individualization were possible. Moreover, Prudential has agreed to create an "800" number

---

**56.** The Louisiana settlement that Beauvias forwards as an ideal settlement example does not provide a separate opt-out form with the settlement notice. Beauvias, Ex. 1.

**57.** Texas argued that the Supplemental Materials failed to explain which "records of the Company" would be considered in evaluating the policyholders' claims and whether the materials would be available to policyholders. Information of this detail need not be provided to class members in the notice of settlement. The Proposed Settlement is available to any class member upon request and provides this information in the ADR Guidelines. Stipulation of Settlement, Ex. B.

to supply policyholders the information that they need to make reasoned choices about relief. The Court addresses the substance of Texas's concern, that policyholders should have access to Complaint History information before choosing relief, in the Court's evaluation of the Proposed Settlement terms.

### K. The Class Notice is Not "Cumbersome" or Inadequate to Alert Policyholders

■ 129. The Florida AG had argued that the Class Notice and Supplemental Materials are "cumbersome." Fla. AG at 8. And the Florida DOI had asserted that the Class Notice and Supplemental Materials could not alert "currently oblivious policyholders" to the possibility that they may have had a claim. Fla. DOI at 18. As discussed above, however, there must be a careful balance between arriving at an appropriate Class Notice length and ensuring sufficient information. The Class Notice here, in conjunction with the Supplemental Materials, struck an appropriate balance between brevity and descriptiveness.

130. The Florida AG argued also that the Class Notice and supplemental materials are "simply incomprehensible to the vast majority of policyholders." Fla. AG at 15. The Florida AG provided details of a survey that purports to indicate that recipients do not recall receiving the Class Notice, are unaware of the pertinent deadlines, and did not understand how to exclude themselves, or that they could object. As Professor Cohen describes in his supplemental affidavit, these findings are meaningless, because the survey contains irreparable flaws. Cohen Supp. Aff. at ¶ 16. The Florida Survey fails to comply with the minimum professional standards governing the design, execution, and reporting of survey research. *Id.* Foremost, the Federal Judicial Center's Reference Guide on Survey Research indicates that a court cannot evaluate survey evidence without specific information, which the Florida AG did not provide:

- a definition of the target population;
- a definition of the population actually sampled;

- a description of the sample design, including the method of selecting respondents, the method of interview, and the number of callbacks;
- a description of the result of sample implementation, including: the number of potential respondents contacted, the number not reached, the number of refusals, the number of incomplete interviews, the number of noneligibles, and the number of completed interviews;
- a copy of interview questions, questionnaire, and the interview directions; and
- a copy of any interview instructions, validation results, and the codebook.

131. The only information that Kerr & Downs provided addressing these issues is in paragraph 3 of Professor Downs' affidavit. The paragraph indicates that Kerr & Downs systematically and randomly sampled 600 Florida class members and contacted them by phone to ask them "a number of questions related to the Notice and its contents." But this information is wholly inadequate for the Court to assess the reliability of the survey. The Court rejects the survey in its entirety.

132. Even if the survey were not flawed, Florida's conclusion that the Class Notice was inadequate is far from clear from the Florida AG's findings. For example, the survey demonstrates that of those who recall receiving the Class Notice and Supplemental Materials: 82% knew what the package was about; 71% read the booklet concerning the Proposed Settlement; and 71% knew what to do if they had questions. These findings, even though developed through Florida's flawed study, indicate that a great majority of those who received the Class Notice could comprehend it.

133. The Florida DOI argued that those who are unaware that they have a claim "will have no incentive to review" the Class Notice and Supplemental Materials. Yet, the best way to reach these policyholders is through individual notice of the class action and of the right to participate or opt out. The Class Notice tells policyholders that their so-called "vanishing premium" obligations may not vanish, that their "free" policies may not be free, and that their "investments" may be

mere life insurance policies. Additionally, the clear title of the Class Notice: "OFFICIAL NOTICE FROM THE UNITED STATES DISTRICT COURT" reasonably alerts recipients of the importance of the contents, diminishing the likelihood that the notice would be tossed as junk mail.

**L. The Class Notice Adequately Indicated the Deadline to File Objections or Opt Out**

134. The Class Notice clearly, and in bold print, sets forth the pertinent deadlines. Stipulation of Settlement, Ex. F–1, at 4. Objectors Burnette and the Florida AG have observed that the Class Notice states that objections must be received by December 19, 1996, and that the Supplemental Materials indicate that the objections need only be postmarked by that date. This minor discrepancy does not undermine the adequacy of the Class Notice because the Court has considered all objections and respected all opt-outs that were filed by either date.

**M. The Class Notice Fairly Describes Basic Claim Relief and Alternative Dispute Resolution Provisions**

135. The Florida AG and Florida DOI argued that the Supplemental Materials steer potential claimants from the APR process towards Basic Claim Relief. Fla. AG at 10–11; Fla. DOI at 22–23. Also Texas argued that the Class Notice's statement that if a policyholder chose the APR Process the policyholder might not recover anything would induce injured policyholders to accept Basic Claim Relief. Tex. at 2–3.

136. Even a cursory review of the Class Notice and Supplemental Materials reveals that the APR is overall more prominent a remedy than Basic Claim Relief and that no "steering" occurs. Stipulation of Settlement, Exs. F–1 to F–3. For example, the APR relief is the first form of relief described in the Class Notice, in the Cover Letter, in the Statement of Eligibility, and in the Questions & Answers materials.

137. These states argued also that the Class Notice's statement that "no relief will be afforded to policyholders whose claims are undermined" by the available evidence (*i.e.,*

scored as a "0"), steered policyholders to Basic Claim Relief. The argument fails because: (1) the statement is true; (2) the statement must be disclosed because it is integral to the Proposed Settlement and to a policyholder's decision whether to choose the APR or Basic Claim Relief; and (3) if a policyholder realistically believes that he or she was not misled and that the evidence will show that he or she was not misled, the policyholder should not choose the APR process. The above statement does not "steer"; it informs!

**N. Objections that Ostensibly Attack the Class Notice But Really Concern Proposed Settlement Terms Will Be Addressed in the Context of the Proposed Settlement's Fairness**

138. Objectors criticize the Class Notice also for describing accurately the terms of the Proposed Settlement, because the objectors find fault with these terms. For example, the Florida AG and Florida DOI argued that the Class Notice was misleading because Basic Claim Relief has no significant value to policyholders. Fla. AG at 10–12; Fla. DOI at 22. The Class Notice, however, describes clearly and accurately the components of Basic Claim Relief. Stipulation of Settlement, Ex. F–2, at 12–15. The Florida AG and Florida DOI argued also that the Supplemental Materials' discussion of the "impartial" ADR decision-maker is misleading because the Proposed Settlement's Claim Evaluation Staff is insufficiently "impartial." Fla. AG at 13; Fla. DOI at 23. The Class Notice, however, describes clearly and accurately the precise composition of the ADR panels. Stipulation of Settlement, Ex. F–2, at 9–10. The Court evaluates these criticisms in considering the fairness of the Proposed Settlement, because the Class Notice accurately reflects the Proposed Settlement's provisions.

**O. Considering All of the Circumstances, Class Notice in the Present Case Comports with Rule 23 and with Due Process**

139. For the above reasons, the Court finds that the combination of individual and

publication notice in this action was the most effective and best notice practicable under all circumstances and constituted due, adequate, and reasonable notice to all class members, satisfying the requirements of due process, Federal Rule of Civil Procedure 23, and the Rules of this Court. The Court finds also that the Class Notice, the Summary Notice, the Election Form, the ADR Claim Form, and the post-settlement notice methodology set forth in the Stipulation of Settlement are reasonably calculated, under all the circumstances, to apprise class members of their rights pursuant to the settlement and that these materials satisfy the requirements of due process, Federal Rule of Civil Procedure 23, and the Rules of this Court.

## VI. The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the Multifarious Factors that the Court Must Consider

140. Federal Rule of Civil Procedure 23(e) provides that the Court must approve any class action settlement. *See* Fed. R.Civ.P. 23(e). The Court determines here that the Proposed Settlement is indeed fair, reasonable, and adequate and should be approved.

141. This Court "cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *GM Trucks*, 55 F.3d at 785. At least nine factors must be assessed to determine whether a proposed settlement is fair reasonable, and adequate, and deserving of court approval under Federal Rule of Civil Procedure 23(e):

(1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*Id.* (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975)) (hereinafter the "*Girsh* fac-

tors"); *see also Lake v. First Nationwide Bank*, 900 F.Supp. 726, 732 (E.D.Pa.1995). This nine-factor test requires this Court to conduct both "a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation" and "a procedural inquiry into the negotiation process." *GM Trucks*, 55 F.3d at 796. The Court must ensure that the case did not settle in the absence of sustained effort by class representatives sufficient to protect the interests of the class. Accordingly, the Court should consider also whether the parties completed sufficient discovery prior to settlement; the adequacy of settlement relief in light of the preliminary discovery; whether the settlement omits major causes of action or types of relief; and whether the parties negotiated simultaneously on attorneys' fees and class relief. *See id.*, 55 F.3d at 806.

142. The Third Circuit has observed that in assessing the fairness of a proposed settlement, the Court should be careful not to substitute its image of an ideal settlement for the compromising parties' views: "The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Id.*, 55 F.3d at 806 (citations omitted); *see also, e.g., Lake*, 900 F.Supp. at 732 (observing that significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class (citing *Austin v. Pennsylvania Dep't of Corrections*, 876 F.Supp. 1437, 1472 (E.D.Pa.1995))); *Sommers v. Abraham Lincoln Fed. Sav. & Loan Ass'n*, 79 F.R.D. 571, 576 (E.D.Pa.1978); *Fisher Bros. v. Cambridge–Lee Indus., Inc.*, 630 F.Supp. 482, 488 (E.D.Pa.1985); *Walsh v. Great Atl. & Pac.*, 96 F.R.D. at 642–43.

143. Thus, the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D.Ga. 1993) (stating a court "may only approve or disapprove the settlement as presented. It may not rewrite the settlement as requested by numerous objectors"); *Cotton v. Hinton*,

559 F.2d 1326, 1331 (5th Cir.1977) (in assessing fairness and reasonableness of settlement, the court is "not free to delete, modify or substitute certain provisions of the settlement").[58]

## A. The Proposed Settlement Provides Extraordinary Relief to Injured Policyholders

 144. Before embarking on a journey into an evaluation of the Proposed Settlement under the many criteria that this Court must consider, the Court must briefly explain why this Proposed Settlement is so exceptional. The Proposed Settlement's combination of Basic Claim Relief and an individualized ADR process evolved from the settlements approved in *New York Life*, Index No. 94/127804, 1995 N.Y. Misc. LEXIS 652, *and Michels v. Phoenix Home Life Ins. Co.,* Index No. 95/5318, slip op. (N.Y.Sup.Ct. Jan. 3, 1997). Courts, academic and industry experts, and various independent organizations have praised this settlement structure. In *New York Life*, the court found that "unlike some other class action settlements in which the value of the relief provided depended on highly contingent future purchases, the Class Relief here is tailored to meet the allegations of the Complaint and the specific insurance and investment needs of the Class Members." 1995 N.Y. Misc. LEXIS 652, at *78. The court in *Phoenix*

*Home Life,* echoed these sentiments. *See Phoenix Home Life,* slip op., at 50 ("The ADR Process is a no-cost and efficient mechanism. It provides an independent forum for the resolution of individual claims, and its objective procedure and substantive criteria negotiated by the parties in advance eliminate concerns of bias."). Moreover, the CPR Institute for Dispute Resolution honored the architects of the New York Life settlement including the Co–Lead counsel of plaintiffs in this case, Milberg Weiss Bershad Hynes & Lerach. Weiss Supp. Aff. at ¶ 32 and Ex. D.

145. Additionally, insurance regulators from fifty states and the District of Columbia have endorsed the Settlement, forty-six of whom had endorsed an earlier and inferior settlement. The Proposed Settlement provides greater procedural safeguards and creates financial guarantees that neither the Task Force Plan nor the *New York Life* settlement contained.

146. The Proposed Settlement benefits the class enormously. Relief is potentially unlimited—there is no cap.[59] The ADR process is fair and objective. And basic Claim Relief allows for remediation to individuals who choose not to partake of the ADR. The Proposed Settlement even provides Additional Remediation Amounts, the punitive damage counterpart to the Proposed Settlement, that will allow individual relief to exceed actual damages.

---

**58.** The Third Circuit observed that in evaluating the fairness of a proposed settlement, the Court should determine the range of reasonableness of the proposed recovery in light of the best possible recovery, the eighth *Girsh* factor, and in light of the risks of litigation, the ninth *Girsh* factor. 55 F.3d at 784. The Court expressed the calculus in formulaic terms: "in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." 55 F.3d at 806 (quoting Manual for Complex Litigation 2d § 30.41).

In the current case, the Court finds, as discussed below, that the Proposed Settlement is fair in light of the best possible recovery and all of the inherent risks of litigation. In broad terms, the Proposed Settlement satisfies these tests because relief is uncapped and individual claimants receive full compensatory relief. The proposed calculus under which the Court would compare an estimated range of values for plain-

tiffs' claims against the value of the proposed settlement is inappropriate here; regardless of any estimate of the aggregate value of plaintiffs' claims under the Proposed Settlement, individual plaintiffs will receive full compensatory relief where they are entitled to that relief. And relief is uncapped.

To create a range of values to satisfy the *Girsh* factors would be pointless in light of the full compensatory relief available under the Proposed Settlement and the fact that individual and aggregate benefits are uncapped. Thus, while the Court fully addresses the eighth and ninth factors of the *Girsh* test, the Court's analysis accounts appropriately for the nuances of this Proposed Settlement.

**59.** Many settlements restrict an individual's ability to recover depending upon the aggregate number of claims filed, but here, through the ADR process, each class member may receive the full amount of compensation necessary to render complete relief.

147. Additionally, plaintiffs are not liable for attorneys' fees, litigation costs, and notice or administrative costs.[60] Prudential has agreed under the Proposed Settlement to bear the substantial expenses of sending Class Notice and implementing the Proposed Settlement. These costs include the costs of: printing and mailing more than eight million notices, publishing print notices in all fifty states and arranging multiple radio and television notices in all states, running the entire ADR process, and establishing the class action information center, toll-free "800" number, and operator staff (exceeding 1,000 operators) to respond to class member inquiries.

148. Additionally, the Proposed Settlement permits class members to submit claims immediately after the Court's approval of the Settlement and issuance of its Final Order and Judgment. Because many class members are elderly or in ill health, the ability of class members to receive substantial relief sooner rather than later—possibly years later—militates in favor of the Proposed Settlement. In this light, the Proposed Settlement appears to be the best possible recovery.

149. Because of these terms in particular, the Court finds that this settlement is extremely fair to the policyholders whom Prudential injured. The Court finds also that the Proposed Settlement is fair, reasonable, and adequate in light of the factors recently gathered in *GM Trucks*.

## B. The Complexity of this Action and the Likely Lengthy Duration of the Litigation Warrant Approval of the Proposed Settlement

150. Courts consider the likely complexity and duration of litigation in evaluating the reasonableness of a settlement. *See GM Trucks*, 55 F.3d at 812 (concluding that lengthy discovery and ardent opposition from the defendant with a plethora of pretrial motions were facts favoring settlement, which offered immediate benefits and would avoid delay and expense); *Lake*, 900 F.Supp. at 732–33 (weighing in favor of settlement that "due to the relative complexity of the

issues involved and the amount of data that would need to be processed, the costs of litigating this matter through trial would likely be high" and, due to the thousands of class members involved, "the task of poring through the relevant records would clearly be a significant undertaking").

151. Although litigation certainly would be manageable and would be superior to other means of adjudicating the controversy, the issue here is the extent to which the anticipated complexity and costs of proceeding to trial favor settlement. In this case, the anticipated complexity, costs, and time necessary to try this case greatly substantiate the fairness of the settlement.

152. First, litigation of this case would raise some complex legal claims and defenses, which would include issues relating to conflicts of law, statutes of limitation, contract interpretation, statutory and common law fraud, causation, and damages. Some of these issues are discussed in this Court's opinion deciding Prudential's Rule 12(b)(6) motion. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 1996 WL 392145 (D.N.J. May 10, 1996).

153. Second, the litigation would raise also many complex factual issues. The litigation concerns Prudential's marketing and sale of various life insurance products. Litigation of plaintiffs' claims would entail proof concerning the practices and procedures of the agents and brokers and the interaction between the agents and brokers and Prudential's home office. In addition, the insurance products at issue are complex and would require actuarial and financial expert testimony to evaluate the assumptions underlying these products and the illustrations though which they were marketed to consumers. Litigation of plaintiffs' claims through trial would also entail extensive, time-consuming, and expensive proof of Prudential's internal procedures for establishing dividend scales, the quality and performance of Prudential's investment portfolio, and the decision-making processes relating to portfolio investments, dividend assumptions, and surplus determinations.

---

**60.** Under the Proposed Settlement, Prudential, not class members, must pay Class Counsels'

attorneys' fees. Absent this agreement, the attorneys' fees could have been charged to the class.

154. Thus, were this action litigated to its conclusion, the litigation would be legally and factually complex and extremely expensive and time-consuming. Class Counsel would require months to consult with additional experts, to prepare trial memoranda, to prepare post-trial memoranda, and to take interlocutory and other appeals. Moreover, if tried, the trial would last for months and would not be completed for years. *See, e.g., Weiss v. Mercedes–Benz of North America, Inc.,* 899 F.Supp. 1297, 1301 (D.N.J.1995) ("Given the crowded state of this Court's calendars, the case would not be tried prior to 1997. [opinion dated May 11, 1995] It is not unrealistic to predict that, if fully litigated, the present class action would not be concluded before the end of this decade...."); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 745 (S.D.N.Y.1985) ("Although much discovery has been conducted, much would remain if the parties were to go to trial.").

155. In contrast to trying the case, the Proposed Settlement permits a prompt and efficient solution to plaintiffs' claims against Prudential; the Proposed Settlement would afford plaintiffs relief months and perhaps years earlier than would be possible in a litigation environment. The Proposed Settlement provides that class members may begin submitting claims if and when the Court issues its Final Order and Judgment. Additional benefits would then be provided if and when the Proposed Settlement receives final appellate court approval. Accordingly, the likely complexity and duration of continuing the litigation weighs in favor of approving the Proposed Settlement.

## C. Class Reaction to the Proposed Settlement Has Been Overwhelmingly Favorable and Weighs in Favor of Class Approval

156. The Court finds that the favorable reaction of the Class and the regulators weighs in favor of approving the Proposed Settlement. *See Bell Atlantic Corp.,* 2 F.3d at 1313–14 n. 15 (holding that small proportion of objectors constituted tacit consent to settlement); *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (finding only twenty-nine objectors from 281-member class "strongly favors settlement"); *Weiss v. Mercedes–Benz,* 899 F.Supp. at 1301 (holding that "substantial silent consent weighs in favor of certification" where approximately 100 out of 30,000 class members objected or opted out of class).

157. The Court recognizes that courts are reluctant to interpret a failure of class members to respond as a sign that these class members approve of the settlement. *See GM Trucks,* 55 F.3d at 812 ("Even where there are no incentives or informational barriers to class opposition, the inference drawn from silence may be unwarranted."). But, in this case, that so little negative feedback was received after such an extensive notice and outreach program, weighs in favor of approving of the Proposed Settlement. Of over eight million class members, only about 300 have filed objections to the Proposed Settlement. Fiandaca Decl. ¶ 11. Owners of 23,421 policies, or about 19,000 class members have opted out.[61] In terms of percentages, only .2 per cent of the class, less than one quarter of one percent, have criticized the Proposed Settlement or chosen not to participate in the class. *Id.* Thus, the numbers of class members who disapprove of the class action or the settlement are truly insignificant. And, the most vociferous objectors to the Proposed Settlement are a handful of litigants represented by counsel in cases that compete with or overlap the claims asserted in the Second Amended Complaint.

158. The Court also finds as an extremely favorable indicator of class reaction, the fact that the insurance regulators in all fifty states and the District of Columbia have accepted the Proposed Settlement as fair and

---

61. Not all policyholders who opted out of the Proposed Settlement did so because they felt that it was inadequate. Over 700 of those who opted out, more than twice the amount of policyholders who objected to the Proposed Settlement's terms, wrote to indicate that they do not feel they were misled in the purchase of their insurance, are satisfied with their policies, and do not want to participate in the action against Prudential. Hegarty Supp. Decl. at ¶ 4. These favorable communications must also be considered in assessing the reaction of the Class to the Proposed Settlement.

adequate. Thus, the regulators of all the states as representatives of their constituencies have indicated their complete approval of the Proposed Settlement.

159. Consequently, although the Court cannot assess class reaction by a mere numerical assessment, the numbers, in conjunction with the content of opt-outs and objections, and the support of regulators in all states weighs in favor of the Proposed Settlement.

**D. Approval of the Proposed Settlement at this Stage of the Proceedings Is Appropriate Because the Plaintiffs Have Completed Extensive Discovery and Settlement Now Would Save the Extensive Costs of Additional Discovery and Trial**

160. The Court also must consider the stage of the proceedings and the amount of discovery completed in assessing the fairness, reasonableness, and adequacy of the settlement. *GM Trucks*, 55 F.3d at 813; *Girsh*, 521 F.2d at 157; *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 741 (S.D.N.Y.1985). The Court must examine the stage of the proceedings to assess "the degree of case development that class counsel have accomplished prior to settlement." *GM Trucks*, 55 F.3d at 813. This Court must determine whether counsel had an "adequate appreciation of the merits of the case before negotiating." *Id.* That appreciation may have been developed in the case at bar or "in some related proceeding."

161. In the current case, counsel for plaintiffs and Prudential did not commence serious settlement discussions until 18 months of vigorous litigation had transpired. Ashinoff Aff. at ¶ 3. Many motions had been

argued and decided.[62] *Id.* Plaintiffs obtained voluminous discovery before settlement negotiations commenced and even more before negotiations concluded.[63] Ashinoff Aff. at ¶¶ 4, 8. Moreover, the parties had the benefit of the findings and results of the Task Force examination, which focused on many of the same issues raised in plaintiffs' complaints. *See In re Beef Antitrust Litigation*, 607 F.2d 167, 180 (5th Cir.1979) (considering discovery in companion cases); *In re Baldwin–United Corp.*, 105 F.R.D. at 483 (finding that counsels' access to expert testimony and other evidence from parallel state court proceedings and public documents demonstrated that counsel "availed themselves of all of these sources of information and conducted full adversarial negotiations"). By the end of July of 1996, the litigation had reached a point where counsel for both Prudential and plaintiffs could make an informed decision about the relative strengths and weaknesses of the case: Weiss Aff. at ¶¶ 104–05; Ashinoff Aff. at ¶¶ 3–5, 11.

162. Consequently, the record reveals and this Court concludes that prior to signing the Settlement Agreement, the parties had reached a stage in the proceedings where they adequately understood the merits of the putative class action and could fairly, safely, and appropriately decide to settle the action. *See Walsh v. Great Atl. & Pac.*, 96 F.R.D. at 654.

**E. The Significant Risks Attendant to Plaintiffs' Ability to Establish Prudential's Liability and Damages Weigh In Favor of Approving the Proposed Settlement**

163. In assessing the fairness, reasonableness, and adequacy of the Proposed Set-

---

**62.** In addition to conducting extensive investigations and formal discovery in this case, counsel have aggressively litigated many pretrial motions: consolidation motions, Prudential's 12(b)(6) motion, Prudential's primary jurisdiction motion, Prudential's precedent-setting motion regarding New Jersey RPC 4.2, motions to stay *Kittle* and *Krell* Actions, case management motions, an emergency motion regarding communication with class members, and a motion to the Court of Appeals by the plaintiff in *Viola Fisher v. Prudential Ins. Co.*, a Texas state court class action, to stay the preliminary injunction contained in this Court's October 28, 1996 Order.

**63.** Prior to settlement, Class Counsel conducted substantial formal and informal discovery. Weiss Aff. at ¶¶ 60–74. Counsel evaluated more than one million pages of documents, approximately 160 computer diskettes and cartridges, and over 500 videotapes and audio tapes that Prudential produced. Plaintiffs also conducted twenty depositions, which included depositions of Prudential's senior managers. Additionally, Plaintiffs' extensive informal investigation encompassed interviews with hundreds of class members and former and current Prudential employees.

t¹ement, the Court must also determine the risks of establishing liability and damages at trial. *Girsh,* 521 F.2d at 157; *In re Warner Communications Sec. Litig.,* 618 F.Supp. at 741. In this regard, the *Weiss v. Mercedes-Benz* Court observed that "the risks surrounding a trial on the merits are always considerable." 899 F.Supp. at 1301. And this case is no exception.

164. On December 26, 1995, Prudential moved to dismiss plaintiffs' clams on various grounds, including statutes of limitations and the fact that many or all of plaintiffs' allegations allegedly were contradicted by written contracts or other writings. As a result of that motion, this Court dismissed many of plaintiffs' causes of action without prejudice and dismissed some class representatives' claims entirely.

165. And plaintiffs are not in the clear. Many obstacles could prevent plaintiffs from recovering after trial:

- the need to prove that class members were unaware, despite their receipt of written disclosures in policy forms and illustrations, that dividends or interest rates could fluctuate;

- the need to prove that class members were unaware, despite their receipt of written disclosures in policy forms and illustrations, that they had purchased life insurance or that the cash value would not accumulate in a life insurance policy at the rate at which it would accumulate in other investment vehicles;

- the need to prove that class members were unaware of the relative merits of using existing policy values to fund the purchase of new insurance policies;

- the need to prove that class members were deceived by Prudential's methods for determining and illustrating dividends and interest rates;

- the need to overcome Prudential's contention that plaintiffs' asserted contract rights are barred by the Parol Evidence Rule because they are contradicted by the unambiguous language of the policies that constitute their contracts with Prudential;

- the need to overcome Prudential's contention that a one-year statute of limitations and three-year statute of repose would bar the federal securities claims of most class members who purchased VAL policies;

- the need to overcome Prudential's contention that the federal securities, common law fraud, and negligent misrepresentation claims are untenable because plaintiffs cannot demonstrate: that class members reasonably relied on oral statements contradicted by written materials, that Prudential intended to defraud Class Members, or that Prudential misrepresented present facts, rather than making unenforceable predictions of future performance; and

- the need to overcome Prudential's contention that the unjust enrichment claim fails to state a claim because valid written contracts bind the parties.

166. Additionally, another potential risk may be plaintiffs' necessary reliance on expert testimony to establish liability and damages; a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials. And, divergent expert testimony leads inevitably to a battle of the experts. *See United States v. 412.93 Acres of Land,* 455 F.2d 1242, 1247 (3d Cir.1972) (observing "the jury . . . is under no obligation to accept as completely true the testimony of any expert witness. It may adopt as much of the testimony as appears sound, reject all of it, or adopt all of it."); *Rubenstein v. Republic Nat'l Life Ins. Co.,* 74 F.R.D. 337, 345 (N.D.Tex.1976); *In re Warner Communications Sec. Litig.,* 618 F.Supp. at 744 ("In this 'battle of the experts' it is virtually impossible to predict with any certainty which testimony would be credited. . . .").

167. Indeed, some of the risks of a trial on the merits in this case have been demonstrated by the *Key* case in which an Alabama judge overturned the substantial jury verdict rendered against Prudential in the life insurance sales practice case involving similar allegations to those now at bar. *See Key v. Prudential Ins. Co. of America,* Civ. No. 93–479 (Al.Cir.Ct. Dec. 28, 1995).

168. Because establishing liability at trial and prevailing on appeal is not, and never

can be, guaranteed, and because the Proposed Settlement is certain and avoids many of the obstacles potentially implicated by a trial, on balance the risks of establishing liability weigh in favor of approving the settlement.

## F. The Risks of Maintaining this Class Action Through Trial Weigh in Favor of Approving the Proposed Settlement

169. Plaintiffs risk also that this action would not proceed as a class action through the conclusion of the litigation. Under Rule 23, the Court may decertify a class at any time during the litigation. And Prudential has endeavored to reserve the right to challenge class certification in the event that the Proposed Settlement is not approved and will certainly endeavor to challenge class certification if this case goes to trial. Thus, although the Court finds that this case is manageable as a class action and that the class action device is the most appropriate means to adjudicate this controversy, as the case evolves, maintaining the class action may become unworkable and the Court may decertify the class. Accordingly, the risks of decertification weigh in favor of approving the Proposed Settlement.

## G. Prudential's Inability to Withstand a Greater Judgment Is a Factor Weighing in Favor of Approving the Proposed Settlement

170. The Settlement is fair, reasonable, and adequate in light of Prudential's inability to withstand a much greater judgment.[64] *See Weiss v. Mercedes–Benz*, 899 F.Supp. at 1303. The value of the Proposed Settlement is extraordinary and Prudential's ability to withstand a greater judgment is a matter of concern.

171. The objective value of the settlement is extraordinary. The Proposed Settlement is at the bare minimum worth $410 million—experts have projected the value at between $1 billion and $2 billion. And there is no cap. Prudential must pay to remediate the claims of all of the claimants who allege that they have been misled; and many of these claimants will receive full or substantial remediation plus exemplary damages.

172. There is evidence that a greater judgment likely would adversely affect Prudential's credit rating, which has already declined during these proceedings, and would, thereby, affect Prudential's ability to compete, its revenues, and its profitability. Class Counsel agreed to require Prudential to pay no greater minimum than $1.080 billion, because of the likely effect that a judgment far exceeding $1 billion would have on Prudential's credit rating and ability to conduct business. Weiss Aff. at ¶ 214.

173. And the fact that Prudential is a mutual insurance company also impacts on Prudential's ability to pay a greater judgment. Because Prudential is a mutual insurance company, policyholders who are not members of this class action may be indirectly negatively affected, in the form of reduced dividends.

## H. The Proposed Settlement Is Reasonable in Light of the Best Possible Recovery and All of the Attendant Risks of Litigation

174. The Court finds also that the Proposed Settlement is fair, reasonable, and adequate in light of the best possible recovery and the attendant risks of litigation. To estimate the best possible recovery for plaintiffs in the aggregate would be exceedingly speculative, and unnecessary here. In the present case, an individual's recovery exceeds the value of the best possible recovery discounted by the risks of litigation.

175. If a plaintiff's case is clear from the available evidence, the plaintiff will be scored a "3" and receive a choice between full rescissionary or compensatory relief plus interest. Indeed, because this plaintiff need not pay any litigation costs or attorneys' fees and the

---

**64.** Prudential has argued that because defendants' liability is uncapped under the Proposed Settlement, there is no need for this Court to determine whether defendants could withstand a greater judgment. The Court disagrees. Prudential has provided no authority for its proposition. And, although compensatory relief is uncapped, the exemplary relief available under the Proposed Settlement, *i.e.* the Additional Remediation Amount, is limited.

plaintiff will receive recovery much more quickly than would be possible through litigation, this recovery is not only fair, it is exceptional.

176. And if a plaintiff scores a "2," because the evidence on balance supports the claim, the plaintiff will receive 50% of the award that would be available with a score of "3," plus 100% of the interest on the claim. This plaintiff receives thus, 50% of damages, and need not pay litigation costs or attorneys' fees. And this plaintiff obtains more prompt relief than would be available through litigation. In sum, even where there is negligible evidence of wrongdoing, and where a plaintiff would not likely prevail after trial, the plaintiff receives an award equal to what a successful plaintiff would likely obtain after trial. The 50% award plus 100% interest is equivalent to a full award minus litigation costs, attorneys' fees, and the price of delay.

177. Additionally, a class member who receives a score of "1," because the available evidence neither supports nor undermines the class member's claim, may obtain Basic Claim Relief, even though at trial this class member would not likely have recovered under the predominance of evidence standard. This relief, thus, is fair.

178. Lastly, class members who choose Basic Claim Relief rather than participation in the ADR receive a value exceeding the value of the best possible recovery in litigation discounted by the risks of litigation. Class members who choose Basic Claim Relief either do not feel misled or do not desire to participate in the ADR process. These class members hence would not have pursued litigation and in essence receive valuable life insurance and investment options for the release of claims that they would not pursue.

179. The Court finds, thus, that in this case the creative mix of the ADR process with the Basic Claim Relief options creates a settlement that benefits class members greatly more than litigation would. And, because class members who desired to pursue litigation, with its risks, in lieu of participation in the Proposed Settlement were permitted to opt-out, the Proposed Settlement is fair, reasonable, and adequate to all concerned.

## I. Plaintiffs Conducted Adequate Discovery Precedent to Agreeing to Settle

180. This test captures the degree of case development that Class Counsel have accomplished prior to settlement. *GM Trucks,* 55 F.3d at 813. Plaintiffs must take discovery sufficient to establish the strengths and weaknesses of their case. *See Walsh v. Great Atlantic & Pacific Tea Co.,* 96 F.R.D. at 654; *In re Surgical Laser Technol. Sec. Litig.,* 1992 WL 328809, at *2, 1992 U.S. Dist. LEXIS 16724, at *3 (E.D.Pa. Oct. 29, 1992); *cf. GM Trucks,* 55 F.3d at 814 (finding that settlement at inchoate stage of case where plaintiffs failed to depose potential valuable witness suggested inadequate discovery).

181. Class Counsel here investigated all aspects of the allegations contained in the Second Amended Complaint. Plaintiffs reviewed and categorized approximately 1 million documents, 160 computer cassettes, 500 audio and video recordings, conducted hundreds of interviews with class members and current and former Prudential agents, and took twenty depositions. Weiss Aff. at ¶¶ 61–63, 72. And Class Counsel had access to, reviewed, and analyzed all of the discovery, and reports of the Task Force and Connecticut regulatory investigations. Indeed, the volume and substance of Class Counsel's knowledge of this case are unquestionably adequate to support this settlement.

182. Krell complains that Class Counsel's swiftness compromised discovery. But plaintiffs on two separate occasions refused Prudential's overtures to settle the case because plaintiffs did not have sufficient discovery to evaluate their claims. Weiss Aff. at ¶¶ 49, 101–02. There is absolutely no support for Krell's assertion of inadequate discovery as the result of undue haste.

183. Krell's argument that Class Counsel's use of informal discovery was inappropriate also fails. Informal discovery is perfectly adequate to substantiate claims. *See, e.g., In re Corrugated Container Antitrust Litig.,* 643 F.2d at 211; ("[W]e are not compelled to hold that formal discovery was a

necessary ticket to the bargaining table. Because the plaintiffs did have access to information, this case cannot be characterized as an instance of the unscrupulous leading the blind."). The use of informal discovery was especially appropriate in this case because the Court stayed plaintiffs' right to formal discovery for many months, and because informal discovery could provide the information that plaintiffs needed. Through informal discovery, plaintiffs obtained and evaluated thousands of pages of documents and conducted dozens of informal interviews. Weiss Aff. at ¶ 64. For example, though Krell complains that plaintiffs did not formally depose John Cressman, a former Prudential auditor, plaintiffs were the first to locate and interview Cressman, in July 1996. *Id.* at ¶ 74. Plaintiffs' completion of several lengthy interviews of Cressman, lasting a total of six hours, their review of the Helfrich memorandum, and their use of other informal discovery materially assisted plaintiffs in evaluating their claims. The propriety of plaintiffs' use of informal discovery, thus, is confirmed by the volumes of material information that plaintiffs required as a result of their efforts.

184. Krell claims that plaintiffs should have obtained Prudential's audit reports. But plaintiffs assumed in their negotiations that those reports would support their worst suspicions and negotiated the punitive Additional Remediation Amount, on that basis. Weiss Aff. at ¶¶ 98–100. Thus, the absence of the audit reports is immaterial.

### J. The Proposed Settlement is Reasonable In Light of the Plaintiffs' Preliminary Discovery

185. Plaintiffs' preliminary discovery lent support to allegations of deceptive sales practices throughout the country. *See supra* commonality discussion. As discussed throughout, the Proposed Settlement provides full compensatory relief to any policyholder where the available evidences supports that policyholder's claim. The Proposed Settlement also provides through Basic Claim Relief very significant and rel-

evant relief to policyholders who cannot establish that they were injured. The Court finds that the Proposed Settlement's relief provisions, as discussed throughout this Opinion, are adequate to account for plaintiffs' discovery of widespread deceptive sales practices.

### K. The Settlement Accounts for All Causes of Action and Types of Relief Sought in the Second Amended Complaint

186. In the current case, both the ADR process and Basic Claim Relief meet the allegations in the complaint and are specifically tailored to remedy the harms identified in the complaint. The ADR provides fitting relief to policyholders injured by any deceptive sales practices that occurred during the Class Period because it allows full rescissionary or restitutionary relief for established claims and slightly lesser but still very substantial relief for claims less clear from the facts. Also, Basic Claim Relief provides appropriate relief to class members because Basic Claim Relief directly helps class members to meet their insurance or investment needs. Although the Proposed Settlement, as any settlement, prevents individual plaintiffs from obtaining exorbitant punitive damage awards, this observation suggests not a fault of the Proposed Settlement, but the reality, and benefit, of class action litigation, in which plaintiffs share in any punitive damages award. Thus, it is clear that the Proposed Settlement is tailored to meet the allegations of the Second Amended Complaint and that the Proposed Settlement remedies provide the relief sought in the Second Amended Complaint.

### L. The Parties Completed Negotiations of the Proposed Settlement Before Negotiating Attorneys' Fees and the Attorneys' Fee Agreement Is Legal and Proper

187. The parties' negotiation of attorneys' fees was completely appropriate and followed the final settlement negotiations.[65] Plain-

---

65. Notably, a settlement agreement need not be filed "of record" prior to the commencement of

fee negotiations. *See GM Trucks,* 55 F.3d at 804 n. 25 (parties could have obtained court approval

tiffs' Counsel and Prudential did not negotiate attorneys' fees until after they had agreed on the appropriate relief and the Court had given its approval for the parties to discuss the fee issue. Weiss Aff. at ¶ 225; Ashinoff Aff. at ¶ 3.

188. Krell objects to Prudential's agreement not to oppose an attorneys' fee award of up to a specified amount, as determined by the Court, but this procedure is entirely proper. *See, e.g., Lake,* 900 F.Supp. at 734 (observing no impropriety in agreement, bargained for after settlement had been reached, that defendant would pay particular amount of attorney fees and any portion disapproved by the court would revert to defendant); *New York Life,* 1995 N.Y. Misc. LEXIS 652, at *89–96 (approving settlement and $22 million fee pursuant to separately negotiated agreement); 3 *Newberg,* § 15.34, at 15–98 to 15–99 (observing that negotiation of a fee agreement should not be discouraged).

189. Krell also unjustifiably attacks the parties' agreement that Prudential would pay half of the attorneys' fees to Plaintiffs' Counsel prior to any appeal. If the Court approves the Proposed Settlement and awards fees, the parties could begin to implement the Proposed Settlement immediately and counsel could collect the *entire* fee immediately. Under the fee agreement, Plaintiffs' Counsel receive less than is their right, not more, and not a "loan" as Krell postulates. The Court finds no impropriety in this arrangement.

## M. Class Counsel's Approval of the Proposed Settlement Indicates Its Fairness

190. The judgment of counsel also weighs in favor of approving the Settlement. *See, e.g., Cotton,* 559 F.2d at 1330 (court is "entitled to rely upon the judgment of experienced counsel for the parties"); *Smith v. Vista Org., Ltd.,* 1991 WL 152612, at *5

(S.D.N.Y. July 30, 1991) (in appraising fairness of proposed settlement, view of experienced counsel favoring settlement is entitled to "considerable weight" (citations omitted)). In the current case, the Court credits the judgment of Plaintiffs' Counsel, all of whom are active, respected, and accomplished in this type of litigation. These counsel have indicated that in their professional view and judgment the Proposed Settlement is both comprehensive and fair, and that it provides valuable and sufficient economic benefits to the Class. Weiss Aff. at ¶ 197. The Court agrees.

## N. The Objectors' Panoply of Other Concerns Fall Under Their Own Weight

### 1. The Proposed Settlement Improves Upon the Task Force Plan

191. Krell has mistakenly argued that the Task Force remediation program is superior to the Proposed Settlement. Krell Brief at 77–86. But the Proposed Settlement unequivocally and dramatically improves upon the Task Force Plan.[66] Weiss Aff. at ¶¶ 161–83; Hoyer Aff. at ¶¶ 9–16. Plaintiffs have repeatedly detailed the extensive improvements of the Proposed Settlement over the Task Force Plan. Weiss Aff. at ¶¶ 161–83; Weiss Supp. Aff. In addition, plaintiffs' actuarial expert has valued the improvements of the Settlement over the Task Force Plan at $1.123 billion. Hoyer Aff. at ¶ 19. Indeed, the Proposed Settlement's substantial improvements over the Task Force Plan are confirmed by the fact that the insurance departments of all fifty states and the District of Columbia have endorsed the Proposed Settlement as a positive development for their citizens and as an improvement over the Task Force Plan that forty-five of the jurisdictions had previously adopted. Thus, the Court concludes that the Proposed Settlement substantially expands the relief to

---

to negotiate attorneys' fees simultaneously with the settlement itself).

**66.** Some states had argued that the interim remediation plan was superior to the Proposed Settlement. Mass. at 10; Fla. AG at 20. These states only have conclusorily alleged that the

interim plan was superior without reasoning their conclusions. The Court has no basis on which to evaluate the conclusion. Even if true, the statement does not undermine the fairness of the Proposed Settlement, which is fair in its own right and sustainable.

class members, and rejects Krell's contrary contention.

192. After an ostensible "line by line analysis of the similarities and differences between the Task Force Plan and Settlement Plan," Krell concludes that plaintiffs' counsel obtained "little, if anything, for the class." Krell Brief at 76. Krell's "line by line" analysis, however, rests entirely on two affidavits of his counsel's paralegal, S. Catherine Colder, whom the Court finds unqualified. Ms. Colder has no legal training, nor any professional expertise or qualifications for the substantive analysis that she undertakes. Colder Aff. at ¶ 2.[67] The Court credits her analysis not one iota.[68] *See Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir.1987) (observing that a trial court has discretion to exclude "conclusional testimony, of little value at best, that the settlement was inadequate, offered in the main by persons having financial or professional relationships with [the objectors].").

193. Nevertheless, to ensure an adequate record in the event, or eventuality, of appeal, the Court will address Krell's professed concerns. Indeed, Krell's line by line analysis and, therefore, his conclusions defy even a cursory reading of the two plans.

194. Krell claims that under the Task Force Plan, the Claim Team was "completely independent of any Prudential involvement" while the parallel provision in the Proposed Settlement permits Prudential to select the Claim Team, subject only to veto by the Regulatory Oversight Staff and Lead Counsel. Krell Brief at 81. Krell overstates this distinction. Both the Task Force Plan and the Proposed Settlement require the Claim Team to be "wholly independent of Prudential." *Compare* Task Force Plan., Ex. A–3, at 10, ¶ II.J. *with* Stipulation of Settlement, Ex. C, at 10, ¶ II.J. Under the Task Force Plan, as Krell quotes, the Claim Team must be "mutually agreeable to the Regulatory Oversight Staff and the Company." Krell

Brief at 81 (citing Task Force Plan, Ex. A–3, at 10, ¶ II.J). Under the Proposed Settlement, the Regulatory Oversight Staff and Lead Counsel must approve the Claim Team candidates proposed by Prudential. Stipulation of Settlement, Ex. C, at 10, ¶ II.J. The plans do not materially differ on this issue. If the change has any effect, it is to afford the Regulatory Oversight Staff and Lead Counsel the final authority to select the Claim Team.

195. Krell complains also that under the Task Force Plan a policyholder could request a rehearing of the Appeals Committee decision, the fourth level of review, if the policyholder believed that the appellate decision operated as a "manifest injustice," but under the Proposed Settlement only the Claimant Representative can make the "manifest injustice" determination. Krell Brief at 82. The Claimant Representative, however, provides another layer of protection to policyholders and has the requisite knowledge and experience to determine whether the appellate decision operated as a manifest injustice. The Claimant Representative is appointed by Lead Counsel and must be experienced in commercial dispute resolution or the life insurance industry. If there is any reasonable basis to believe that a manifest injustice has occurred, the Claimant Representative will request a re-hearing. And under the Proposed Settlement only, the policyholder may have another Representative to assist with the rehearing. Stipulation of Settlement, Ex. C, at 22, ¶ V.C.5. A policyholder dissatisfied with a prior scoring decision might believe that he or she was inadequately represented initially and desire new representation.

196. Krell argues that the Proposed Settlement is inferior to the Task Force Plan also because the Proposed Settlement would exclude privileged documents from consideration in the ADR process. Krell Brief at 79. Krell directs us to the underscored language

---

67. Ms. Colder summarizes her qualifications to conduct her analysis as a "Bachelor's Degree in Communications from Towson State University and more than three years of additional study at the graduate level in English and related disciplines." Colder Aff. at ¶ 2.

68. The reliance of Krell's counsel, Michael Malakoff, on the affidavit of his paralegal in this context is patently inappropriate.

concerning the assembly of claim files in the Proposed Settlement's ADR process:

> The file for a particular Claim will contain copies of all documents transmitted to, or prepared or obtained by, the Claim Evaluation Staff with respect to the claim, including, without limitation, to the extent available in the Company's records (*including the non-privileged Company documents . . . held by Defendants' Counsel*), the following materials: . . .

Stipulation of Settlement, Ex. C, at 5, ¶ II.F (emphasis added) Krell errs because this language irrefutably expands the realm of records that may be searched for claim evaluation purposes. The corresponding Task Force Plan provision limited the search to records in Prudential's direct possession. Task Force Plan, Ex. A–3, at 4, ¶ II.F. In negotiating the Proposed Settlement, the parties agreed to include records in the possession of Prudential's counsel. Only privileged documents, which would be nondiscoverable, are excluded from the claim file assembly process.

197. Krell argues that the Proposed Settlement is inferior to the Task Force Plan also because the definition of "Interest Rate" has changed. Krell Brief at 77–78. According to Krell, the change in the definition has reduced benefits to class members. The parties to the Proposed Settlement changed the wording of the definition to clarify the calculation of interest as set forth in the Task Force Plan. The definition does not change the amount of interest that will be provided to policyholders. *Compare* Task Force Plan, Ex. A–1, at 5, ¶ I.C. *with* Stipulation of Settlement, Ex. B, at 6, ¶ I.C.

198. Krell argues that a change in the way that "Agent Statements" are prepared "appears to substantially decrease the amount of evidence available to class members to prove their claims." Krell Brief at 80. The ADR process requires the Claim Evaluation Staff to request the selling agent to furnish an "Agent Statement" concerning the claim.[69] Stipulation of Settlement, Ex. C, at 6, ¶ II.G.2. Under the Task Force Plan, an unsworn or unsigned agent statement is "Available Evidence." Task Force Plan, Ex. A–2, at 6, ¶ II.G.2.b. Under the Proposed Settlement, unsworn or unsigned agent statements are not considered to be "Available Evidence." This change does not harm policyholders, however. Stipulation of Settlement, Ex. C, at 6, ¶ II.G.2. First, although there may be less evidence under the new provision, there will not be less credible evidence; an unsworn and unsigned statement has no indicia of reliability. Second, where an agent refuses to cooperate by signing a statement, the class member's score is enhanced by one, regardless. Stipulation of Settlement, Ex. B, at 11, ¶ I.F.1.d. Accordingly, Krell's complaint is unfounded.

## 2. ADR Review Is Impartial

■ 199. Some objectors incorrectly argue that initial review of the ADR claims by the Claims Evaluation Staff is not sufficiently impartial because the Staff is comprised of Prudential employees. Fla. AG at 13–14; Beauvias at 18; Johnson at 23–24. The Claim Evaluation Staff consists of qualified professional administrative Prudential employees wholly independent of Prudential's marketing or sales functions. Stipulation of Settlement, Ex. B, at 4, ¶ I.C. Moreover, the Staff does not include employees who have been agents or who have directly supported agents. *Id.* Additionally, many of the scoring factors are objective and not subject to interpretation. *Id.*, Ex. B, at 16, ¶ II.A. And the Staff has no incentive artificially to minimize ADR scores because the entire evaluation, review, and appeals process occurs at Prudential's expense.[70]

200. Moreover, the ADR's multiple levels of review by undeniably impartial non-employees also ensures that the ADR process is

---

69. The agent will be asked to provide also "any other facts or documents . . . that might be relevant in assessing the Claim, including whether the agent knows . . . whether any documents . . . specifically pertaining to the Claim have been destroyed . . ., and whether copies of such documents cannot be located." Stipulation of Settlement, Ex. C, at 6, ¶ II.G.2.b.

70. Even if one anticipates that Prudential will act at any cost to achieve its own self-interest, thus, the economics of the ADR process ensure that Prudential will be fair and generous in the initial and every stage of the review process.

impartial. The Claim Team, composed of individuals wholly independent of Prudential, reviews all scores of less than "3." The Claim Team then recommends an appropriate score to the Claims Review Staff. Later, the Appeals Committee may finally review the policyholder's claim. The argument that this process is not fair and impartial is untenable.

### 3. The ADR Process is Simple

201. Beauvias argues that the ADR process is "onerous," requires the submission of "endless forms," and forces a policyholder to challenge a decision in several forums before a final decision can be obtained. Beauvias at 17–18. Treadway argues that the Proposed Settlement is unfair because it "puts the initial onus on defrauded life insurance customers to initiate a mini-trial." Treadway at 4. The Florida AG had argued that the ADR process is too "bureaucratic" and "complicated." Fla. AG at 13. The Florida AG submitted a 46 page "flow chart" prepared by its expert to support the Florida AG contention that the ADR process is overly complicated. Oscher Report, Attach. B. Also, Krell submitted an elaborate flow-chart to show the purported complexity of the Proposed Settlement and its unfairness to class members. Colder Aff., Ex. E. These objectors are mistaken.

202. The ADR process is uncomplicated. To participate in the ADR process, the policyholder need only check a box on the Election Form, complete the Claim Form provided, attach any available documentation, and return the information in postage-prepaid envelopes.[71] Stipulation of Settlement, Ex. C. The available "800" number facilitates the process. Id., Ex. C, at 4, ¶ II.D. Claimants need not appear personally. Nor need a claimant retain counsel, though a claimant is free to do so.

203. Consequently, and contrary to the objectors' contentions, the ADR process is quite simple for policyholders. Policyholders are spared the burden and expense of typical litigation, while Prudential performs the enormous and costly administrative process-

es. Prudential has projected, in fact, that its administrative costs for the Proposed Settlement will substantially exceed $100 million. Meade Aff. at ¶ 10.

204. The Florida AG and Krell flow charts are grossly misleading because they attribute to the policyholder all calculations of the ADR process, the large majority of which do not involve policyholders. Prudential is correct in asserting that this approach is tantamount "to diagramming the internal operating system of a computer and arguing that a lay person cannot possibly use the machine." Pru. Reply at 19–20.

205. At the Fairness Hearing, Ms. Chin stated that her father had received misinformation from an operator at the "800" number. February 24, 1997 Tr. at 153–54. Though over 500,000 calls were received at the "800" number, no other complaints have been registered regarding the number. Although an occasional blip in "800" service is extremely unfortunate, the occasion does not undermine the Proposed Settlement's fairness. The parties are devoting substantial resources to ensuring that all individuals who interact with class members regarding the settlement are appropriately trained and supervised.

### 4. The ADR Process Provides Adequate Substantive Relief

206. The ADR process provides each classmember an opportunity to receive full compensatory or rescission based relief, plus an Additional Remediation Amount (the equivalent of exemplary relief or punitive damages). Class members may be entitled to this relief without purchasing any additional products from Prudential. There is no monetary cap or ceiling on the amount that Prudential may pay to each claimant or all claimants.

207. The Florida DOI had submitted the opinion of Steven S. Oscher of Oscher Consulting, P.A. in an effort to demonstrate that the Proposed Settlement is not valuable. Oscher Aff. Although the Florida DOI has

---

71. Only in the case of appellate review will the policyholder have any further action to take and seldom will appellate review be necessary because, as discussed above, Prudential has an incentive to resolve claims quickly and generously. And even where appellate review is necessary, the Policyholder Representative will assist the policyholder at no cost to the policyholder.

since withdrawn the submission, the Court addresses Oscher's analysis because other objectors have incorporated his conclusions by reference. Oscher's conclusions are not persuasive because his assumptions are mistaken.

208. For example, Oscher erroneously assumed a 4% interest rate. *Id.*, Ex. A, at 4–5. This interest rate is substantially less than the Interest Rate under the Proposed Settlement. The Proposed Settlement calculates interest at a variable rate, the actual rate in effect between the date the policy was issued and the date of award, plus 1.5%. Stipulation of Settlement, Ex. B., at 6, ¶ I.C. (defining "Interest Rate"). The applicable Interest Rate from 1982 through 1995 ranges from 5.04% to 9.97%. Weiss Supp. Aff. at ¶ 54. Oscher concludes that his hypothetical claimant is not made whole in reliance on his own incorrect assumed rate.

209. In addition, Oscher misstates the function of the Financial Guarantees. Oscher complains that there is no logical reason that the first 330,000 policyholders should receive a greater remediation amount than subsequent remediated policyholders. Oscher Aff., Executive Summary, at 6 & Ex. D. This statement reflects a misunderstanding of the Proposed Settlement. If there are more than 330,000 claims remediated, the Financial Guarantees do not benefit the first 330,000 claimants to the detriment of later claimants. Rather, as is clear from a careful reading of the Stipulation of Settlement, the difference between the amount actually spent and $780 million will be allocated proportionally to all claimants, not merely the first 330,000 remediated claims. Stipulation of

Settlement at C.5.a. and Ex. B, at 39, VI ("Allocation of Additional Remediation Amount").

210. Oscher also misunderstands Prudential's position in the ADR process. According to Oscher, the Financial Guarantee will result in Prudential skewing the scores of all claims exceeding the first 330,000. Oscher Aff., Executive Summary, at 5. The process is unquestionably designed, however, to prevent misscoring.

### 5. The Proposed ADR Scoring Provisions Adequately Determine Whether Prudential Misled Individual Class Members

211. The ADR procedures provide relief without regard to a policyholder's ability to establish materiality, causation, damages, or any other of the requirements that would apply in formal litigation. Nevertheless, California, the Florida AG, the Florida DOI, and Massachusetts argued that a score of "3" is too difficult to obtain. Cal. at 4–5; Fla. DOI at 6–8; Fla. AG at 13. Beauvias argues that the scoring system is "stacked" against individual class members. Beauvias at 17.[72] The Court finds, however, that the score of "3" is available to all claimants who establish that they are entitled to full relief.

212. For example, a "3" will be awarded whenever the producing agent confirms the allegation that a misstatement occurred in connection with the underlying sale of insurance.[73] And if an agent refuses to cooperate in the ADR process, the policyholder's score will also be enhanced.

213. Additionally, a "3" will be awarded whenever "Company Documentation" expressly supports the conclusion that a mis-

---

**72.** As an interesting aside, Beauvias' counsel attempted recently to settle a Louisiana class action against New York Life using an ADR mechanism similar to the one at bar. Beauvias, Ex. 1.

**73.** Objectors argue that the agent will rarely admit that a misstatement occurred in connection with the sale of the insurance policy. The Court disagrees.

Many agents have already readily acknowledged that misstatements were made in the sale of replacement policies, abbreviated payment policies, and retirement plans. As James Helfrich observed in his widely reported memorandum to Prudential management, "the common response when agents were questioned as to why

they used financed or abbreviated pay mechanisms for selling insurance has been: 'that's the way we were trained.'" Memorandum from James Helfrich to David Fastenberg dated November 16, 1992 *in* Pls. Evid. Sub., Vol. 2, Ex. H–1. Many of these agents have filed suit against Prudential based on allegations that would support a "3." Other agents have submitted statements to the state agencies that are investigating Prudential. Fla. DOI at 4 (indicating that the Florida DOI has or knows of sworn testimony and documents that demonstrate that, among other things, Prudential's field sales management actively encouraged churning).

statement occurred.[74] "Company documentation" broadly includes correspondence from Prudential or its agents, policy illustrations, applications, and sales materials. Stipulation of Settlement, Ex. B, at 5, ¶ I.C. The materials would encompass, for example, misleading vanishing premium illustrations,[75] retirement plan sales materials, and application materials reflecting replacement policy sales. These materials also would encompass commonplace handwritten notations confirming contemporaneous or prior misstatements.

214. Also, the ADR procedures incorporate several factors, "positive considerations," that may increase a score of "2" to a "3."[76] These considerations may afford relief to a policyholder if any of several circumstances surrounded the sale of the policy at issue. For example, if the agent without authority executed the policyholder's signature on a transaction document, the claimant automatically will receive a score of "3." Additionally, a claimant who normally would score a "2" may score a "3" if, for example: (1) the agent used unauthorized or altered sales materials or illustrations in connection with the sale, (2) the agent was terminated or otherwise disciplined or fined due to improper sales practices; (3) the agent refused to cooperate with the claim investigation; (4) the sale or servicing of the policy violated applicable state or federal regulations; or (5) documents relevant to the claim have been improperly destroyed or removed. Stipulation of Settlement, Ex. B, at 9, ¶ I.D.

215. In addition to understating a claimant's ability to score a "3," some of these objectors understate the quality of relief available to those who score a "2." Claimants

awarded a "2" will receive compensatory relief equal to more than 50% of their actual damages, plus possibly a share of the Additional Remediation Amount. *E.g., Id.,* Ex. B, at 19, ¶ II.C.1.b. As Massachusetts has conceded, this is "meaningful relief." Mass. at 12. Moreover, this relief is not diminished by attorneys' fees or costs as would be the case in an ordinary civil proceeding. Absent the Proposed Settlement, the policyholders somehow able to secure representation on a contingent fee basis would pay 30% to 40% of their recovery, plus litigation costs, to their counsel.

### 6. The ADR Process is an Appropriate Mechanism to Assess Whether Class Members Were Affected by Prudential's Deceptive Sales Practices

216. Treadway objectors argue that there should be an independent audit to initiate and remediate claims, so that individual class members need not act to receive relief. Treadway Supp. at 3. According to the Treadway objectors, the victimized policyholder demographics—injured policyholders were often elderly or uneducated—mandate automatic remediation. *Id.* at 5. Treadway objectors argue that the need for an automatic auditing system also is supported by Prudential's deliberate destruction of damaging evidence. *Id.*

217. Treadway errs. Courts widely have recognized that it is generally appropriate to require each class member to demonstrate his or her entitlement to relief under the ADR. *See, e.g., Franks v. Kroger Co.,* 670 F.2d 71, 72–73 (6th Cir.1982) (affirming employment action settlement requiring class members to prove they were subjected to

---

**74.** The Florida DOI argued that Company Documentation will be unavailable in churning situations, "dooming" victims of this practice to a "2." Fla. DOI at 7–8. Many individuals have observed otherwise. For example, John Cressman, the Florida DOI's own witness, contradicts the Florida DOI's contention. Cressman testified in his deposition that agents often used blank, signed disbursement forms to complete replacement transactions. Deposition of John Cressman, dated September 28, 1996 at 27:2–38:13; *in* Fla. DOI App., Ex. F. Also the Task Force has indicated that blank disbursement forms are a common churning tool. Task Force Report at 188–89. And objector Krell exclaims that replacement is "easily demonstrated by the policy-

holder's underwriting file at Prudential." Krell Brief at 6 n. 3; *see also* Pietz Aff. at ¶ 19 (listing types of Prudential records indicating improper replacement).

**75.** Massachusetts incorrectly argued that "Company Documentation" would not include the vanishing premium illustrations. Mass. AG at 12.

**76.** To obtain the score of "2," which may be increased to a "3" based on an assessment of the positive considerations, the claimant need demonstrate only that the oral and written evidence "on balance supports the claimant's allegation." Stipulation of Settlement, Ex. B, at 9, ¶ I.D.

discrimination before receiving relief); *Carbone v. Gulf Oil Corp*, No. 85–361, 1989 WL 86950, at *2–7, 1989 U.S. Dist. LEXIS 8805, at *5–10 (E.D.Pa. July 27, 1989) (approving settlement requiring claimants to submit substantiated proofs of claim demonstrating entitlement to relief).

218. Moreover, the ADR process does in effect presume that claimants are entitled to relief unless Prudential proves otherwise. A policyholder will be entitled to no relief only where the evidence, on balance, shows that no misrepresentation occurred. Where evidence is evenly divided policyholders will receive a "1," which may in many cases be enhanced to a "2" by the positive considerations discussed above.

■■■ 219. And the Proposed Settlement must be assessed as a whole; the Court cannot extricate an individual provision from the plan. Plaintiffs achieved minimum guarantees, additional remediation amounts, and other benefits under the Proposed Settlement that may benefit policyholders more than the provisions that the objectors request.

### 7. The ADR Process Adequately Identifies Churning Cases

■■■ 220. According to some objectors, the Proposed Settlement unfairly requires each class member to initiate and prove his or her right to compensation through the ADR Process. Treadway Supp. at 3–4. These objectors argue that Prudential policyholders who were churned should be identified objectively through an independent audit using the "exact match" system and should be automatically compensated. *E.g., id.* The Court rejects the argument that the "exact match" system is preferable to the ADR procedures. To presume that all of Prudential's financed sales were wrong, ignores the reality that financing can be in the best interest of the consumer. The consumer may desire to meet increased life insurance needs without any immediate cash outlay, for example. Lautzenheiser Aff. at ¶ 3. Neither the "exact match" system, nor any presumption that a financed transaction is fraudulent, is an appropriate replacement for the ADR, which appropriately discerns whether a given transaction was improper and affords the affected policyholder adequate relief.

221. The "exact match" system isolates all new policies issued for which the premiums equal the amount of disbursements from old policies where the disbursement was made within 90 days of the issuance of the new policy. Treadway Supp. at 4. This system can be used whether or not the original policy was from Prudential, because Prudential's files contain records of disbursements of both Prudential and non-Prudential policies. *Id.* at 4 n. 3.

222. The "exact match" system is unnecessary, because the ADR adequately remediates policyholders who believe that they were induced through deceptive sales practices to buy their policies. And the "exact match" system is inappropriate because it detects as "matches" replacement transactions that are not illegal, fraudulent, or otherwise improper. All states permit replacement sales to occur and experts agree that financed life insurance sales may be in the best interest of the policyholders. Lautzenheiser Aff. at ¶¶ 13–24. No states have prohibited financed insurance or replacement sales; nor have they found that these practice are misleading or improper *per se.* *Id.* at ¶ 3. Rather, states have prescribed appropriate safeguards to ensure that policies are financed properly, with clear and complete disclosure, and in a manner that protects the consumer against fraud and misrepresentation.[77] *Id.* at ¶ 14.

---

77. None of the four states that objected to the Proposed Settlement have ever prohibited financed insurance sales and three of the four did not regulate in any respect financed insurance sales for great portions of the Class Period.

Texas did not in any respect regulate insurance replacement during the Class Period. Massachusetts enacted in 1987 regulations that do not proscribe replacement activity. Mass. Regs.Code 34.00 (1987). California enacted in 1990 replacement regulations that do not proscribe replacements. Cal. Ins.Code § 10509 (1990; amended 1991). Florida is the only objecting state to have regulated replacement transactions early on.

California, Massachusetts, and Florida replacement regulations do not prohibit replacement transactions, but require that the insurer provide

223. Indeed, federal and state regulators, life insurance industry associations and consumer advocates have long recognized that financing or replacements may be in the best interest of a policyholder. *Id.* The laws only prohibit misleading or deceptive practices. *Id.* at ¶¶ 19–24. The Task Force, for example, found that when interest rates were high in the 1980s financing new policies with values from older policies may have been a sound financial decision for some policyowners:

> [W]hen interest rates were high and universal ·life and "interest-sensitive" whole life products were being developed, the replacement of old life policies sold at rates based upon old mortality tables and offering low interest rates could have been viewed as a sound financial decision for many policyowners. These new products were designed to compete with banks, money market funds and newly founded life insurers that could offer new money interest rates that were at an all-time high.

Task Force Report at 7.[78]

224. Moreover, the ADR process is preferable to the "exact match" system, because the ADR process incorporates the actual protections afforded by state laws as they have existed over time. A violation of any state law or regulation applicable at the time of sale, whether replacement or otherwise, is deemed evidence that the policyholder was misled, and directly factors into the scoring of his or her claim. Stipulation of Settlement, Ex. B, at 11, ¶ I.F.1.e (including as a positive consideration a violation of state insurance statutes or regulations).[79] Additionally, if the available evidence does not include executed forms required to be retained under state law, the Company is deemed to have violated applicable regulations and the claimant receives no less than the rescission remedy for a claim attaining a score of "2" without any deduction for term insurance costs. *Id.*, Ex. C, at 10, ¶ II.A.5.

**8. The ADR Process Adequately Identifies Cases in Which Prudential Sold Life Insurance Policies as Investment Vehicles**

225. Objectors argue also that an "even premium/odd face amount" test should be used to detect life insurance policies sold as investment vehicles and to provide automatic relief to class members. Fla. DOI at 14–15; Treadway at 4. The "even premium/odd face amount" test is inferior to the current ADR process, however.

226. According to these objectors, ordinary life insurance policies are sold to achieve a face value of even increments, *e.g.*, $1,000 investments. Treadway at 4. The premium payments on these policies are calculated to achieve the desired face amount, and

---

prospective purchasers adequate information regarding replacement transactions. Each of the states' regulations specifically acknowledges that replacement may be in the best interest of the policyholder.

California, for example, requires the following notice to be supplied to all consumers who are contemplating a replacement of existing insurance policies:

> Are you thinking about buying a new life insurance policy or annuity and discontinuing or changing an existing one?· If you are, *your decision could be a good one—or a mistake ...* Make sure you understand the facts ... Hear both sides before you decide. This way you can be sure you are making a decision that is in you best interest.

Cal. Ins.Code § 10509.4 (emphasis added). And both Massachusetts and Florida require a nearly identical notice. *See* Mass Regs.Code tit. 211, § 34.04; Fla Admin. Code Ann. r. 4–151.006 (1992).

Even Florida, which was the most vociferous proponent of the churning presumption for all replacements, has never enacted a broad prohibition of financed insurance in its own laws. As recently as 1995, Florida passed an "anti-churning" law that emphasizes that the replacement that is prohibited involves fraud: to be prohibited, replacement must be done in a manner that is "fraudulent, deceptive or otherwise misleading or that involves a deceptive omission." Fla. Ins. Laws § 626.9541(aa) (1995).

**78.** Notably, Prudential was not alone in selling many replacement policies during the Class Period. Industry-wide replacement totalled 45% of new premium payments in 1984, 47% in 1985, 43% in 1986, and 40% in 1987. M&R Fact Sheet.

**79.** Krell argues that the Proposed Settlement deprives policyholders of state law protections concerning the replacement of life insurance policies. *See* Krell at 54–56. Krell's objection fails to account for the fact that the ADR scoring procedures specifically incorporate state replacement regulations.

rarely result in premium payments equaling round numbers, *i.e.* multiples of $5. *Id.* The Florida DOI system detects policies for which premium payments are in unusually round numbers, such as $50, $55, or $75, and the face value of the policy is not in $1,000 increments. *Id.* Because people who desire to save often desire to save in multiples of $5, where an agent sells a policyholder a policy for investment purposes, according to these objectors, the agent begins with a round numbered monthly payment or premium, *e.g.*, $25 per month, and then backtracks to determine the face value of the policy, which often involves dollars and cents, *e.g.*, a face value of $65,243.23. *Id.* According to Tread-way and the Florida DOI, locating so-called "even premium/odd face amount" policies is tantamount to locating insurance policies sold as an investment vehicle and qualifying po-lices should receive full relief. *Id.;* Fla. DOI at 14–17.

227. But, there is no basis to presume that a policy having a face value that is not a multiple of $1,000 was sold as an investment and not a life insurance policy. Indeed, us-ing the presumption would likely identify legitimate VAL sales, rather than solely im-proper transactions, because it was a com-mon practice for Prudential representatives to work out an even premium schedule dic-tated by a client's ability to make regular payments. Fiandaca Decl. at ¶ 8. And, this sort of premium-driven transaction often re-sults in a policy having a face value that is not a multiple of $1,000. *Id.* Consequently, it would be unreasonable to impose the re-quested presumption on these Prudential transactions.

228. The Court finds that the existing ADR provisions adequately identify transac-tions in which life insurance was sold as an investment plan. The ADR process weighs the available evidence, including policyholder statements, available documents, and agent complaint histories. These are more accu-rate indicia of whether a policyholder was misled than the proposed "even premium/odd face amount" test.

229. Consequently, the Court rejects the argument that the ADR process should be replaced with the proffered "even premi-um/odd face amount" test.

### 9. The Proposed Presumptions for APP Claims Are Unnecessary and Inappropriate

230. Massachusetts argued and Beauvias argues that beginning in 1984, Pru-dential improperly used the "Investment Generation Approach" ("IGA") to set the div-idend scales that appeared in Prudential's illustrations without fully disclosing the im-plications of the IGA change in the illustra-tions. Mass. at 13–15; Beauvias at 8–10. Massachusetts argued that the ADR should include additional evidentiary considerations to increase a policyholder's score where these illustrations were used in a sale. Mass. at 13–15. Additionally, California proposed five additional factors that it believed should be considered in evaluating claims involving APP claims. Cal. at 10–11.

231. The Court finds that the ADR pro-cess adequately addresses and remedies the damages flowing from Prudential's decision to adopt the IGA. First, if the class member was misled, the ADR scoring provisions will score the class member so that the class member will be entitled to significant relief. Second, the ADR damages formula adequate-ly accounts for any losses stemming from Prudential's IGA. Vanishing premium scheme victims may obtain the difference between the premium payments and policy values illustrated at the time of sale and those that occurred in the wake of falling interest rates. Stipulation of Settlement, Ex. B, at 28–31, ¶¶ III.C.1.a, III.C.2.a. To the extent that claimants were paid dividends lower than those Prudential projected at sale, thus, they may recoup the resulting damages under the ADR process. Under any mea-sure, this is fair and adequate relief.

### 10. No Additional Evidentiary Considerations Are Necessary

232. As discussed above, the Pro-posed Settlement provides an extensive, non-exclusive list of Specific Evidentiary Considerations for each claim category. Several objectors argue that the Proposed Settlement must include additional factors. Massachusetts argues for additional Specific Evidentiary Considerations for each Claim–

Specific Category.[80] Mass. at 14–16. Similarly, California argued for the addition of several Specific Evidentiary Considerations in the Abbreviated Payment Plan category. Cal. at 10–11. The Court finds the Proposed Settlement as it is to be fair and adequate.

233. The existing lists of Specific Evidentiary Considerations, quite broad as they are, do not purport to be exclusive. They were incorporated into the agreement "to provide additional guidance to the Claim Evaluation Staff, the Claim Review Staff or the Appeals Committee, as the case may be, particularly in instances where there is an absence of Available Evidence of the alleged Misstatement, but where it appears that the Claimant was misled. . . ." Stipulation of Settlement, Ex. B, at 10, ¶ I.F. The Considerations, thus, are illustrative of the matters to be considered in assessing a claim under the Claims Resolution Factors.

234. Indeed, to catalogue each factor and consideration that could bear on a Claims Resolution Factor would be both impossible and undesirable. Those who review the claims must be given the flexibility to react to the facts as presented in determining whether a policyholder was misled.

235. Consequently, the Court rejects the assertion that the Proposed Settlement's failure to include the detailed factors provided by several objectors makes the Proposed Settlement unfair.

### 11. Agent Conduct Is an Appropriate Talisman of Prudential's Wrongful Conduct

236. Some objectors have argued that the Proposed Settlement's ADR process

is flawed because it focuses on the agent's conduct, rather than on the conduct of Prudential management. The Court disagrees. It is completely appropriate for the ADR process to evaluate the agents' conduct, because that conduct was a conduit through which Prudential misled and injured the individual claimants. If this case were tried, the Court could find that legal presumptions were appropriate and that a focus on individual agent conduct would not be necessary. But this cognizance does not bespeak to the fairness of the ADR's approach.

### 12. A Presumption in Favor of the Policyholder Where the Policyholder's Statement Conflicts with an Agent's Statement Is Unnecessary and Undesirable

237. One objector seeks a presumption in favor of the policyholder where the statements of the policyholder and agent conflict. Beauvias at 19. The Court finds that this presumption is unnecessary, because the ADR guidelines contain sufficient scoring mechanisms to address the veracity of policyholder and agent statements. The ADR Guidelines contain numerous scoring and evidentiary considerations to evaluate the veracity of policyholder and agent statements and to increase a claimant's score where the agent's credibility or conduct should be questioned, including where:

· the agent has been terminated for sales practices problems, Stipulation of Settlement, Ex. B, at 11, ¶ I.F.1.c;

· the agent has been placed on probation for sales practices problems, *id.*;

---

**80.** In the "Abbreviated Payment/APP" claims category Massachusetts argued to include whether the agent when presenting an illustration: (1) disclosed (when applicable) that Prudential had actually decreased its dividends in one or more recent years (as was true from 1988 through 1995); (2) stated that Prudential has always met or exceeded its dividend projections; (3) explained that changes in dividends, which are not guaranteed and which are usually illustrated in a separate column, would have no effect on the out-of-pocket premiums column shown in the illustration; (4) informed the consumer that dividends are not guaranteed.

Massachusetts argued also that in the "Life Insurance Sold as an Investment" category, the

specific evidentiary considerations must include whether the policyholder received a solicitation that did not mention life insurance or that referred to the product being offered as a pension plan, private pension plan, or pension maximization plan. Massachusetts also argued that "supporting evidentiary factors" must be added to the "Financed Insurance" claims category: (1) whether the new policy was issued within 180 days of cancellation of, or withdrawal of value from, the old policy; (2) whether funds were withdrawn from the old policy in the exact amount of the premium on the new policy; and (3) whether, for several years, funds were withdrawn from the old policy in amount less than the premium on the new policy.

· the agent was disciplined on more than one occasion for his sales practices, *id.*;

· the agent was fined or sanctioned by a regulatory body for his sales practices, *id.*;

· the agent failed to certify his statement under pains and penalties of perjury, *id.*, Ex. C, at 6–7, ¶ II.G.2.b.;

· the agent has a Complaint History, id., Ex. B, at 9, ¶ I.D; or

· the agent has a pattern of financing activity, *id.*, Ex. B, at 17, ¶ II.B.1.a.

The Court finds also that the requested presumption would be undesirable, because the presumption would encourage policyholders to submit claims where they were not misled; policyholders would know that only written documentation would overcome any of their allegations. Accordingly, this presumption must be rejected.

### 13. The Agent's Presence Before a Decisionmaker is Unnecessary to Adjudicate Class Members' Claims

■■■ 238. Beauvias argues that every claimant should "be entitled to have the agent appear at the examination and that the agent's failure to appear should automatically lead to an award of the highest score." Beauvias at 19. The Court disagrees. It would be unnecessary and unduly burdensome to require an agent to testify personally during the ADR process. The ADR process does not involve any live witness testimony. The process does provide that a written statement by the agent, signed under oath, should be obtained. Stipulation of Settlement, Ex. C, at 2, ¶ I.D.1. The ADR process also provides that an existing agent's refusal to cooperate is a positive consideration in assessing a policyholder's claim. *Id.*, Ex. B, at 11, ¶ I.F.1.d. The Court finds, moreover, that it would be inappropriate to penalize Prudential for the failure of individual agents to appear where these agents no longer are employed by Prudential or subject to its direction or control. Thus, these ADR procedures are adequate.

### 14. The Complaint History Factor is Adequate

■■■ 239. A claimant automatically receives a minimum score of "2" if his or her agent has a "Complaint History." The Proposed Settlement initially defined Complaint History as three or more complaints, valid or invalid, relating to any sales practice category, that were made at any time through September 20, 1996. Stipulation of Settlement, Ex. B, at 9, ¶ I.D. The Final Enhancements to which Prudential agreed on the eve before the Fairness Hearing extend that Complaint History cut-off date to February 1, 1997.[81] Stipulation Amendment. The cut-off date is fair.

240. Extending the cut-off date further would not be necessary or desirable for several reasons. First, the February 1, 1997 cut-off date follows almost two years of continuous and intensive media scrutiny and widespread adverse publicity, which sensitized the general public to life insurance sales practice issues in general and Prudential's in particular, and which prompted policyholders to file numerous complaints (totalling 16,912 in 1996 alone through September 20). Pru. Reply at 33; Fiandaca Decl. at ¶ 4. Second, the Complaint History is already an inflated figure because it includes both valid and invalid claims. Pru. Reply at 33. Third, all sales complaints are aggregated, even if they do not pertain to the type of claim at issue. *Id.* Fourth, the three-complaint threshold is very low because it covers complaints recorded over fourteen years. And fifth, Prudential had already agreed with plaintiffs to reduce the threshold from the six complaints specified in the Task Force Plan to three, which results in substantially more agents falling within the Complaint History category than under the Task Force Plan. *Id.*

### 15. The Proposed Settlement's Method of Assembling Associated Complaints is Adequate

241. The Florida DOI contended that the Complaint History provision could not be implemented properly because Prudential's records are incomplete. Fla. DOI at 8–11. The Court finds, however, that Prudential's

---

**81.** The states that had objected to the September 20, 1996 cut-off date are in complete accord that the February 1, 1997 cut-off date is fair, reasonable, and adequate.

records amply identify complaints for Complaint History purposes. Barcafer Aff. at ¶¶ 2–3. Prudential has retrieved customer complaints from its regional and agency records, and has processed and input the data into a comprehensive database. *Id.*

242. The Florida DOI argued that Prudential's complaint records are inadequate because many complaints have not been incorporated into the "official Prudential complaint system." Fla. DOI at 9–11. This complaint is unfounded, because Associated Complaints documentation is not limited to materials in Prudential's official complaint system. Stipulation of Settlement, Ex. B, at 3, ¶ I.C. A customer complaint letter, for example, may constitute an Associated Complaint, regardless of whether the letter was filed with Prudential's headquarters. *Id.*

243. The Florida DOI cited Cressman's criticism of Prudential's Complaint resolution process for the proposition that consideration of Associated Complaints is an inadequate measure of complaints against an agent. Fla. DOI at 9–10. Because an Associated Complaint need *not* be resolved in favor of the policyholder to be considered, however, the Florida DOI argument is without merit.

244. Additionally, the Florida DOI argued that the measure of Associated Complaints is inadequate, because there is an inability to identify pre–1989 misconduct and a significant portion of the original pre–1992 complaint records have been destroyed. Fla. DOI at 10–11. Prudential insists, however, that its regional databases date back to 1985 or 1987, Barcafer Aff. ¶ 2, and that all records were entered into its computerized system before destroying them, Hebel Supp Aff. ¶ 34. And, despite plaintiffs' extensive investigation into Prudential's document destruction, plaintiffs have encountered no evidence that pertinent complaint records have been irretrievably lost or destroyed. Pls. Settl. Reply at 52 n. 51.

245. The Florida DOI argued also that early complaint logs do not describe complaints in a manner consistent with the claim-

specific categories and that the inability to categorize these complaints will understate the number of complaints. Fla. DOI at 10–11. This criticism is unwarranted, however, because Prudential has agreed to count all claims against a particular agent regardless of whether they relate to a specific category.

### 16. Class Members Need Not Be Informed of Agents' Complaint Histories Prior to Choosing Relief

■ 246. The Texas DOI argued that prior to being required to choose between the ADR process and Basic Claim Relief, each participant should be informed of whether his or her agent has a Complaint History.[82] Tex. at 5. The Court disagrees entirely. It is not necessary to disseminate the Complaint History information before the election period for policyholders to make informed decisions about whether to choose between the ADR process and Basic Claim Relief. Policyholders will know whether they were misled without Complaint History information because they have personal knowledge of the sale and of the operation of their policies. Additionally, to distribute the list before the election period would create an inappropriate *de facto* presumption that class members who bought policies from an agent with a Complaint History were misled. The presumption is inappropriate, of course, because not all class members who bought policies from agents with Complaint Histories were misled.

### 17. Unauthorized Execution as a Positive Consideration is Adequately Described and Effective

■ 247. California argued that the Proposed Settlement inadequately defines "unauthorized execution" as a positive consideration and California proffered detailed criteria to determine whether signatures are unauthorized. Cal. at 9–10. California argued also that the ADR guidelines should award an automatic "3" where a forgery is discovered in connection with a claim involving life insurance sold as an investment. *Id.*

---

**82.** In fact, the Texas DOI moved for this Court to enforce a *Subpoena Duces Tecum* to require Prudential to produce a list of Texas agents whom Prudential identified as having three or more sales related complaints as of September 30, 1996. The Court denied the request in its Order of January 24, 1997.

at 10. It appears that California's request for an automatic "3" was resolved by one of Prudential's concessions in the Final Enhancements: Prudential agreed to add language to the Proposed Settlement to allow an automatic "3" for a forgery on any life insurance application. Stipulation Amendment at ¶ 4.

248. And the Court disagrees with the argument that additional criteria are necessary to determine whether there has been a forgery, and finds that the ADR guidelines in this respect are fair, reasonable, and adequate. The ADR guidelines provide that the score initially given a claim may be increased by one point if the agent executed the policyholder's signature on any transaction document without authorization. Stipulation of Settlement, Ex. B, at 10, ¶ I.F.1.a. The Court does not believe that California's detailed criteria are necessary for a claim evaluator to determine whether a signature is unauthorized. The purpose of the positive considerations is to allow the claims evaluators to compensate a class member for being misled where there is an absence of available evidence:

> The Positive Considerations and the Negative Considerations are to be reviewed in light of the totality of the facts and circumstances pertaining to the particular Claim. They are to provide additional guidance to the Claim Evaluation Staff, the Claim Review Staff or the Appeals Committee, as the case may be, particularly in instances where there is an absence of Available Evidence of the alleged Misstatement, but where it appears that the Claimant was misled as to any one or more of the itemized Claim Resolution Factors herein.

Stipulation of Settlement, Ex. B, at 10, ¶ I.F. The Court finds that the ADR criteria are adequate to allow a claim evaluator to determine whether a signature has been forged.[83]

### 18. The ADR Process Fairly Addresses Document Destruction

249. Krell argues that the Proposed Settlement's document destruction provision does not apply to class members who would need the provision most. Krell Brief at 83–86. To prove his theory, Krell presents a hypothetical claim that he argues demonstrates the inability of a claimant to score a "3" where there has been document destruction. *Id.* A close look at Krell's hypothetical reveals its flaws and Krell's faulty conclusions.

250. Krell hypothesizes that where (1) a class member relied on misstatements contained in company documentation; (2) the class member was shown the company documentation by an agent with a Complaint History; (3) it is clear that Prudential destroyed the documentation; and (4) the agent denies that he or she misled the policyholder, the class member would never score more than a "2." *Id.* at 84.

251. Krell's conclusion is wrong: Krell's hypothetical class member would receive a "3" under either the original or the enhanced document destruction provisions. Under the original document destruction provision, the hypothetical class member would provisionally receive a score of "2" because the balance of available evidence, which includes the Claim Form, supports the claim.[84] The score

---

83. Indeed, the ADR allows forgery to be considered as a factor whenever the policyholder indicates that a document was forged. The ADR process enables any policyholder who does not initially receive a score of "3" to appeal the decision and receive and review a copy of his or her Claim File. Stipulation of Settlement, Ex. C, at 20, ¶ V.B.3. The policyholder can then challenge any purportedly forged document that he or she had not seen before.

84. The ADR does limit the ability to enhance a score by reason of document destruction where the only reason that the class member is initially scored a "2" is because of the Complaint History presumption. Where the evidence on balance

does not indicate that the policyholder was misled, thus, the policyholder would not be enhanced from a "2" to a "3" by evidence of document destruction. The limitation is reasonable, a great percentage of the class may be entitled to an automatic "2" by reason of the Complaint History presumption. Stacking an additional presumption, such as a document destruction presumption, would afford full relief to policyholders who were never misled.

This limitation on the ability of a claimant to obtain stacked presumptions does not affect Krell's hypothetical claimant, who has scored a "2" by virtue of the fact that the evidence on balance indicates that she or he was misled.

would then be adjusted to a "3" based on the presence of any "positive considerations," which specifically include the destruction of company documentation. Stipulation of Settlement, Ex. B, at 11, ¶ I.F.1.g. Thus, the class member in Krell's hypothetical could very well obtain a "3." Moreover, under the enhanced document destruction provisions, the hypothetical policyholder certainly scores a "3" because the documents that Krell hypothesized are clearly material to the claim under review and would have a known impact on the class member's file (because the class member relied on them at the time of sale).[85]

### 19. Policyholders Receive Adequate Representation in the ADR Process

■ 252. One objector argues that the ADR Process does not provide for enough policyholder representatives. Beauvias at 22–23. The Court finds that the ADR process provides adequate policyholder representation, with direct assistance to the claimant at every stage of the process. The ADR process provides a Claimant Representative to monitor and oversee the ADR Process. Stipulation of Settlement, Ex. C, at 13–14, ¶ IV.A. The Claimant Representative may discuss individual claims with and make recommendations to the Claim Team, the Claim Review Staff, or the Representatives. Id. The ADR process also provides the Claimant Support Team to help policyholders learn about the ADR Process and how to submit claims. Id. Ex. C, at 4, ¶ II.D. The ADR process provides the Claim Review Staff to respond to policyholder inquiries and advise policyholders regarding the processing and administration of their claims. Id., Ex. C, at 12–13, ¶ III.A. And, if the claimant is dissatisfied with the remedy offered, he or she can pursue an appeal with the direct assistance of a policyholder representative (who is not the same individual as the Claimant Representative(s)). Id., Ex. C, at 19, ¶ V.B.2.

### 20. The Time Periods Allocated to Each Step in the ADR Process Are Fair, Reasonable, and Adequate

■ 253. Beauvias argues that the time periods between steps of the ADR process are too short, to Prudential's benefit. Beauvias at 22. Beauvias recommends each step be extended by between three and six months. Id. The Court disagrees with Beauvias' suggestion, because the time frames presently incorporated in the settlement strike a balance between providing policyholders with sufficient time to pursue the ADR process and providing policyholders a swift recovery.

254. In November of 1996, policyholders received an extensive package of information describing in detail the Proposed Settlement, the Task Force Plan, the enhancements included in the Proposed Settlement, and the types of claims and remedies included in the remediation plan. Stipulation of Settlement, Exs. F–1 to F–3; Meade Aff. at ¶ 11. Prudential mailed additional packets to policyholders in 46 jurisdictions around February 1, 1997, to implement the Task Force Plan and describe the status of the Proposed Settlement. Fiandaca Decl. at ¶ 9. Each Policyholder will have at least two and a half months (seventy-five days) simply to choose between filing an ADR claim and obtaining Basic Claim Relief and, if so, to return an Election Form. Stipulation of Settlement, Ex. C, at 9, ¶ II.I.2.b(i). In addition, policyholders in the forty-six jurisdictions that adopted the Task Force Remediation Program have already received the February notice and have until June 1, 1997 to make an election. Ashinoff Supp. Aff. at ¶ 3. Thus, these policyholders will have up to four months to make this decision. And, if a policyholder elects to file an ADR claim, he or she will then have up to three months to fill out a Claim Form. Stipulation of Settlement, Ex. C, at 9, ¶ II.I.2.b(i). The Court finds that allotting

---

85. The Florida AG asserted that several incidents of document destruction allegedly occurring in Florida resulted in the destruction of material documents. Fla. AG Supp. at 4–10. If substantiated, any claimant impacted by the document destruction that occurred in the Jacksonville Marketing Division, or any other Florida location, will receive adequate relief as provided in this Court's Order of February 3, 1997. That Order requires a document destruction audit of all Prudential field offices by an independent auditor to be paid solely by Prudential and at no cost to the class. Through this audit process, all incidents of document destruction occurring in any state will be investigated and affected files will be scored appropriately in the ADR process.

class members between two to four months to fill out the Election Form and three months to fill out the Claim Form is fair, reasonable, and adequate under the circumstances.

### 21. The ADR Procedures Properly Consider as Undermining Evidence that a Class Member Received a Clear Written Disclaimer at the Time of Sale

255. Massachusetts argues that the ADR incongruously allows scorers to rely on the disclaimers often printed on the last page of illustrations as "undermining evidence" but does not directly allow scorers to consider the first page of illustrations, which shows that premiums will become "$0" as "supporting evidence." Mass. at 12–13. Under the ADR Guidelines, however, if a policyholder received sales materials that stated clearly that dividends, investment returns, or interest crediting rates are not guaranteed and may change over time, or that described the operation of the APP, that evidence is considered undermining evidence where the statement was not solely that dividends were "not guaranteed" or "non-guaranteed." Stipulation of Settlement, Ex. B., at 9, ¶ I.D.

### 22. This Court's Role in Allocating the Additional Remediation Amount Is Appropriate and Does Not Undermine the Ability of Class Members to Evaluate the Proposed Settlement's Fairness

■ 256. Objectors have argued that it is impossible to evaluate the settlement fairness without advance notice of the manner in which the Additional Remediation Amount will be allocated. The Court disagrees. Most of the Proposed Settlement benefits are clearly described. The Court's discretion to disperse the Additional Remediation Amount within the parameters defined by the Proposed Settlement does not undermine the ability of a class member to choose a form of relief. Stipulation of Settlement, Ex. B, at 39, ¶ VI ("After the ADR process completion, the Court shall determine, at a hearing and upon notice, the method and allocation of the distribution of the Additional Remediation Amount among Claimants receiving relief in the ADR Process.").

### 23. Basic Claim Relief Is a Valuable Remedy

■ 257. The Court rejects several objectors' concerns that Basic Claim Relief has no value. Plaintiffs' expert, Robert L. Hoyer, projected that the Basic Claim Relief will provide benefits valued at nearly $800 million. Hoyer Aff. at ¶¶ 6, 16, and Exs. F1–F3, G1–G5, H1–H3. The Court rejects also the argument that if the cost of Basic Claim Relief to Prudential is low, then Basic Claim Relief is worthless to policyholders. The cost of the relief to Prudential is not the measure of class member benefit. The value of the relief to the Class, which may be substantial, is what matters. *See New York Life,* No. 94/127804, 1995 N.Y. Misc. LEXIS 652, at *60 (class members benefitted from settlement regardless of cost to defendant). The Court finds Basic Claim Relief will provide substantial value to policyholders who choose not to participate in the ADR process.

■ 258. The Court rejects also the novel contention that Basic Claim Relief is inadequate because class members must continue to do business with Prudential or because Basic Claim Relief is merely a marketing tool for Prudential. Objectors who prefer not to do business with Prudential may elect the ADR process or choose the Basic Claim Relief Mutual Fund Enhancement option. Similarly, those objectors who feel that Optional Premium Loans and Enhanced Value Policies create unacceptable risks may simply elect other forms of relief. The availability of these choices exemplifies the fairness of the Proposed Settlement in providing individually tailored relief to the entire Class.

259. Additionally, the Court declines to follow the demands of Beauvias and others, who would prefer that claimants receive cash or other relief. The cash alternatives demanded by these objecting class members are available through the ADR process to those that satisfy the criteria of that process. Furthermore the desire of some class members for cash relief does not indicate that the Proposed Settlement's relief is inadequate. *See New York Life,* 1995 N.Y. Misc. LEXIS 652, at *54.

260. The Court also rejects sundry objections to specific Basic Claim Relief provisions. For example, *Johnson* argues that the Optional Premium Loans ("OPL") offer nothing because policyholders can already obtain a loan against their policies at reduced rates. Johnson, Ex. 1 at 3. The interest rates offered on OPLs, however, are significantly lower than the rates policyholders would pay under their policies. Hangstrom Supp. Aff. at ¶ 4. As the Task Force noted, "[f]or policyholders who are experiencing a financial difficulty in meeting current premiums but do not feel they were misled, the Optional Premium Loans offer assistance." Task Force Report at 193.

261. And Beauvias argues that OPLs may injure policyholders by putting them deeper into debt. Beauvias at 15–16. The Court disagrees. Because OPLs are available only to maintain existing coverage, there is little risk of increasing burdensome debt, and these loans may enable policyholders to maintain their desired coverage.

262. Johnson complains that Enhanced Value Policies ("EVP") cannot be purchased with loans or rollovers from other policies. Johnson, Ex. 1, at 4. The EVP provides additional permanent death benefit coverage at no cost to the policyholder. Stipulation of Settlement, Ex. D, at 5, ¶ III. The additional insurance is paid-up, has its own cash value, and will earn dividends. The Proposed Settlement does not permit loans and rollovers so as not to encourage policyholders who already have heavily loaned policies to buy additional insurance that they cannot afford. The Court does not find that the provision is unfair.

263. Finally, Oscher had contended that Basic Claim Relief is designed to finance the cost of the ADR Program. Oscher Aff., Executive Summary, at 2–3. The products offered under Basic Claim Relief are either minimally profitable or unprofitable. Hangstrom Supp. Aff. at ¶ 3. Prudential's expert anticipates that Basic Claim Relief will be a break-even proposition for the company, at best. *Id.* Moreover, any profit on Basic Claim Relief will be more than offset by the administrative costs of the Proposed Settle-

ment, including its Basic Claim Relief component. *Id.*

### 24. The Settlement Does Not Discriminate Against Policyholders Who Cannot or Desire Not to Purchase Basic Claim Relief

264. Several objectors conclusorily argue that the Proposed Settlement discriminates against policyholders who cannot afford class relief and policyholders who cannot meet the underwriting requirements of certain types of Basic Claim Relief. The Settlement in its entirety provides adequate relief to the class as a whole. Policyholders who cannot afford some Basic Claim Relief options, who cannot avail themselves of options because they do not meet certain underwriting requirements, or who do not desire to avail themselves of these options may choose to avail themselves of other available Basic Claim Relief options. And, more importantly, the ADR process is available to those who feel that they were misled. The Proposed Settlement does not discriminate against any policyholders at the expense of others.

### 25. The Proposed Release Is Fair and Appropriate

265. Krell argues that the release is too broad, because it releases claims not pleaded in the Second Amended Complaint, but cites no authority to support the argument. Krell Brief at 36–39. And the Court disagrees with Krell's argument. First, even if there were a requirement that the release correspond to the Complaint, the requirement would be satisfied. The Complaint involves allegations relating to all wrongful conduct in the sale and treatment of life insurance policies. The release fairly corresponds to the allegations in the Complaint and to the relief provided by the Proposed Settlement. Second, two recent cases in the Third Circuit hold that releases may include all claims, including unpleaded claims that arise out of the same conduct alleged in the case. *See Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1562–64 (3d Cir.), *cert. denied*, 513 U.S. 986, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994); *Sandler Assocs., L.P. v. Bellsouth Corp.*, 818 F.Supp. 695, 704–05 (D.Del.1993), *aff'd*, 26 F.3d 123 (3d Cir.1994);

accord *Matsushita Elec. Indus. Co. v. Epstein*, —— U.S. ——, ——, 116 S.Ct. 873, 883, 134 L.Ed.2d 6 (1996). Third, class members who did not wish to be bound by the release, could have opted out of the class. *See New York Life*, 1995 N.Y. Misc. LEXIS 652, at *70–71. For these reasons, the objection is meritless.

266. Krell also incorrectly argues that releases improperly cover class members without current, cognizable claims against Prudential. Krell Brief at 39. Krell contends that because these class members have no justiciable case or controversy, their claims cannot be released. *Id.* The Court is not persuaded. Whether an individual class member has been damaged and has a cognizable claim is always uncertain, litigants often settle claims whose existence is uncertain, and the uncertainty of a claim does not bear on whether a case or controversy exists. *See In re Asbestos Litig.*, 90 F.3d 963, 987 (5th Cir.1996) (objection to class settlement on ground that it purported to release claims not presenting a case or controversy was mistaken; settlement did not purport to make a determination of "the validity or amount of individual personal injury claims" against defendant), *petition for cert. filed*, No. 96–1379 (Feb. 27, 1997). Class actions routinely include members who may or may not have suffered individualized damage. *See, e.g., Weiss v. Mercedes–Benz*, 899 F.Supp. at 1298–99 (class of all who purchased a 1992 or 1993 Mercedes); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 164 F.R.D. 362, 366 (S.D.N.Y.) (class of all purchasers of securities in question), *aff'd*, 107 F.3d 4, 1996 WL 739258 (2d Cir.1996). Additionally, all class members have received adequate consideration for the releases—each class member has the right to participate in Basic Claim Relief or the ADR Process.

267. Beauvias incorrectly argues that the release is not valid because "non-recovering" policyholders will receive no consideration for releasing their claims. Beauvias at 11. The settlement is designed to compensate all policyholders who were misled in purchasing financed insurance. That compensation undeniably constitutes consideration for the release of claims. Additionally, the consideration for the release includes the right of every class member to participate in the ADR Process or to obtain Basic Claim Relief. *See, e.g., DiMartino v. City of Hartford*, 636 F.Supp. 1241, 1249–50 (D.Conn.1986) (finding participation in testing process to constitute adequate consideration).

268. The Court rejects also Beauvias' objection to the release of claims against Prudential officers, directors, and agents. The need for finality on Prudential's part requires that *any* settlement include a release also as to individuals. A settlement with Prudential alone would lack finality because if dissatisfied policyholders sued Prudential agents, the agents would likely turn to Prudential for indemnity or contribution. *See, e.g., New York Life*, 1995 N.Y. Misc. LEXIS 652, at *71. Additionally, some former Prudential officers are named defendants here. The Court finds that the release of the individual parties is appropriate and does not render the Proposed Settlement unfair.

## 26. There Is No Basis to Appoint a Custodial Receiver or Special Fiscal Agent

269. Treadway has argued that the Court should appoint for Prudential a receiver or a fiscal agent, but has failed to demonstrate sufficient legal basis for his argument. Treadway argues that the Court should appoint an independent individual to administer the remediation program because there has been fraudulent mismanagement and a gross abuse of trust. Treadway Supp. at 2, 11–12.

270. To appoint a receiver is not a decision that courts take lightly, however. For example, the Second Circuit has held that the appointment of a receiver is an option to be exercised only sparingly. *See Donovan v. Bierwirth*, 680 F.2d 263, 276 (2d Cir.) ("the appointment of a receiver is a harsh remedy, not to be imposed without a showing of necessity"), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Treadway has cited cases in which courts have appointed receivers where management's chronic fraud necessitated the ouster of corporate management or the preservation of assets for

the benefit of investors or creditors; *see also,* *S.E.C. v. Bowler,* 427 F.2d 190, 190 (4th Cir.1970) ("A receiver is ... appropriate where necessary to protect the public interest and where it is obvious ... that those who have inflicted serious detriment in the past must be ousted."); *S.E.C. v. Keller Corp.,* 323 F.2d 397, 403 (7th Cir.1963) (appointing trustee-receiver where corporation illegally operated as an unregistered investment company); *Leone Indus. v. Associated Packaging, Inc.,* 795 F.Supp. 117, 120 (D.N.J. 1992) (observing that as a general rule "receivers are appointed only when the party seeking receivership has 'an equitable interest in the property to be seized or ... judgments that cannot otherwise be satisfied' ").

271. Courts are also reluctant to appoint fiscal agents. Fiscal agents are generally appointed to monitor corporate record keeping or to prevent the erosion of assets on behalf of shareholders. *See, e.g., S.E.C. v. Alan F. Hughes, Inc.,* 461 F.2d 974 (2d Cir. 1972) (appointing special fiscal agent to review corporate books and to report need for receiver to dissolve corporation); *Ferguson v. Birrell,* 190 F.Supp. 506, 511 (S.D.N.Y. 1961) (appointing fiscal agent to determine the propriety of corporate disbursements).

272. Here, there is no evidence of any managerial problem at Prudential that would suggest the need for a receiver or fiscal agent; to the contrary, the Task Force concluded that Prudential's current sales program, designed to prevent a repeat of past mistakes, is an industry "model." Task Force Report at 216–18. Moreover, there is abundant evidence that the Proposed Settlement is designed to provide and will provide independent and objective remediation to class members. As discussed above, the Proposed Settlement provides extensive procedural safeguards to ensure that the Proposed Settlement is implemented as intended by Class Counsel and state regulators, and as Prudential agreed. These observations in conjunction with the lack of any persuasive argument by Treadway, cause the Court to decline to appoint the requested custodial receiver or special fiscal agent.

## 27. The Proposed Settlement Does Not Violate State Law

273. Krell argues that the Proposed Settlement violates four types of state laws enacted for the purpose of regulating insurance: (1) regulations governing insurance advertising; (2) prohibitions on the mandatory arbitration of contractual insurance claims; (3) regulations governing the readability of insurance policies and forms; and (4) regulations governing the replacement of insurance policies. Krell Brief at 47–56. The Court finds that the Proposed Settlement does not violate state law, and the Court derives substantial comfort in its conclusions from the observation that insurance regulators of all fifty states have approved the Proposed Settlement as being in compliance with their laws.

274. Krell incorrectly argues that the Settlement Agreement and the Class Notice "advertise" life insurance. Krell Brief at 47–48. But, the definition of "advertisement" under the model rule that Krell cites, expressly excludes "[c]ommunications with policyholders other than material *urging* policyholders to purchase, increase, modify, reinstate or retain a policy." Krell Brief, Ex. B, National Association of Insurance Commissioners, Governing the Advertising of Life Insurance § 2A(2)(b). And the Class Notice and Proposed Settlement do not *urge* policyholders to purchase insurance policies. Rather, these communications inform the policyholders of their rights as class members and their rights under the Proposed Settlement. Because the Settlement Agreement and Class Notice are clearly not "advertisements," but litigation documents designed to inform policyholders of their rights in these proceedings, the regulations governing insurance advertising simply do not apply.

275. Krell incorrectly argues also that the Proposed Settlement violates state law prohibitions on the arbitration of insurance claims. Krell Brief at 49. Krell argues that the Proposed Settlement's ADR procedures violate several state laws that exempt insurance contracts from the general rule that contractual agreements to arbitrate disputes are valid, binding, and irrevocable.

Krell Brief at 49 and n. 23. The argument fails because the ADR procedures do not constitute "arbitration" agreements. Here, unlike under a mandatory arbitration clause, policyholders choose whether to participate in the Proposed Settlement and then choose whether to participate in the ADR process. The ADR process is completely voluntary, while a contractual arbitration clause completely forecloses other remedies. There is no legitimate comparison.

 276. Also, Krell argues incorrectly that the Proposed Settlement and the Class Notice violate state laws governing the form, content, and readability of life insurance contracts and policy forms. Krell Brief at 50–54. The Proposed Settlement and the Class Notice are not life insurance contracts or policy forms and do not violate state laws pertaining to those documents. The Proposed Settlement is what it purports to be, a settlement. The Class Notice is a notice to the class about the pendency of this class action and the terms of the Proposed Settlement. Moreover, none of the regulators of the fifty states that have approved the settlement has expressed or embraced Krell's concerns. The Court finds that state laws governing the form, content, and readability of life insurance contracts and policy forms do not apply.

## 28. The McCarran Ferguson Act Does Not Apply to the Proposed Settlement, Which Does Not Affect Policyholders' State Substantive State Law Rights

 277. Krell argues that the Proposed Settlement violates the McCarran–

Ferguson Act [86] because Rule 23(e) is an Act of Congress that here operates to "invalidate, impair or supersede" state laws "enacted for the purpose of regulating the business of insurance." Krell Brief at 56–58. This argument is absurd in this context. Even if the Federal Rules of Civil Procedure were an "Act of Congress," which they are not,[87] a consensual settlement between parties to a lawsuit could not *invalidate, impair,* or *supersede* substantive state laws. Indeed, the Proposed Settlement does not go so far as to *violate* state laws, as discussed above, let alone to *supersede* them.

## 29. The Rules Enabling Act Does Not Apply to the Proposed Settlement, Which Does Not Affect Policyholders' State Substantive State Law Rights

 278. Krell argues that the Court's approval of the Proposed Settlement would violate also the Rules Enabling Act,[88] because the Proposed Settlement would modify or abridge state law rights. Krell Brief at 56–57. Federal Rule of Civil Procedure 23(e) does not, however, "abridge, enlarge or modify" any substantive rights. The Rule requires that the district court approve any settlement between the parties to a class action. *See* Fed.R.Civ.P. 23(e). In other words, if the parties agree to compromise their rights, they must, thereafter, seek court approval. A court's approval of a voluntary settlement, by nature a compromise of rights, does not affect substantive state rights. The Court's act merely recognizes the parties' voluntary compromise of their

---

**86.** The McCarran–Ferguson Act provides in pertinent part:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically related to the business of insurance....

15 U.S.C. § 1012.

**87.** The Supreme Court transmits the Rules to Congress and they become effective if Congress takes no action.

**88.** The Rules Enabling Act provides in pertinent part:

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrates thereof) and courts of appeals.

(b) Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect....

28 U.S.C. § 2072.

rights. The requirement that the court must approve any settlement in the class action context, thus, does not abridge, enlarge, or modify any substantive rights.

### 30. This Court Properly Preliminarily Certified the Class for Settlement Purposes Only

279. This *Court's* procedures in preliminarily certifying the class for settlement purposes were completely proper. According to the *Manual on Complex Litigation*, this Court's procedures have been completely appropriate:

> Approval of class action settlements involves a two-step process. First, counsel submit the proposed terms of settlement and the court makes a preliminary fairness evaluation. In some cases this initial evaluation can be made on the basis of information already known to the court, supplemented as necessary by briefs, motions, or informal presentation by the settling parties.

§ 30.4 at 236–37. The Court has discretion to hear from counsel, the parties, and from attorneys who did not participate in the negotiations. *See id.* But, the Court is not required to do so. This Court clearly had an adequate record to make the determination of preliminary approval without holding a hearing.

280. Krell complains that on October 28, 1996 this Court signed an order conditionally certifying the class for settlement purposes without holding a formal hearing. Krell also complains that the Court that day participated in an improper *ex parte* conference. Despite Krell's unfounded contentions that a conference occurred, there was no conference on that date. Rather, counsel delivered the Stipulation of Settlement and accompanying documents, and the Court later signed its Order.[89]

---

**89.** Throughout these proceedings, Krell's counsel, Michael Malakoff, has falsely accused this Court of participating in improper conferences in an effort to undermine the Proposed Settlement. His efforts are at best unprofessional. At the

### 31. The Fairness Hearing Format Was Fair

#### a. The Opt–Out and Objection Period Was Sufficient

281. Several objectors have contended that the December 19, 1996 opt-out deadline was scheduled too soon after the policyholders received the Class Notice. The Court disagrees. Courts have routinely approved of deadlines of between thirty and sixty days. *See White v. National Football League*, 41 F.3d 402, 408 (8th Cir.1994), (finding that notice mailed "approximately one month prior to the first settlement hearing" was adequate notice), *cert. denied*, 512 U.S. 1220, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir.1993) (finding that notice mailed thirty-one days before deadline for objections and forty-five days prior to hearing was timely), *cert. denied*, 512 U.S. 1220, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994); *Marshall*, 550 F.2d at 1178 (finding that notice mailed twenty-six days before deadline for opting out of settlement was adequate); *Milstein v. Werner*, 57 F.R.D. 515, 518 (S.D.N.Y.1972) (notice mailed thirty-eight days before scheduled settlement hearing was adequate); *see also generally* 2 *Newberg* § 8.37, at 8–118 (observing that the bulk of notices incorporate intervals of between thirty and sixty days between the mailing or publishing of class notice and the deadline for the recipient to respond). In the present case, Class Notice was mailed by November 3, 1996 and objections and opt-outs were due by December 19, 1996. Thus, class members had approximately forty-five days to opt out of the class after receiving the Class Notice. This amount of time is unquestionably sufficient.

#### b. Objectors Had Sufficient Opportunity to Conduct Discovery to Prepare for the Fairness Hearing

282. Krell wrongfully argues in his Supplemental Objection and support-

---

conclusion of these proceedings, the Court will address Mr. Malakoff's aberrant conduct. *See* December 13, 1996 Tr. (explaining context of allegedly improper *ex parte* conferences).

ing documents that his inability to complete discovery prejudiced his ability to participate in the Fairness Hearing. But, objectors have no absolute right to take independent discovery to prepare for a fairness hearing. *See Bell Atl. Corp.*, 2 F.3d at 1314–15. An objector is entitled to establish a record, but the Court has discretion to employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement. Krell's contention that he was entitled to additional discovery must be rejected for several reasons.

283. First, Krell has had ample opportunity to review the discovery obtained by Plaintiffs' Counsel, *see generally* Weprin Aff. and attachs., yet Krell failed to use that discovery; Krell's counsel appears to have spent only three days reviewing discovery in the depository. Weprin Aff. at ¶¶ 7–8; *see also Bell Atl. Corp.*, 2 F.3d at 1314–15 (objector's request for discovery denied where objector participated in action before Class Notice was sent and objector had adequate access to discovery generated by plaintiffs); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463–64 n. 9 (2d Cir.1974) (denying discovery where objectors' counsel had spent just four days in the document depository).

284. Second, Krell had sufficient time to respond.[90] Over two months transpired between the initial Class Notice and the date that all supplemental objections were to be submitted and no other class member has claimed that this ample time frame was inadequate. Krell managed to supply the Court with initial objections, with supplemental objections, and filed scads of baseless motions and affidavits in the interim.[91] Krell's counsel chose to dedicate his attention to filing a series of emergent motions and to preparing counsel and paralegal affidavits, rather than to pursuing the discovery available in plaintiffs' warehouses or to retaining experts to evaluate the adequacy of the Proposed Settlement. The Court will not delay relief to the Class, because of Krell's case management peculiarities.

285. Third, Krell's objection that he lacked sufficient time to act is belied by the activities of other objectors. For instance, the Jewell & Moser firm had sufficient time to use the depository to review the records of 171 different clients, and to determine that the Proposed Settlement was fair, reasonable, and adequate. And the Florida AG (prior to withdrawing its objections) had time to commission and complete two extensive expert reports.

286. Fourth, Krell focuses on legal issues, the development of which would not be facilitated by additional discovery. *See Weinberger v. Kendrick*, 698 F.2d 61, 79 (2d Cir. 1982) (no discovery for objector who does not present "cogent factual objections to the settlement"), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Krell attacks, for example, whether a nationwide class is appropriate, whether the requirements of Rule 23 have been met, and whether the Settlement is fair and reasonable.

c. **Objectors Had No Absolute Right to Present and Cross Examine Witnesses at the Fairness Hearing, and Under the Circumstances, These Activities Were Inappropriate**

287. At a hearing on December 30, 1996, Krell's counsel stated that he wished to present the testimony of John Cressman and to cross-examine Prudential's experts at the Fairness Hearing. December 30, 1996 Tr. at 30–31. Krell argues that the Court's refusal to allow testimony and cross-examination at the Fairness Hearing made the hearing unfair. The Court disagrees. *See generally Walsh v. Great Atl. and Pac.*, 726 F.2d at 956 (denying an evidentiary hearing because the facts were largely undisputed, the fairness of the settlement depended primarily upon an evaluation of the competing legal positions of the parties, and it was

---

**90.** Krell was in a great position to develop an evidentiary record because, unlike most objectors who remain unaware of the underlying litigation and proposed settlement until receipt of the Class Notice, *see Bell Atl. Corp.* 2 F.3d at 1315, Krell has participated in these proceedings for over a year.

**91.** Krell's counsel Michael Malakoff filed at least fifteen "emergency" motions between the issuance of the Class Notice and the date of the Fairness Hearing.

difficult to imagine what value an evidentiary hearing would have had).

288. As the Court has noted, the Cressman testimony was already before the Court. December 30, 1996 Tr. at 31. And having experts testify would be redundant and wasteful of the Court's time because experts ordinarily testify in accordance with their written reports. *Id.* at 30. The Court suggested that objectors who wished to challenge the parties' experts file their own expert affidavits. *Id.* at 29. Krell had access to everything that the parties' experts reviewed in forming their conclusions, and Krell could have, but did not, retain an expert to review these materials and submit a contrary affidavit.

### d. Krell and All Objectors Were Afforded an Adequate Opportunity to Present All of Their Factual and Legal Arguments

289. At the Fairness Hearing, Krell's counsel and all objectors' counsel were afforded thirty minutes for oral argument. Moreover, in advance of the Fairness Hearing the Court granted Krell's application for the filing of an oversized brief. Whatever arguments Krell and any other objectors deemed important were placed before the Court through both their written and oral submissions.

290. The Court allotted three full days for the Fairness Hearing and provided closed-circuit live video feed at four remote locations within the courthouse complex to accommodate an overflow of interested parties. The Fairness Hearing concluded on the first day allotted and only one remote location was partially filled. Because all objectors were permitted to observe and be heard, the Court is satisfied that the Fairness Hearing was what it purported to be: fair.

### CONCLUSION

When Edmund Burke, the Irish statesman, orator, and author, said "[T]he only

thing necessary for the triumph of evil is for enough good men to do nothing," [92] he did not have The Prudential Insurance Company of America in mind. Yet, through deceptive sales practices, harm resulted. What distinguishes Burke's admonition from the facts of this case is that good people, including Prudential, have done something and, through regulatory and judicial processes, have stemmed the tide of harm.

Through this Opinion, the Court has explicitly demonstrated that the settlement is exceptionally fair, reasonable, and adequate, far exceeding the requirements of Federal Rule of Civil Procedure 23. While some, but only a few, naysayers object to this settlement in pursuit of their own parochial interests, the settlement, when viewed through the prism of reality, provides sufficient judicial comfort to merit the imprimatur of the Court.[93]

An appropriate Order is attached.

### *FINAL ORDER AND JUDGMENT*

Based upon the submissions of the parties referenced above and the full record before this Court, and upon this Court's Findings of Fact and Conclusions of Law as set forth above,

It is on this 17th day of March, 1997

ORDERED as follows:

1. This Final Order and Judgment incorporates herein and makes a part hereof (i) the Stipulation of Settlement, and the release included therein, dated October 28, 1996, as amended as of February 22, 1997 (together, the "Stipulation of Settlement"), (ii) Exhibit B (Prudential Alternative Dispute Resolution Guidelines), Exhibit C (Manual of Procedures for Resolving Claims Under Prudential Alternative Dispute Resolution Guidelines), Exhibit D (Guidelines for Prudential Basic Claim Relief), Exhibit E (Hearing Order),

---

**92.** Letter to William Smith *in Familiar Quotations* (John Bartlett ed. 1968).

**93.** I wish to acknowledge the cooperative efforts contributed to the writing and issuance of this Opinion. In particular, I recognize my law clerk, Sabrena Silver, for her perspicacity, dedi-

cated effort, and personal sacrifice. Likewise, I thank interns, Monique Hoogenboom and Todd Julian. Lastly, to my secretary of long standing, Barbara Vorob, your unparalleled patience and attention to detail breathed life into a succession of words.

Exhibit F (Cover Letter to Class Notice; Class Notice; Questions and Answers), Exhibit G (Summary Notice), Exhibit H (Claim Form), Exhibit I (Stipulation of Confidentiality) to the Stipulation of Settlement, (iii) this Court's January 24, 1997 Order denying Texas' motion to enforce its November 5, 1996 subpoena duces tecum, and (iv) this Court's February 3, 1997 Order regarding document destruction guidelines; *provided,* however, that the parties are hereby authorized to agree to and adopt such amendments and modifications to the Stipulation of Settlement and its implementing documents (including, without limitation, the Post–Settlement Notice materials and the ADR Manual) as (i) shall be consistent in all material respects with this Final Order and Judgment, (ii) do not limit the rights of class members, or (iii) permit for early implementation of the terms of the Settlement at the sole option of Prudential.

2. A class for settlement purposes in accordance with *In re General Motors Corp.,* 55 F.3d 768 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995), is hereby finally certified, consisting of: all persons who own or owned at termination an individual permanent whole life insurance policy issued by Prudential or any of its United States life insurance subsidiaries during the Class Period of January 1, 1982 through December 31, 1995 (the "Policy" or "Policies"), except as specifically described below ("Policyholders"), and have not timely excluded themselves from participating in the Settlement ("class members" or the "class"). The Policyholders do not include the following persons or entities (unless such persons or entities are policyholders by virtue of their ownership interest in other Policies): (i) policyowners who were represented by counsel at the time they executed a document in connection with a settlement of a claim, action, lawsuit or proceeding, pending or threatened, that released Prudential with respect to such Policies; (ii) policyowners that are corporations, banks, trusts or non-natural entities, that purchased policies as corporate or trust-owned life insurance under which *either* (a) there are fifty or more separate insured individuals, or (b) the aggregate premium paid over an eight-year period, end-

ing with the close of 1996 exceeds one million dollars; or (iii) policyowners who were issued policies in 1995 by Prudential Select Life Insurance Company of America. A list of those persons who have timely excluded their policies from the class has been filed with the Court under Seal, and is made a confidential part hereof.

3. The terms and provisions of the Stipulation of Settlement, including all exhibits and supplemental exhibits thereto, are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the Settling Parties and the class members whose individual claims are hereby extinguished, except as to eligibility for relief provided by the Stipulation of Settlement; and the Settling Parties and class members are hereby directed to implement and consummate the Stipulation of Settlement according to its terms and provisions.

4. The Settling Parties are hereby directed to mail Post–Settlement Notice materials in the form approved by the Court in its Order dated March 11, 1997.

5. The Settling Parties are hereby directed to mail a separate notice to those class members who excluded themselves from the class prior to December 19, 1996:(a) explaining the enhancements to the Settlement, as reflected in the February 22, 1997 amendment to the Stipulation of Settlement, and (b) giving those policyholders seventy-five days from the mailing of said notice to elect to participate in the Settlement, as amended on February 22, 1997.

6. The terms of the Stipulation of Settlement and of this Final Order and Judgment, including all exhibits and supplemental exhibits thereto, shall forever be binding on, and shall have *res judicata* and claim preclusive effect in all pending and future lawsuits maintained by or on behalf of, the plaintiffs and all other class members, as well as their heirs, executors and administrators, successors and assigns. All claims for compensatory or punitive damages on behalf of class members are hereby extinguished, except as provided for in the Stipulation of Settlement.

7. The Release set forth in Section J of the Stipulation of Settlement is expressly incorporated herein in all respects and the effective date of the Release shall be the date of this Final Order and Judgment.

8. All class members, and all persons acting on behalf of or in concert or participation with any class member, are hereby permanently enjoined from this day forward from filing, commencing, prosecuting, intervening, or participating in any lawsuit on behalf of any class member in any jurisdiction based on or relating to the facts and circumstances underlying the claims and causes of action in this lawsuit or the Released Transactions (as that term is defined in the Stipulation of Settlement). All persons receiving notice of this Order, including all class members, are hereby permanently enjoined from this day forward from bringing a class action on behalf of class members, seeking to certify a class which includes class members, or seeking damages of any sort either expressly or impliedly on behalf of class members, in any lawsuit, in any jurisdiction, based on or relating to the facts and circumstances underlying the claims and causes of action in this lawsuit or the Released Transactions (as that term is defined in the Stipulation of Settlement).

9. Nothing in this Final Order and Judgment shall preclude any action to enforce the terms of the Stipulation of Settlement, nor shall anything in this Final Order and Judgment preclude plaintiffs or class members from participating in the ADR Process described in the Stipulation of Settlement.

Because of the procedural context of the Opinion, and its focus on class certification and approval of the Proposed Settlement, none of the findings of fact are deemed to be final for purposes of issue preclusion in any other court of competent jurisdiction.

10. Without in any way affecting the finality of this Final Order and Judgment, this Court hereby retains exclusive jurisdiction as to all matters relating to administration, consummation, enforcement and interpretation of the Stipulation of Settlement and of this Final Order and Judgment, and for any other necessary purpose.

11. This class action, including all individual claims and class claims presented thereby, is hereby dismissed on the merits and with prejudice against the plaintiffs and all other class members, without costs to any party, except as otherwise provided herein.

12. All prior restraints that tolled time limits to file appeals and stayed the right to file an appeal are dissolved.

### APPENDIX A

*Plaintiffs' Class Action Counsel*

**GOLDSTEIN LITE & DePALMA**
Allyn Z. Lite, Esq.
Joseph J. DePalma, Esq.
Bruce D. Greenberg, Esq.
Two Gateway Center, 12th Floor
Newark, NJ 07102

**MILBERG WEISS BERSHAD HYNES & LERACH LLP**
Melvyn I. Weiss, Esq.
Barry A. Weprin, Esq.
Brad N. Friedman, Esq
One Pennsylvania Plaza
New York, N.Y. 10119

-and-

John J. Stoia, Jr., Esq.
Sharon T. Maier, Esq.,
600 West Broadway
1800 One America Plaza
San Diego, CA 94108

**MUCH SHELIST FREED DENENBERG AMENT BELL & RUBENSTEIN, P.C.**
Michael Hyman, Esq.
Deborah S. Bussert, Esq.
Ellyn M. Lansing, Esq.
200 North LaSalle Street, Suite 2100
Chicago, IL 60601–1095

**HOPKINS GOLDENBERG, P.C.**
Mark C. Goldenberg, Esq.
Elizabeth V. Heller, Esq.
2132 Bontoon Road
Granite City, IL 62040

**ARNZEN PARRY & WENTZ, P.S.C.**
Ron Parry, Esq.
Robert Sparks, Esq.
128 E. Second Street
Covington, KY 41012

**PERRY & WINDELS**
Paul Windels, III, Esq.
150 Broadway
New York, N.Y. 10038

**BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.**
Andrew S. Friedman, Esq.
Francis J. Balint, Jr., Esq.
4041 N. Central Avenue—Suite 1100
Phoenix, AZ 85012

**CANTILO MAISEL & HUBBARD, LLP**
Stephen L. Hubbard, Esq.
Robert W. Biederman, Esq.
1717 Main Street—Suite 3200
Dallas, TX 75201

*Defendants' Counsel*

**RIKER, DANZIG, SCHERER, HYLAND & PERRETTI**
Edward A. Zunz, Esq.
Alan Kraus, Esq.
Headquarters Plaza—One Speedwell Avenue
Morristown, NJ 07962
(Attorneys for The Prudential Insurance Company of America)

**SONNENSCHEIN NATH & ROSENTHAL**
Reid L. Ashinoff, Esq.
Michael H. Barr, Esq.
John Grossbart, Esq.
David C. Jacobson, Esq.
Lorie A. Chaiten, Esq.
Helen B. Kim, Esq.
1221 Avenue of the Americas
New York, N.Y. 10020
(Attorneys for The Prudential Insurance Company of America)

**CRUMMY DEL DEO DOLAN GRIF-FINGER & VECCHIONE, ESQS.**
John J. Gibbons, Esq.
Guy Amoresano, Esq.
One Riverfront Plaza
Newark, NJ 07102–5497
(Attorneys for Defendant Robert Winters)

**LeBOEUF, LAMB, GREENE & MacRAE, ESQS.**
Frederick B. Lacey, Esq.
One Riverfront Plaza
Newark, NJ 07102
(Attorneys for Defendant Robert Beck)

*On Behalf of the New Jersey Department of Banking and Insurance*

**DEPARTMENT OF BANKING AND IN-SURANCE**
Anita B. Kartalopoulos, Deputy Commissioner
Division of Administration and Planning
20 W. State Street, CN 325
Trenton, NJ 08625–0325

-and-

**OFFICE OF THE NEW JERSEY ATTORNEY GENERAL**
Karen Suter, Chief Deputy Attorney General
Jennifer Fradel, Deputy Attorney General
Department of Law and Public Safety
Hughes Justice Complex
25 W. Market Street
Trenton, NJ 08625

*On Behalf of the Texas Department of Insurance*

**OFFICE OF THE TEXAS ATTORNEY GENERAL**
David T. Mattax, Esq., Assistant Attorney General
Box 12548
Austin, TX 78711–2548

*On Behalf of the Massachusetts Department of Insurance*

**OFFICE OF THE MASSACHUSETTS ATTORNEY GENERAL**
Charles Harak, Esq., Assistant Attorney General
Cynthia Martin, Esq., Assistant Attorney General
Peter Leight, Esq., Assistant Attorney General
200 Portland Street—4th Floor
Boston, MA 02114

*On Behalf of the State of California*

**OFFICE OF THE CALIFORNIA ATTORNEY GENERAL**
Paul D. Gifford, Esq.
Deputy Attorney General
50 Freemont St., Suite 300
San Francisco, CA 94105–2239

*On Behalf of the State of Florida and Florida Department of Insurance:*

**OFFICE OF THE FLORIDA ATTORNEY GENERAL**
Keith P. Vanden Dooren, Esq., Assistant Attorney General
Gary Betz, Esq., Assistant Attorney General
PL–01, The Capitol
Tallahassee, FL 32399–1050

**OFFICE OF THE FLORIDA DEPARTMENT OF INSURANCE**
Douglas Shropshire, Esq.
Division of Legal Services
612 Larson Building
Tallahasee, FL 32399–0333

*Attorneys for Objectors*

**FLEMING, HOVENKAMP & GRAYSON, ESQS.**
Debra B. Hayes, Esq.
Andres C. Pereira, Esq.
1330 Post Oak Boulevard, Suite 3030
Houston, TX 77056
(For Objector Beauvias)

**McCUSKER, ANSELMI, ROSEN & CANELLI, ESQS.**
Bruce Rosen, Esq.
127 Main Street
Chatham, NJ 07928

 -and-

**KRISLOV & ASSOCIATES, LTD.**
Clint Krislov, Esq.
William Bogot, Esq.
(For Objectors Treadway, Parnell & Ginsberg)

**MALAKOFF, DOYLE & FINBERG, ESQS.**
Michael P. Malakoff, Esq.
James Pietz, Esq.
The Frick Building—Suite 200
Pittsburg, PA 15219
(For Objector Krell)

**RICHARD N. ROSENTHAL, ESQ.**
**LYNDE SELDEN, ESQ.**
25 E. Carmel Valley Road, Box 1021
Carmel Valley, CA 93924
(For Objector Johnson)

**UNITED AUTO WORKERS LEGAL SERVICES**
Eric Aglow, Esq.
10 Woodbridge Center Drive, 7th Floor
Woodbridge, NJ 07095
(For Objector United Auto Workers)

**CAREY & DANIS, ESQS.**
T. Evan Schaeffer, Esq.
8182 Maryland Avenue, Suite 1400
St. Louis, MO 63105
(For Objectors Helton, Rodney Grady and Janet Grady)

*APPENDIX B*

The plaintiffs have submitted documents including the following:

· Memorandum of Law in Support of Final Approval of the Proposed Class Action Settlement ("Pls. Settl. Memo.");

· Memorandum of Law in Support of Plaintiffs' Motion for Class Certification for Settlement Purposes ("Pls. Certif. Memo.");

· Reply Memorandum in Support of Final Approval of the Proposed Class Action Settlement ("Pls. Settl. Reply");

· Reply Memorandum in Support of Class Certification ("Pls. Certif. Reply");

· Plaintiffs' Evidentiary Submission ("Pls. Evid. Sub.");

· Joint Petition of Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses and Plaintiffs' Memorandum of Law in Support of That Joint Petition;

· The Declaration of Professor H. Russell Bernard ("Bernard Decl.");

· The Affidavit of Robert W. Biederman ("Biederman Aff.");

· The Declaration of Professor Joel Cohen ("Cohen Decl.");

· The Supplemental Affidavit of Joel Cohen ("Cohen Supp. Aff.");

· The Declaration of Andrew S. Friedman ("Friedman Decl.");

· The Affidavit of Robert L. Hoyer ("Hoyer Aff.");

· The Reply Affidavit of Robert L. Hoyer ("Hoyer Supp. Aff.");

· The Declaration of Professor Samuel Issacharoff ("Issacharoff Decl.");

· The Declaration of Professor Arthur R. Miller ("Miller Decl.");

· The Affidavit of Dean John E. Sexton ("Sexton Aff.");

· The Declaration of John B. Torkelson ("Torkelson Decl.");

· The Affirmation of Georgene M. Vairo ("Vairo Affirm.");

· The Affidavit of Melvyn I. Weiss ("Weiss Aff.");

· The Appendix of Exhibits to the Weiss Aff. ("Weiss Aff. App.");

· The Supplemental Affidavit of Melvyn I. Weiss ("Weiss Supp. Aff."); and

· The Affidavit of Barry M. Weprin ("Weprin Aff.").

Prudential submitted documents including the following:

· A Memorandum in Support of Class Action Settlement ("Pru. Mem.");

· A Reply Memorandum in Response to Objections to the Class Action Settlement ("Pru. Reply");

· An Appendix to Prudential's Memoranda In Support of the Class Action Settlment and in Response to Objections ("Pru. App.");

· The Affidavit of Reid L. Ashinoff, *in* Pru. App., Ex. 1 ("Ashinoff Aff.");

· The Supplemental Affidavit of Reid L. Ashinoff, *in* Pru.App., Ex. 54 ("Ashinoff Supp. Aff.");

· Affidavit of Deborah Barcafer, *in* Pru. App., Ex. 49 ("Barcafer Aff.");

· Affidavit of Deborah Bello–Monaco, *in* Pru.App., Ex. 50 ("Bello–Monaco Aff.");

· The Affidavit of Thomas Burke, *in* Pru. App., Ex. 10 ("Burke Aff.");

· The Declaration of Fred Fiandaca, *in* Pru. App., Ex. 46 ("Fiandaca Decl.");

· The Affidavit of Patricia L. Guinn, *in* Pru. App., Ex. 26 ("Guinn Aff.");

· Dale S. Hagstrom, "Analysis of Possible Profit and Loss to Prudential Arising From Benifits Made Available By the Proposed Settlement in MDL Docket No. 1061 (Milliman & Robertson, February 1997), *in* Pru. App., Ex 44 ("Hangstrom Analysis");

· The Affidavit of George J. Hebel, Jr., *in* Pru. App., Ex. 27 ("Hebel Aff.");

· The Affidavit of George J. Hebel, Jr., *in* Pru. App., Ex. 41 ("Hebel Supp. Aff.");

· The Affidavit of William J. Hegarty, *in* Pru. App., Ex. 9 ("Hegarty Aff.");

· The Supplemental Declaration of William J. Hegarty, Jr., *in* Pru. App., Ex. 53 ("Hegarty Supp. Decl.");

· The Affidavit of Barbara Lautzenheiser *in* Pru. App., Ex. 30 ("Lautzenheiser Aff.");

· The Affidavit of Daniel J. McCarthy, *in* Pru. App., Ex. 28 ("McCarthy Aff.");

· The Affidavit of Richard E. Meade, *in* Pru. App., Ex. 4 ("Meade Aff.");

· The Affidavit of Esther Milnes, *in* Pru. App., Ex. 8 ("Milnes Aff.");

· Letters from selected Prudential Policyholders who opted out of the Class, *in* Pru. App., Ex. 70.

· Millman and Robertson, "Replacement Fact Sheet" *in* Pru. App., Ex. 45 ("M&R Fact Sheet");

· Multi–State Life Insurance Task Force and Multi–State Market Conduct Examination of The Prudential Insurance Company of America, *in* Pru. App., Ex. 5 ("Task Force Report").

· Excerpts from the Deposition of James Tignanelli, *in* Pru. App., Ex. 19 ("Tignanelli Dep.");

The state participants submitted, and later withdrew, documents including the following:

· Objection of the California Insurance Commissioner to Proposed Settlement ("Cal.");

· Statement of Objections of Lester A. Garringer, Jr., and Other Similarly Situated Florida Class Members to the Notice of Class Action, Proposed Settlement ("Fla. AG");

· Supplement to Statement of Objections of Lester A. Garringer, Jr., and Other Similarly Situated Florida Class Members to the Notice of Class Action, Proposed Settlement ("Fla. AG Supp.");

· Survey Concerning Prudential Insurance Company's Class Action Settlement Notice to Florida Policy Holders, *in* Fla. AG, Ex. C, Attach. B. ("Kerr & Downs Survey");

· Affidavit of Lester A. Garringer, Jr. ("Garringer Aff.")

· The Florida Department of Insurance Amicus Curiae Brief Regarding Proposed Class Action Settlement ("Fla. DOI");

· Florida Department of Insurance Supplement to Amicus Curiae Brief ("Fla. DOI Supp.");

· Florida Department of Insurance Appendix to Amicus Curiae Brief ("Fla. DOI App.");

· Affidavit of Stephen S. Oscher, *in* DOI App., Ex. D ("Oscher Aff.")

· Objections of the Massachusetts Attorney General and Commissioner of Insurance to the Proposed Class Action Settlement ("Mass.");

· Supplemental Objections of the Massachusetts Attorney General and Commissioner of Insurance ("Mass. Supp."); and

· Objection of the Texas Department of Insurance to Proposed Settlement and Motion for Order Enforcing Subpoena Duces Tecum ("Tex.").

The objectors submitted documents including the following:

· A Motion and Memorandum of Law Filed by Objector Brent A. Beauvias In Opposition to the Proposed Settlement ("Beauvias");

· Objector Richard Johnson's Memorandum of Points and Authorities in Support of Opposition to the Settlement Agreement ("Johnson");

· A Supplement to Objector Richard Johnson's Objections and Points and Authorities In Opposition to the Settlement Agreement ("Johnson Supp.");

· Objections to Fairness, Reasonableness and Adequacy of Proposed Settlement and Award of Attorneys' Fees and Expenses by Richard Krell and Over 20 Other Individual Policyholders ("Krell");

· Brief in Support of Objections to the Proposed Settlement by Policyholders Represented by Malakoff Doyle & Finberg, P.C. ("Krell Brief");

· Supplemental Objections to Fairness, Reasonableness and Adequacy of Proposed Settlement and Award of Attorneys' Fees and Expenses by Richard Krell *et al.* ("Krell Supp. Obj.");

· Affidavit of S. Catherine Colder by Krell ("Colder Aff.");

· Affidavit of James M. Pietz in Support of Krell Objectors Regarding Attempts to Obtain Discovery Through Lead Counsel and Identifying Internal Documents Relating to Prudential's Ability to Identify Policyowners Subject to Replacement ("Pietz Aff.")

· Objections to Proposed Settlement and Notice of Intention to Appear and Appearance by Counsel and Request for Leave to Intervene of Sherry Lynn Treadway, Nancy Parnell, and Edward Ginsberg ("Treadway");

· Objectors Treadway's, Parnell's and Ginsberg's Supplementary Memorandum In Support of Objection to Proposed Settlement ("Treadway Supp.").

· Objection to Deadline for Exclusion in Class Action Settlement Notice by UAW–GM ("UAW–GM");

· Supplemental Objection of Class Members Represented by UAW–GM Legal Services Plan and Request for Discovery by Class Members of Their Files ("UAW–GM Supp.")

The Court also has considered the proposed findings of fact and conclusions of law submitted by plaintiffs, Prudential, intervenor Richard Johnson, objector Beauvias, the Krell objectors, and objectors Treadway, Parnell, and Ginsberg.

# APPENDIX C

## GEORGINE VS. PRUDENTIAL

| GEORGINE | PRUDENTIAL |
| --- | --- |
| "Futures" claimants lacking present injuries or knowledge of exposure | No "futures" claimants. All class members sustained actual, present injuries |
| Mass toxic tort | Commercial dispute |
| Personal injury damages | Economic damages |
| Only one common issue identified | Multitude of common issues susceptible to class-wide proof |
| Lack of any case-dispositive common issues or defenses | Central primary common issues and potentially case-dispositive common defenses. |
| Class members not ascertainable or subject to notice | Class members ascertainable from Prudential's records and subject to notice |
| Limited settlement fund with damage caps | Unlimited relief available under ADR |
| Conflicts among "future" exposure only claimants, "exposure" only claimants and "medical" claimants due to differences between nature of claims and relief available | No conflict among class members |
| No common federal claim | Common federal claim |
| Insuperable variations among states' laws. No effort or ability to categorize | Potentially applicable laws grouped into manageable patterns per *School Asbestos* |
| Nine defendants raising separate defenses | One defendant raising uniform defenses |
| Impossible obstacles to trial. No effort or ability to demonstrate manageability | Trial manageable through jury instructions, special verdicts, interrogatories, sub-classes and other case management techniques. |
| Adequacy of representation compromised by specter of collusion. Case filed simultaneously with pre-packaged settlement. | No hint of collusion or inadequate representation. Case hotly contested from outset, protracted negotiations long after inception of litigation against backdrop of Task Force investigation |
| Adequacy of representation compromised by conflicts of interest. Parallel settlements of individual actions in which class counsel represented individual plaintiffs. | No representation of individual plaintiffs by class counsel and no parallel settlement of individual cases. |
| Ineffective notice and opt-out right for futures | Full notice and effective opt-out right |
| Individual claims involve radically different factual and legal issues | All class members' claims arise from alleged common course of conduct and involve similar legal and factual issues |
| Individual plaintiffs harmed in different ways with different results | All class members harmed in similar ways with similar results |
| Large individual claims-death or serious injury | Modest individual claims-small economic losses |
| No typicality due to conflicts and complex differences among class members | Class representatives' claims typical. No conflict with other class members. |
| Personal injury damages subjective and not quantifiable | Economic damages objective and quantifiable |

No structural protections to protect unique individual interests

ADR provides structural protections, allocation standards and cost-free individual representation